**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF TEXAS**

| | |
|---|---|
| **UNITEDHEALTHCARE SERVICES, INC., UNITEDHEALTHCARE INSURANCE COMPANY,** | **Case No. 3:17-cv-243** **JURY DEMAND** |

**Plaintiffs,**

**VS.**

**NEXT HEALTH LLC, UNITED TOXICOLOGY LLC, MEDICUS LABORATORIES LLC, US TOXICOLOGY LLC, AMERICAN LABORATORIES GROUP LLC, ERIK BUGEN, AND KIRK ZAJAC,**

**Defendants.**

## COMPLAINT

Plaintiffs United Healthcare Services, Inc. and UnitedHealthcare Insurance Company (collectively, "United") bring this action against Defendants Next Health LLC ("Next Health"), Medicus Laboratories LLC ("Medicus"), US Toxicology LLC ("US Toxicology"), American Laboratories Group LLC ("ALG"), United Toxicology LLC ("UTox"), Erik Bugen, and Kirk Zajac.

## I. INTRODUCTION

1.      First registered with the Texas Secretary of State in 2014, Dallas-based Next Health owns and operates several subsidiaries – including Medicus, US Toxicology, ALG and UTox – that perform drug and genetic laboratory testing services.  Next Health describes itself to the public (via its website www.nexthealthusa.com) as "one of the nation's leading ancillary service companies."

2.      Next Health's rapid growth has been primarily, if not exclusively, driven by its unlawful conduct and inappropriate business practices. Specifically, Next Health and its subsidiary labs paid bribes and kickbacks to referral sources (physicians, sober homes, sales consultants, etc.) in exchange for test orders; they inappropriately utilized standing test protocols regardless of patients' medical histories, clinical conditions, or needs; they performed and billed for testing services that were not ordered by physicians; they improperly billed for services that they did not perform; and they routinely ignored patients' payment responsibilities to avoid drawing attention to the scheme.

3.      If Next Health's scheme sounds familiar, it is because the Department of Justice ("DOJ") recently indicted several executives, surgeons, physicians and others in connection with a similar illegal kickback conspiracy at Forrest Park Medical Center, including Semyon Narosov and Andrew Jonathan Hillman.  Narosov and Hillman held (and may still hold) ownership and/or management positions with Next Health and/or one or more of its subsidiaries.  Through those ownership and management positions, Narosov and Hillman made sure that Next Health and its subsidiaries employed an illegal scheme that was similar to the one in place at Forrest Park.

4.      For years, Next Health and its subsidiaries succeeded in illegally billing commercial insurers for improper and unnecessary laboratory services.  Between 2011 and mid-

2016, Next Health and its subsidiaries submitted thousands of claims to United, charging more than $400 million for out-of-network drug and pharmaco-genetic laboratory testing services. United paid Next Health and its subsidiaries more than $100 million for these claims. Unbeknownst to United, all of the claims arose from the illegal and improper practices set forth herein.

5.      It was not until mid-2016 that United uncovered the true nature of Next Health's illegal operation.  Specifically, after a routine claims review identified abnormal testing activity, United's Special Investigations Unit ("SIU") launched an investigation into Next Health and its subsidiary labs. The investigation revealed, among other things, that Next Health funneled kickbacks and/or bribes to providers in multiple geographic areas for drug and pharmaco-genetic test orders. One of these illicit arrangements involved Next Health's sales consultants paying people $50 to urinate in a cup in a Whataburger bathroom so that the urine could be portioned out and sent to Next Health for multiple unnecessary and expensive drug tests that were later billed to United and its customers. This one kickback scheme resulted in United paying Next Health subsidiaries more than $11.1 million in less than one year. After United began denying claims submitted by Next Health subsidiaries that were linked to this fraudulent conduct, Next Health shifted and feverishly submitted claims, which were based on the same malfeasance, under the guise of a different subsidiary. For example, over the course of less than 40 days, Next Health submitted approximately $1 million in claims to United for drug testing requested by a chiropractor, who is legally unable to prescribe medications.

6.      Unfortunately, hard-working Texans bore the brunt of Next Health's illegal business model. For example, Next Health targeted self-funded insurance plans offered by United customers Goodwill of Texas, the Texas Employee Retirement System, and various other

Texas governmental entities. The above-referenced "Whataburger scheme" alone caused these entities to pay millions of dollars for unlawful commercial insurance claims. Put another way, Next Health used kickbacks, unnecessary testing protocols and unlawful business practices to bilk Texas charities, retirees, and tax payers out of millions of dollars. As noted by U.S. Attorney John Parker in connection with the Forrest Park indictment (Narosov and Hillman's other illegal kickback operation), "massive, multi-faceted schemes such as this one, build on illegal financial relationships, drive up the cost of healthcare for everyone and must be stopped."

7. United brings this action to stop Next Health's scheme. United seeks to recover damages in the amount of the payments it made to Next Health in reliance on the fraudulent claims submitted to it by Next Health's subsidiaries, the money it has expended in investigating and pursuing Next Health's scheme, damages to remedy the harm United suffered because of Next Health subsidiary United Toxicology's false association with United, and punitive damages to deter this conduct in the future. United further seeks injunctive and declaratory relief to preclude the submission of any similarly fraudulent claims, and to declare that United is not obligated to pay Next Health or any of its subsidiaries millions of dollars in charges stemming from claims submitted to United, which United has refused to pay because of its discovery of this scheme.

## II. JURISDICTION AND VENUE

8. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 because it arises under the Constitution, laws, or treaties of the United States. Specifically, United asserts claims in this case that arise under the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001 *et seq*. United has standing to bring ERISA actions because it serves as an ERISA fiduciary to many of its ERISA plans. United also asserts a claim

for damages under the Lanham Act, 15 U.S.C. § 1125(a). This Court has jurisdiction over United's remaining claims pursuant to 28 U.S.C. § 1367 because the state and common law claims alleged herein are so related to the federal claims that they form part of the same case or controversy.

9.    Notwithstanding the preceding paragraph, this Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332, because there is complete diversity between Plaintiffs and Defendants and the amount in controversy, more than $100 million, exceeds $75,000.

10.    This Court has personal jurisdiction over Defendants in this action, and personal jurisdiction is proper before this Court as Defendants are all residents of Texas and/or maintain their principle places of business in Texas.

11.    Venue is appropriate in the Northern District of Texas pursuant to 29 U.S.C. § 1132(e)(2) and 28 U.S.C. § 1391(b)(1) because Defendants Next Health, Medicus, US Toxicology, ALG and UTox reside in this judicial district and pursuant to 28 U.S.C. § 1391(b)(2) because events giving rise to the claims occurred here.

### III. PARTIES

**A.    Plaintiffs**

12.    Plaintiff UnitedHealthcare Services, Inc. is a corporation organized under the laws of the State of Minnesota, with its principal place of business in the State of Minnesota. UnitedHealthcare Services, Inc. administers health and welfare benefit plans.

13.    Plaintiff UnitedHealthcare Insurance Company, Inc. is a corporation organized under the laws of the State of Connecticut, with its principal place of business in the State of

Connecticut. UnitedHealthcare Insurance Company, Inc. fully-insures and administers health and welfare benefit plans.

**B.      Defendants**

14.     Defendant Next Health is a limited liability corporation organized under the laws of Texas, with its principal place of business in Texas. Its address is 5710 LBJ Freeway, Suite 300, Dallas, TX 75240. Next Health's registered agent is The Oberheiden Law Group, PLLC, located at 5710 LBJ Freeway, Suite 120, Dallas, TX 75240. Next Health is the parent company to myriad subsidiaries, including Defendants Medicus, US Toxicology, ALG, and UTox. Next Health utilizes these subsidiaries, and others, as mere business conduits and does not observe corporate formalities between and among them. In short, Next Health operates its subsidiaries in whatever manner is most effective to perpetrate its fraudulent schemes.

15.     Defendant Medicus is a limited liability company organized under the laws of Texas, with its principal place of business in Texas.  Medicus is a Next Health subsidiary—located at the exact same address as Next Health, 5710 LBJ Freeway, Suite 300, Dallas, TX 75240. Medicus also shares a registered agent with Next Health—The Oberheiden Law Group, PLLC, located at 5710 LBJ Freeway, Suite 120, Dallas, TX 75240.

16.     Defendant US Toxicology is a limited liability company organized under the laws of Texas, with its principal place of business in Texas.  US Toxicology is a Next Health subsidiary—located at the exact same address as Next Health and Medicus, 5710 LBJ Freeway, Suite 300, Dallas, TX 75240. It also shares a registered agent with Next Health and Medicus— The Oberheiden Law Group, PLLC, located at 5710 LBJ Freeway, Suite 120, Dallas, TX 75240.

17.     Defendant ALG is a limited liability company organized under the laws of Texas, with its principal place of business in Texas.  ALG is a Next Health subsidiary—located at the

exact same address as Next Health, Medicus and US Toxicology, 5710 LBJ Freeway, Suite 300, Dallas, TX 75240. Its registered agent is Business Partners in Health Care LLC, 13601 Preston Road, Suite 300E, Dallas, TX 75240. (Michael Austin, Stephen Ward, and Semyon Narosov are the managers of Business Partners in Health Care LLC and list their address as 5710 LBJ Freeway, Suite 300, Dallas, TX 75240.)

18.     Defendant UTox is a limited liability company organized under the laws of Texas, with its principal place of business in Texas. Defendant United Toxicology LLC is a Next Health subsidiary, located at 5710 LBJ Freeway, Suite 325, Dallas, TX 75240. UTox shares a registered agent with Next Health, Medicus and US Toxicology—The Oberheiden Law Group, PLLC, located at 5710 LBJ Freeway, Suite 120, Dallas, TX 75240.

19.     Defendant Erik Bugen is an individual and resident of Texas.

20.     Defendant Kirk Zajac is an individual and resident of Texas.

## IV. FACTS

**A.     COMMERCIAL INSURANCE**

### 1. Health Benefit Plans

21.     United provides health care insurance, administration, and/or benefits to insureds or plan participants pursuant to a variety of health care benefit plans and policies of insurance, including group and individual health benefit plans, employer-sponsored benefit plans, and government-sponsored benefit plans.

22.     United provides administrative services for health benefit plans, including (subject to the terms of plan documents and, for Self-Funded Plans, associated Administrative Services Agreements ("ASAs")) the processing of claims for reimbursement of medical services

provided to the individuals covered by the health benefit plans. Individuals who are part of United's health benefit plans are known as "members."

23.     Many of United's health benefit plans are sponsored by employers who want to provide health benefit plans to their employees and their employees' dependents.

24.     The health benefit plans sponsored by most private employers are governed by ERISA, 29 U.S.C. § 1001 *et seq*. The health benefit plans sponsored by governmental employers and other employers and organizations that fall within an ERISA safe harbor, are exempted from ERISA.

25.     With respect to the ERISA plans harmed by Defendants' conduct, United is the claims-review fiduciary of those plans, and has standing to bring an action for declaratory judgment and injunctive relief regarding claims submitted to United by Defendants in the past or in the future.

26.     Regardless of whether a plan is governed by ERISA, it is generally either a (i) Self-Funded Plan or (ii) Fully-Insured Plan.

27.     For Self-Funded Plans, United provides administrative services, pursuant to ASAs between United and the Self-Funded Plans' sponsors (usually an employer), which identify the rights and obligations of each party. Under these ASAs, United has the authority, responsibility, and discretion to determine eligibility for coverage, make factual determinations, make coverage determinations, process and remit payment on claims submitted by healthcare providers, adjudicate plan members' appeals relating to adverse benefits decisions under many plans, and to pursue overpayments, fraud, waste, and abuse, on behalf of the plan.

28.     For Self-Funded Plans, United adjudicates claims and then makes benefit payments from its own omnibus account.

29. The ASAs typically give United the exclusive authority to recover overpayments made on behalf of United's self-funded clients. The ASAs state that the client delegates to United the authority to recover overpayments (including those related to fraud and abuse), as well as the authority to initiate litigation to recover overpayments. The ASAs typically require United to return to the customers/plans overpayments that it recovers, subject to United's right to retain a portion of the overpayment, as compensation for its services as further set forth in the ASAs. The self-funded clients agree that they will not engage any other entity to provide these recovery services, unless United consents.

30. For United's Fully-Insured Plans, United provides the insurance policies that fund the plans. It also provides administrative services, similar to those it provides to Self-Funded Plans. United adjudicates claims for Fully-Insured Plans and then makes benefit payments from its own assets.

31. United is obligated to approve claims for health benefits that satisfy the terms of its Fully-Insured and Self-Funded Plans. It can, in some circumstances, be held accountable to its self-funded customers if it causes payments to be made for claims that do not satisfy the terms of the relevant plan.

32. All of United's Fully-Insured and Self-Funded Plans only provide benefits for services that are medically necessary.

### 2. Network and Out-of-Network Providers

33. Commercial health insurance plans, including United's plans, generally utilize a two-tier provider system, which allows members the flexibility to choose to obtain healthcare services from either network providers or out-of-network ("OON") providers.

34.     Network providers are those with whom United has entered into an agreement under which United has agreed to reimburse the providers at specified rates for services provided to United's members. In turn, network providers agree to provide services to United's members, accept reimbursement at the specified rates as payment in full, and not "balance bill" United's members for any other amounts.  Accordingly, members ordinarily have no financial obligation to the network providers for covered services beyond a copayment, co-insurance and/or deductible.

35.     Conversely, OON providers have not entered into a network agreement with United. United has not agreed to pay OON providers any predetermined amounts for services provided to United's members. OON providers bill United's members at rates set by the OON providers, which are generally higher than the rates agreed to between United and network providers for the same services.  In fact, OON providers set their own fees subject only to governing laws and regulations, which mandate, among other things, that the fees be reasonable.

36.     The health benefit plans insured or administered by United typically limit benefits for OON services and require members to contribute to the costs of care by OON providers beyond the copayment and/or deductibles typically required in connection with in-network care. The plans typically reimburse eligible charges for OON services at the lesser of the OON provider's actual charge for services or an amount determined by United pursuant to the terms and conditions of the underlying health benefit plan. These plans sometimes calculate benefits based on the OON provider's billed charges, which must, as mentioned above, be reasonable under state law. United's members are responsible for payment of patient responsibility, including deductibles and co-insurance under their applicable health benefit plans. In addition, they are also responsible for payment of OON charges not covered by the health benefit plans.

This amount – i.e., the amount by which an OON provider's charges exceed the amounts payable under the member's health benefit plan – is referred to as the "balance bill."  Pursuant to Texas law, OON providers such as Next Health, Medicus, US Toxicology, ALG and UTox must refrain from balance-billing members for improper, fraudulent, or unreasonable fees, and comply with mandated notice and disclosure requirements.

37.     Generally, a member pays less out-of-pocket costs if he or she utilizes network providers, rather than OON providers. This allows United's members to obtain medical services from network providers with less financial risk or out-of-pocket expense.  Thus, members utilize OON providers judiciously.

38.     Members' payment responsibilities serve as an important check on fraud, waste, and abuse. Since it is members, not United, who ultimately control the services they receive, members' payment responsibilities sensitize them to unnecessary or overpriced services, resulting in more affordable healthcare for all members (and healthcare consumers, generally).

39.     Since United does not have relationships with OON providers, it relies heavily on its members' sensitivity to the greater out-of-pocket costs to ensure that members seek OON providers' services *only* when they are medically necessary and reasonably priced.

40.     Many plans provide that, when a United member receives services from an OON provider, the OON provider bills the member for the services performed and the member pays the full amount billed. The member then submits a claim to United for reimbursement of some part of what the member paid. United processes the member's claim and remits a reimbursement to the member, pursuant to the terms of the member's plan.

41.     Providers – whether network or OON – generally employ individuals, or even entire companies, who focus on submitting claims and dealing with insurance issues. Although

many plans prohibit an assignment of benefits to medical providers, most plans authorize United to make payment of the member's benefits directly to their OON providers.

### 3. Claim Submission

42.     OON providers, including Medicus, US Toxicology, ALG, and UTox in this case, submit paper or electronic claims to United on the member's behalf.

43.     The standard paper claim form, referred to as a CMS 1500, and the standard electronic claim form, referred to as an 837p, identify certain material information that must be submitted to United before United will make payment.

44.     Among other things, each claim must include the following specific material information: the member's personal information; the member's insurance information, including the subscriber (who may be different than the member), the policy or group number; whether the member has additional insurance policies; whether the member's condition is related to a work injury or an accident; the billing provider's information, including its name, address, tax identification number ("TIN"), and National Provider Identification number ("NPI"); the service provider's information, including its name, address, TIN, and NPI; whether the patient has authorized the release of his or her information; whether the patient has authorized United to make payment of his or her benefits to the billing provider; the name and information of the medical provider (if any) who referred the member to receive the services in the claim, including the referring medical provider's NPI number; the diagnoses that support the medical necessity of the services rendered; the procedure code(s) of the service(s) rendered; and the amount charged to the member for each service. This information and, where additional information required under Texas law, must be complete, legible and accurate.

45.     When a provider submits a claim to United, it represents and certifies that the contents of the claim are true, correct, and complete, and that the services billed for by the provider were determined to be medically necessary. This certification is material to United and United relies on it when making payment of benefits.

46.     United receives nearly two million health care claims per day and it reasonably and in good faith relies on the information provided to it in the claim forms to determine whether payment is owed and, if so, the amount of the payment to make.

## B.     ANCILLARY TESTING SERVICES

47.     Modern medicine utilizes various kinds of laboratory testing that is ancillary to a patient's encounter with a medical provider.

48.     Under the Clinical Laboratory Improvement Amendments ("CLIA"), the Centers for Medicare & Medicaid Services ("CMS") regulate all laboratory testing performed on human specimens when the results are to be used in relation to diagnostic and treatment decisions.

49.     In order for a provider (whether a laboratory or a physician) to perform testing on human specimens, it must be licensed under CLIA. Some states have licensing structures that are stricter than CLIA, while others, like Texas, rely solely on CLIA's licensing structure.

50.     A provider must satisfy different criteria under CLIA, depending on the type and complexity of the testing it wishes to perform. For example, physicians can get "waivers" under CLIA to perform simple testing in their offices because the testing is so simple that there is little risk of error. Any kind of complex testing, however, must be performed by a CLIA-certified provider (generally, a laboratory).

51.     The ancillary testing services relevant to this lawsuit are drug (i.e., toxicology) testing and pharmaco-genetic ("PG") testing that require CLIA certification.

### *1.  Drug Testing*

52.     Drug testing is generally used to detect recent drug use by a patient. Testing can be performed on a variety of human specimens, but is predominantly performed on a patient's urine or saliva.

53.     There are different kinds of drug tests, which range in complexity from screening tests – sometimes referred to as point of care ("POC") tests – which are performed in a physician's office under a CLIA waiver and provide nearly immediate results, to quantitative confirmation tests, which are performed in a CLIA-licensed laboratory and provide forensic-level accuracy and very detailed results.

54.     POC testing is performed by collecting a patient's urine in a cup that has several strips embedded in it. POC testing provides "qualitative" results; the embedded strips change color to reflect whether a particular class of drugs is present in the patient's urine. POC tests generally cost less than $10.

55.     POC testing cups usually test for certain classes of commonly abused drugs (e.g., marijuana, cocaine, heroin, opiates, benzodiazepines). When testing for several drugs or drug classes is conducted at the same time, it is referred to as a "panel" or "profile."

56.     Sometimes physicians request qualitative drug testing to be performed in CLIA-licensed laboratories with machines that analyze the chemistry of a specimen and certain drugs or drug classes contained therein. This type of testing, commonly referred to as machine-analyzed qualitative testing, does not produce immediate results, but can provide more reliable results than POC testing. This type of testing can be performed on either saliva or urine specimens.

57.     Machine-analyzed qualitative testing is much more expensive than POC testing.

Below are a few examples of machine-analyzed qualitative testing procedure codes and the average amount *charged*[1] by laboratories throughout United's network and the average OON laboratory charge:[2]

| Procedure Code | Procedure Description | Avg. Network Lab Charge | Avg. OON Lab Charge |
|---|---|---|---|
| G0431 | Drug Screen Qualitative; Single Class Meth EA | $202.00 | $890.00 |
| G0479 | Drug Test Presumptive; Instrumented Chemistry Analyzer | $252.00 | $1,124.00 |

58.     After a qualitative test is completed, a medical provider reviews the results in conjunction with other circumstances (such as the patient's history of drug use and current clinical indications), and exercises his or her independent medical judgment to determine whether sufficient information is present to make a treatment decision for the patient, or whether confirmatory testing is necessary.

59.     Confirmatory testing is performed by CLIA-certified laboratories using specialized machines that analyze bodily fluids using various methods (e.g., gas or liquid chromatography, mass spectrometry (GC-MS, LC-MS, or LC-MS/MS)). This type of testing provides very detailed results, identifying specific drugs from within a larger class of drugs, as well as the quantitative concentrations of the drugs or their metabolites (i.e., rather than telling a medical provider that a test is positive for opioids, generally, an LC/MS test can identify the particular type of opioid and its concentration in the patient's specimen (e.g., hydrocodone = 88.9 ng/mL)).

60.     Quantitative confirmatory testing is even more expensive than machine-analyzed

---

[1] The illustrative charts reflect *charged* amounts only and do not include details about the amounts paid by United to network or OON providers pursuant to member benefit plans.
[2] The average OON lab charges listed in the following tables are significantly inflated because they include Next Health's exorbitant and excessive charges.

qualitative testing. Below are a few examples of quantitative confirmatory testing procedure codes and the average amount charged by laboratories throughout United's network and the average OON laboratory charge:

| Procedure Code | Procedure Description | Avg. Network Lab Charge | Avg. OON Lab Charge |
|---|---|---|---|
| 83789 | Mass Spectrometry Quantitative Test | $100.00 | $248.00 |
| G0480 | Drug Test Definitive DR ID Meth Per Day 1-7 Drug Classes | $244.00 | $1,104.00 |
| G0483 | Drug Test Definitive DR ID Meth Per Day 22/More Drug Classes | $801.00 | $3,796 |
| G6058 | Drug Confirmation Each Procedure | $144.00 | $687.00 |

61.     Whether quantitative confirmation tests are medically necessary may vary significantly depending on the type of screen performed and the context of the original test. Where a quantitative confirmatory test is done for potentially forensic purposes (e.g., after a motor vehicle accident or a work place accident), it is much more important than when used in an emergency room to provide guidance for a patient's course of treatment because quantitative confirmation testing has limited or no value when it is done to affect immediate treatment decisions (due to the fact that it can take days to get results).

62.     Only under extremely unusual circumstances would it be appropriate to order quantitative confirmatory testing on negative qualitative results. In other words, generally speaking, it is unnecessary to prove a negative.

### 2. PG Testing

63.     PG testing refers to testing individuals for specific genetic variations that may affect the way that individuals react to certain medications.

64.     Medical researchers have developed hypotheses that the presence of certain genes in people affects the way they metabolize certain medications. For example, the way that

individuals metabolize the pharmaceutical warfarin, an anticoagulant, may be affected by genetic variation in genes CYP2C9 or VKORC1.

65.     PG testing is generally performed by CLIA-certified laboratories that analyze saliva.

66.     PG testing is a relatively new technology and can be very expensive. Below are some examples of PG testing services and the average price *charged* by laboratories in United's network and the average OON laboratory charge:

| Procedure Code | Procedure Description | Avg. Network Lab Charge | Avg. OON Lab Charge |
|---|---|---|---|
| 81225 | CYP2C19 Gene Analysis Common Variants | $441.00 | $684.00 |
| 81226 | CYP2D6 Gene Analysis Common Variants | $793.00 | $1,098.00 |
| 81479 | Unlisted Molecular Pathology Procedure | $2,289.00 | $1,573.78 |

### 3. *Requesting Testing Services*

67.     When a medical provider determines it is necessary to perform off-site testing, he or she fills out a requisition form, which is sent to the laboratory with the patient's specimen.

68.     Requisition forms generally include the patient's biographic and insurance information, the tests to perform, the diagnoses that support the medical necessity of the testing, and a medical provider's signature, certifying that the services were authorized and determined to be medically necessary.

69.     Legitimate requests for testing services are based on a medical provider's independent medical judgment as to what *particular* tests need to be performed, based on *patient-specific* clinical indications, histories, and potential future treatment options and outcomes. Thus, just as a physician must carefully consider each patient's specific information when ordering x-rays or calculating dosages of prescription drugs, so too must the physician act carefully when identifying necessary laboratory testing to fit the unique needs of each patient.

70.     Labs receive requisition forms and specimens and then perform the requested testing. The machines that perform the requested testing services connect with software to create automatically populated reports of the test results. Reports are transmitted back to the medical provider who requested the testing services so that the report can be reviewed and the medical provider can modify or adapt the patient's course of treatment as necessary.

## C.     NEXT HEALTH

71.     Next Health is the hub of more than 160 entities registered as doing business out of 5710 LBJ Freeway, Suite 300, Dallas, Texas 75240, which overlap to create a complicated and opaque web of ancillary service providers.

72.     Next Health is a rebrand of U.S. Health Group, which controlled many of the same subsidiaries and operated out of 13601 Preston Road, Suite 220E, Dallas, Texas 75240. In January 2013, a *qui tam* suit was filed against US Health Group, Medicus, Semyon Narosov, and Andrew Hillman (among others). Medicus settled the suit for $5 million and entered in a Corporate Integrity Agreement with the U.S. Department of Health and Human Services, Office of Inspector General. A few months later, Next Health was created and it has governed the subsidiaries ever since.

73.     Next Health is controlled by Semyon Narosov and Andrew Hillman, who were recently indicted in connection with a conspiracy to pay and receive health care bribes and kickbacks at Forest Park Medical Center.

74.     Next Health has four subsidiaries that are licensed under CLIA to perform drug testing services: ALG, Medicus, US Toxicology, and UTox (the "licensed subsidiaries"). Next Health uses its licensed subsidiaries to interface with United, including submitting claims to United.

75.     Next Health has dozens of other subsidiaries, which, on their face, appear to be legitimate service providers, but, in reality, are not licensed to perform any testing services and do not submit any claims to United (the "unlicensed subsidiaries").[3] Semyon Narosov is registered as the manager of several of these unlicensed subsidiaries. As discussed below, Next Health's unlicensed subsidiaries are simply conduits for illegal payments.

76.     Next Health and its subsidiaries maintain common offices, share employees, have common contact information, perform services and tasks on each other's behalf, and share funds. Next Health employees, regardless of whether they hold a title with one of its subsidiaries, have Next Health email addresses.

77.     Next Health's forms and documents (e.g., requisition forms, test result reports, billing policies, advertisements, marketing materials) are generally labeled under the name of one of its subsidiaries, but also include the phrase, "Powered by Next Health" somewhere on the page.

78.     Next Health and each of its subsidiaries are OON providers for United's plans.

79.     Next Health charges several multiples of what other labs charge for the same testing services, despite the fact that all tests are performed and analyzed by the same highly-specialized machines.

| Procedure Code | Procedure Description | Avg. Network Lab Charge | Avg. OON Lab Charge | Next Health Lab Charge |
|---|---|---|---|---|
| Qualitative Testing/Screening | | | | |
| G0431 | Drug Screen Qualitative; Single Class Meth EA | $202.00 | $890.00 | **$1,512.00** |

---

[3] These unlicensed subsidiaries include University Laboratories, Pure Labs, Addison Laboratories, National Toxicology, Altus Toxicology, APSP-Addison Labs, Pure Laboratories, Lab1 Toxicology, Facilitated Labs, Infinity Toxicology, Sirius Laboratories, Reliant Laboratories, Trident Toxicology, Guardian Toxicology, Clinical Labs of America, Empire Labs, Sunshine Toxicology, IMED Laboratory, and RXCompliancy Laboratory.

| | | | | |
|---|---|---|---|---|
| G0479 | Drug Test Presumptive; Instrumented Chemistry Analyzer | $252.00 | $1,124.00 | **$1,818.00** |
| **Confirmatory Testing** | | | | |
| G0480 | Drug Test Definitive DR ID Meth Per Day 1-7 Drug Classes | $244.00 | $1,104.00 | **$2,398.20** |
| G0483 | Drug Test Definitive DR ID Meth Per Day 22/More Drug Classes | $801.00 | $3,796.00 | **$6,456.90** |
| G6058 | Drug Confirmation Each Procedure | $144.00 | $687.00 | **$1,622.70** |
| **PG Testing** | | | | |
| 81225 | CYP2C19 Gene Analysis Common Variants | $441.28 | $684.00 | **$1,456.80** |
| 81226 | CYP2D6 Gene Analysis Common Variants | $793.14 | $1,098.00 | **$2,254.55** |
| 81479 | Unlisted Molecular Pathology Procedure | $2,289.46 | $1,573.78 | **$5,223.20** |

80.     Given Next Health's astronomical charges, there is no reason that a United member would ever knowingly consent to have his or her lab testing performed by a Next Health subsidiary. Even assuming that a member's health benefit plan includes a 20% coinsurance obligation for network or OON lab services and protection against any balance billing from OON providers (which would never actually occur given the inherent differences between network and OON benefits discussed in paragraphs 33-41, *supra*), a member would be responsible for hundreds, even thousands, of dollars more to have his or her testing performed by Next Health. The following chart shows what a member would pay in coinsurance for machine-analyzed qualitative testing (G0479) and a full battery of quantitative confirmation testing (G0483) – a combination of services frequently billed by Next Health's subsidiaries – depending on the type of lab that performed and billed for the test:

| | Network Lab | Avg. OON Lab | Next Health Lab |
|---|---|---|---|
| **Member Pays:** | **$210.60** | **$982.00** | **$1,654.98** |

81.     There are obviously situations that might cause a member to ignore finances when selecting a medical provider. For example, brain surgery is a scary, life-threatening, highly-

technical operation. It would be understandable if a member facing brain surgery selected an OON neurosurgeon based on reputation, skill or bedside manner—regardless of the resulting coinsurance or balance billing implications. Laboratory services, on the other hand, are commoditized. The same machines are used to perform the same tests, and patients rarely (potentially never) interact with any laboratory personnel. There is no reason a fully-informed member would consent to testing by a Next Health subsidiary over a laboratory in United's network when the latter would save the patient more than $1,400.00 and provide the same test results.

82.     And yet, despite being outside United's provider network and charging several multiples more than other labs, Next Health, through its licensed subsidiaries, has submitted more than 136,000 claims to United for testing services since 2011. United, relying on Next Health's representation that each of those claims contained "true, correct, and complete" information, has made payments totaling more than $100 million to Next Health's licensed subsidiaries.

## D.     NEXT HEALTH'S SCHEME TO DEFRAUD

83.     Next Health attracts test specimens by offering and paying kickbacks to any individual or entity that can send it testing requests or cause testing requests to be sent. Next Health's kickback-based business model incentivizes additional inappropriate practices engineered to increase both the volume of specimens submitted by referral sources as well as the amount of money per specimen that Next Health collects from United. To conceal and disguise its scheme, Next Health engages in even more unlawful and misleading conduct, such as misrepresenting which of its subsidiaries perform the testing services, improperly waiving

patient payment responsibilities, and routing kickbacks through its agents, such as Erik Bugen, and entities set up for the benefit of the kickback recipients.

### 1. *Next Health Relies on Kickbacks to Induce Test Requests*

84.     Next Health makes payments (or promises to make payments) to medical providers in exchange for collecting urine and saliva specimens and submitting the specimens to Next Health for ancillary testing services.  Similarly, Next Health makes payments (or promises to make payments) to incentivize sales consultants, third-party contractors, and others who cause urine and saliva specimens to be sent to Next Health for ancillary testing services (collectively referred to as "brokers"). Next Health knows that its brokers funnel portions of the payments they receive from Next Health to medical providers to conceal the link between Next Health and direct payments to medical providers.

85.     These payments and promises are intended to induce unnecessary testing so that Next Health can submit claims to United and unjustly enrich itself through the collection of United's members' OON benefits.

86.     Rather than pay kickbacks as a set amount of money per specimen, Next Health pays kickbacks based on a percentage of the amount collected as a result of the testing services performed on each specimen.

87.     According to former Next Health marketing representative Erik Bugen, Next Health pays twenty percent (20%) of the revenue collected from the testing performed on each specimen as a kickback to the referral source.

88.     Kickbacks result in overutilization of medical services, increased costs, unfair competition, and adverse treatment determinations, because medical providers are incentivized to make decisions based on profit, rather than the best interests of the patient. This concern is

heightened in the context of ancillary services, because patients have little or no input in the services and they are often performed off-site, without patients ever realizing that the services are being performed.

89.     Next Health's offers to pay, and payments of, money in connection with the performance of services for which claims for payment were submitted to United were intended to defraud and deceive insurers, like United, and constitute insurance fraud, as defined in Texas Penal Code § 35.02(b). Next Health's use of kickbacks to induce referrals violates other Texas laws, as well as the laws of many other states. *See* Tex. Occ. Code § 102.001, *et seq.*

90.     To conceal the source and purpose of its illegal kickback payments, Next Health uses its licensed and unlicensed subsidiaries to create separation between (a) the performance and billing of testing services and (b) the payments made to induce the requests. For example, the images below are reports from testing allegedly performed by Medicus (or for testing that was at least billed for by Medicus and for which United paid Medicus), but the reports reflect the names and logos of unlicensed subsidiaries, Lab1 Toxicology, Trident Toxicology, and Infinity Toxicology:





91.     Next Health utilizes its licensed subsidiaries to perform and/or bill for testing services. Next Health utilizes its unlicensed subsidiaries as conduits to (a) pay the kickbacks that induced the test orders, and (b) obtain assignments of OON benefits from United's members and/or authorizations to bill United directly. Thus, contrary to the representations made in the claims submitted to United by Next Health's licensed subsidiaries, they did not hold assignments of OON benefits and/or authorizations to bill United directly. For example, the image below is the language on which Medicus based its material representation to United that United's member authorized United to make payment of the member's benefits directly to Medicus:

Consent/Insurance Release: I voluntarily consent to the collection and testing of my specimen and certify that the specimen identified on this form is my own; it is fresh and has not been adulterated in any manner I certify that the information provided on this form and on the specimen bottle is accurate I further authorize the laboratory to release the result of this testing to the ordering facility and or my insurance company. Furthermore, I authorize my insurance benefits directly to a US Health Group affiliate lab for the services I receive. I acknowledge that the Lab & Clinic may be an out-of-network facility within my insurance. I am also aware that in some circumstances my insurance will send the payment directly to me for the services provided. Under law, I agree to endorse the insurance check and forward it to the Lab & Clinic within 30 days of receipt. Failure to do so could result in my account being forwarded to collections. By checking "Self-Pay", I agree to be financially responsible for these tests.

92.     The language, however, makes no such authorization or assignment to Medicus.

The image above comes from an ALG requisition form (even though ALG was not CLIA-certified to perform any testing at the time the testing was performed), which resulted in Medicus submitting the two claims listed below to United. The claims listed below misrepresented that Medicus was authorized to collect this member's benefits:

| Date Submitted | Claim | Amount Charged | Amount Paid | Next Health Subsidiary |
|---|---|---|---|---|
| 12/31/2014 | 4867151612 | $144.42 | $95.32 | Medicus |
| 1/5/2015 | 4868776183 | $2,441.26 | $1,611.21 | Medicus |

93.    Next Health further disguises its illegal kickbacks by characterizing them as compensation for administrative, marketing, or consulting services, or as distributions on an investment interest in one of its unlicensed subsidiaries. In reality, the payments are made in exchange for inducing the referral of specimens for testing performed by Next Health's licensed subsidiaries.

94.    Bugen connected a group of approximately 1,500 physicians to Next Health. The group requested testing from Next Health in exchange for twenty percent of the revenue collected by Next Health. Bugen, as the Next Health marketing representative who made the connection, received one percent of the revenue.

95.    Bugen wanted a larger portion of the kickbacks, so, with the help of his friend Kirk Zajac, he created The ADAR Group specifically to collect urine and saliva specimens submitted to Next Health for testing. Bugen paid medical providers for the use of their medical billing credentials (discussed more in paragraphs 127-137, below) so that he could keep the twenty percent kickback normally paid directly or indirectly to the medical providers requesting the testing, as well as the one percent he normally collected for brokering the test orders.

96.    The ADAR Group collected urine and saliva specimens by paying commercially-insured individuals for their urine and saliva. Bugen and Zajac posted advertisements online

claiming that The ADAR Group was conducting a "wellness study" and would give $50 gift cards to commercially-insured individuals who provided urine or saliva specimens. Bugen and Zajac also advertised The ADAR Group via word-of-mouth, offering "patients" additional $25 gift cards for every "qualified" friend or coworker (i.e., people with private insurance) referred to The ADAR Group.

97.     The "wellness study" did not exist. It was a subterfuge to explain why Bugen and Zajac could pay commercially-insured individuals for their urine and saliva.

98.     Bugen and Zajac began collecting the specimens in a "clinic" at 600 28th St., Suite 105, Austin, Texas 78705. This location did not have a restroom, so patients were instructed to use a public restroom to provide a urine specimen. When the building's public restroom was full, patients were told to use a restroom in a nearby Whataburger.

99.     Bugen and Zajac opened a second "clinic," located at 3705 Medical Parkway, Austin, Texas 78705, that they used to collect urine and saliva specimens from "patients" in exchange for $50 gift cards. Bugen and Zajac later operated similar clinics in Killeen and San Antonio, Texas.

100.     Bugen and Zajac sent the urine and saliva specimens collected at these ADAR Group locations to Next Health for testing. In exchange, they received kickbacks equal to twenty percent of the amount collected by Next Health from commercial insurers, like United. Next Health submitted claims to United through its licensed subsidiaries UTox, Medicus, and US Toxicology for the testing performed on the specimens gathered through The ADAR Group scam.

101.     Bugen and Zajac stopped collecting urine and saliva specimens through The ADAR Group in or around May 2016, after a national TV news program confronted Zajac with

undercover footage of the scheme in action. (*See* http://tinyurl.com/zc4a29c (accessed on Jan. 23, 2016).)

102.    Next Health chose its licensed subsidiary UTox – United Toxicology" – to perform and bill United for the overwhelming majority of the services performed on specimens collected from United's members at The ADAR Group's clinics. It did so intending to associate the "United" name with the unnecessary testing so as to confuse United's members about the legitimacy of the services.

103.    In fact, United's members were actually confused when they viewed their Explanation of Benefits ("EOBs"), which listed "United Toxicology" as a provider that charged tens of thousands of dollars for services. Specifically, they misunderstood the services to have been performed by a lab related to United.

104.    Over the course of approximately one year, Next Health subsidiaries UTox, Medicus, and US Toxicology submitted more than 10,800 claims to United, charging approximately $45 million for testing services performed on specimens gathered by Bugen and Zajac through The ADAR Group. United paid more than $11 million to these subsidiaries based on the claims they submitted to United for the services.

105.    Next Health paid kickbacks equal to twenty percent of the $11,185,000 to Bugen and Zajac, directly or indirectly, through its unlicensed subsidiary Sirius Toxicology.

106.    International Medical Research ("IMR") is another entity formed specifically to collect urine and saliva specimens to send to Next Health in exchange for kickbacks.

107.    IMR offers medical providers $100 per specimen sent to Next Health for testing. IMR attempts to disguise or justify these kickbacks by characterizing them as being in exchange

for the medical providers' participation in a sham medical study (and not in exchange for the specimens).

108.    IMR solicits medical providers to send specimens to Next Health, through IMR, by offering "[a]n extremely lucrative, new revenue stream for your doctor's office!" It tells providers that by sending 10 specimens per day to Next Health, they can make an extra $20,000 per month and $240,000 per year.

109.    IMR's website includes the following illustration summarizing the illicit arrangement (an illustration that was also used in a flyer to solicit physicians):



110.    Upon information and belief, IMR's kickbacks to medical providers are funded by the kickbacks IMR receives from Next Health for causing each testing request to be sent to Next Health for testing.

111.    In every claim Next Health and its licensed subsidiaries submit to United, they represent that the services billed for in the claim forms were performed because they were medically necessary. However, unbeknownst to United, frequently, if not always, the services

were actually requested and performed because Next Health and its subsidiaries paid kickbacks to induce the requests.

112.    By making a partial disclosure and conveying a false impression regarding the reason the services were performed, Next Health and its licensed subsidiaries triggered a duty to disclose the entire truth to United. But Next Health and its licensed subsidiaries never disclosed to United that any services billed for in the claim forms submitted to United were performed because of kickbacks.

113.    The fact that kickbacks underlie the services performed and billed for by Next Health and its licensed subsidiaries is material to United's determination of whether payment is owed on any particular claim.

114.    Next Health and its licensed subsidiaries knew that United was unaware of the fact that the services were induced by kickbacks and did not have an equal opportunity to discover the truth.

115.    Next Health and its licensed subsidiaries intended to induce United to make payment on the claims by omitting the fact that the services were induced by kickbacks, despite certifying to United that the information contained in each claim was "true, correct, and complete." United suffered injury as a result of acting without knowledge of the undisclosed fact that the services were induced by kickbacks, because it made millions of dollars in payments to Next Health subsidiaries that it would not have otherwise made.

116.    The claims in the table below are just some examples of claims submitted to United by Next Health's licensed subsidiaries, which sought payments for the performance of services that were, unbeknownst to United, induced by kickbacks. United learned after making

payment on the claims below that the services were induced by kickbacks to Erik Bugen, Kirk

Zajac, and/or The ADAR Group.

| Date Submitted | Claim | Amount Charged | Amount Paid | Next Health Subsidiary |
|---|---|---|---|---|
| 2/19/2016 | 5210333305 | $8,797.86 | $8,797.86 | UTox |
| 8/12/2015 | 5150038527 | $10,204.56 | $6,358.73 | UTox |
| 2/26/2016 | 5842329955 | $6,456.90 | $1,937.07 | UTox |
| 8/5/2015 | 5144171620 | $10,204.56 | $6,358.73 | UTox |
| 8/10/2015 | 5150038487 | $9,147.69 | $5,805.23 | UTox |
| 1/12/2016 | 5763041646 | $7,617.42 | $6,093.94 | Medicus |
| 1/7/2016 | 5763041451 | $7,617.42 | $3,951.86 | Medicus |
| 1/7/2016 | 5763040830 | $7,617.42 | $3,513.36 | Medicus |
| 1/6/2016 | 5749444655 | $7,617.42 | $3,951.86 | Medicus |
| 1/14/2016 | 5763041917 | $1,771.95 | $1,500.74 | Medicus |
| 3/14/2016 | 5851917234 | $20,360.93 | $9,986.07 | US Toxicology |
| 3/9/2016 | 5854369391 | $6,499.92 | $5,654.91 | US Toxicology |
| 3/9/2016 | 5854369381 | $6,499.92 | $2,729.98 | US Toxicology |
| 3/9/2016 | 5854369367 | $6,499.92 | $1,688.36 | US Toxicology |
| 3/1/2016 | 5854369399 | $6,499.92 | $6,499.92 | US Toxicology |

117.    Exhibit A identifies claims submitted to United by UTox that failed to disclose

that the services billed for therein were induced by kickbacks to Bugen and Zajac and/or The

ADAR Group. Exhibit B identifies claims submitted to United by Medicus that failed to disclose

that the services billed for were induced by kickbacks to Bugen and Zajac and/or The ADAR

Group. Exhibit C identifies claims submitted to United by US Toxicology that failed to disclose

that the services billed for were induced by kickbacks to Bugen and Zajac and/or The ADAR

Group. In total, United paid Next Health's licensed subsidiaries nearly $11.2 million in

reasonable reliance on the claims submitted for services induced by kickbacks to Bugen and

Zajac and/or The ADAR Group.

118.    Upon information and belief, many more, if not all, claims submitted to United by

Next Health and its subsidiaries were similarly induced by kickbacks that Next Health and its

subsidiaries failed to disclose. This belief is supported (a) by statements from former Next

Health sales representative Bugen, who told United that Next Health's business model depends

on paying kickbacks; (b) by Medicus's involvement in a similarly structured scheme, which resulted in Medicus entering into a Corporate Integrity Agreement with the Office of the Inspector General for inducing services with kickbacks; (c) by Next Health owners Narosov and Hillman's alleged involvement in a similarly-structured kickback scheme (*see U.S. v. Beauchamp, et al.*, No. 3:16-cr-0516-D, [DE 1] (N.D. Texas November 11, 2016); (d) by the fact that Next Health's subsidiaries charge significantly more than other laboratories for the performance of the same services and no rational economic actor would choose Next Health without perverse incentives like kickbacks; (e) by the fact that kickbacks explain why, as described in the next prongs of the scheme, medical providers would agree to uniformly request blanket testing for drugs and genes that have nothing to do with a particular patient's clinical indications; and (f) by the fact that medical providers have informed Next Health's competitors that Next Health attracts testing requests by offering kickbacks disguised as distributions on fractional ownership interests.

119.    Specific details regarding all of Next Health's kickbacks to induce services are uniquely in Next Health, its subsidiaries, and the kickback recipients' possession.

### 2.    *Fraudulent Conduct Caused by, and Indicative of, the Kickback Scheme*

120.    Next Health's kickback-based business model incentivized and, predictably, resulted in the proliferation of fraudulent practices engineered solely to increase the volume of specimens submitted for testing, as well as the charges per specimen submitted for testing— practices that sometimes jeopardized patients' privacy, health, and financial well-being.

121.    This fraudulent conduct includes, but is not limited to the following examples: (a) performing unauthorized testing services; (b) performing testing pursuant to inappropriate

"custom profiles"; and (c) improperly billing for services that were performed by other providers.

122.    Next Health and its subsidiaries' submissions of insurance claims that contain false and misleading information were intended to defraud and deceive insurers, like United, and constitute insurance fraud, as defined in Texas Penal Code § 35.02(a).

a.    Performing unauthorized testing services

123.    Next Health knows that in order to receive payments from United for its performance of testing services, it must certify and represent that the services were performed at the request of the medical provider listed in the claim and that the medical provider determined the services to be medically necessary. These representations are material to United's determination of whether payment is owed on a claim.

124.    Next Health only knows whether a medical provider has actually requested testing services by verifying that the medical provider has signed the requisition form that accompanies a specimen submitted for testing.

125.    Yet, Next Health and its licensed subsidiaries routinely submit claims to United for services performed on specimens submitted for testing with requisition forms that are not signed by the alleged requesting medical provider.

126.    Next Health and its subsidiaries pay no attention to whether requisition forms are actually signed because they know that the services are being requested pursuant to an agreement to kickback proceeds from the performance of the tests.

127.    For example, Next Health received thousands of requisition forms from The ADAR Group. None of the requisition forms contained the listed medical provider's actual signature.

128.    Bugen paid medical providers so that The ADAR Group could use their medical billing credentials. The medical providers did not examine any patients or sign any requisition forms.

129.    Bugen "hired" Dr. Sekhar Rao as The ADAR Group's original "medical director." Dr. Rao's actual responsibilities for The ADAR Group, however, were nonexistent. Dr. Rao signed no requisition forms and saw no patients. Yet, he was listed as the requesting medical provider on tens of millions of dollars in claims submitted to United by Next Health and its licensed subsidiaries.

130.    Bugen "hired" Dr. Yun Kim in September 2015 to serve in the same role. Dr. Kim signed an Independent Contractor Agreement with "The ADAR Group" on September 22, 2015. The agreement was signed by Erik Bugen as "Director" of the ADAR Group.

131.    Dr. Kim never saw any patients at The ADAR Group clinics. He never authorized any testing services. Dr. Kim asked Bugen and Zajac to see patients and to let him access medical records and other information, but they told him it was not necessary.

132.    After a few months, Dr. Kim terminated his relationship with Bugen and The ADAR Group. In Dr. Kim's termination letter to Bugen, he stated:

> I was to provide services in charge of the toxicology portion of the outpatient program of The ADAR Group. However, you, and The ADAR Group, denied me the access and information required for me to properly perform the services. I have been denied and refused access to information regarding patients, charts, billing information and processes of the toxicology portion of the program. I have therefore been unable to perform the services that had been agreed to. . . . Most importantly, it has come to my attention that you may have been using my NPI number for billing purposes, without my consent. I have not agreed to your use of my NPI number, or DEA number, under any circumstances. I did not assign billing privileges to mid level providers or to anybody at The ADAR Group.

133.    Dr. Kim, like Dr. Rao, signed no requisition forms and saw no patients. Yet, he was listed as the requesting medical provider on millions of dollars in claims submitted to United by Next Health and its licensed subsidiaries.

134.    Bugen "hired" Dr. Vinay Parameswara in October 2015. Dr. Parameswara, like Dr. Rao and Dr. Kim, saw no patients and signed no requisition forms. Yet, he too was listed as the requesting medical provider on millions of dollars in claims submitted to United by Next Health and its licensed subsidiaries.

135.    Drs. Rao, Kim, and Parameswara confirmed to United that (a) they never examined a single patient at The ADAR Group's clinics, (b) they did not know what tests were ordered under their names, (c) they did not know why any tests were requested, and (d) they did not know from which lab any tests were requested.

136.    Importantly, these three doctors never submitted a claim to United for having seen, examined, or treated any of The ADAR Group patients. The only claims stemming from the alleged patient encounters were submitted to United by ancillary service providers, like Next Health and its subsidiaries, for the performance of drug and PG testing.

137.    United interviewed many of its members who provided specimens to Bugen or Zajac at The ADAR Group's clinics and none of them ever met or were treated by Dr. Rao, Dr. Kim, or Dr. Parameswara.

138.    Next Health and its licensed subsidiaries know that they are falsely representing that services were requested by a medical provider when the requisition form underlying the services is not signed by that medical provider. At a minimum, Next Health and its licensed subsidiaries know they are recklessly representing that the services were requested by the listed medical provider, but actually do not know whether that is true. Next Health and its licensed

subsidiaries make these false representations in claims to United intentionally and in furtherance of the scheme to defraud United, hoping that United will rely on the false representations and make payments on claims for the performance of unauthorized services.

139.    Exhibits A, B, and C identify claims submitted to United by UTox, Medicus, and US Toxicology, respectively, which represented that the services billed for therein were requested by either Dr. Rao, Dr. Kim, or Dr. Parameswara. However, Next Health and the licensed subsidiary that submitted each respective claim knew at the time the claims were submitted to United that the services billed for therein were not requested or authorized by the listed referring medical provider.

140.    Next Health's practice of performing services without a legitimate request from a medical provider was not limited to the ADAR Group-related claims submitted to United.

141.    United recently requested medical records underlying a random sample of claims submitted to it by UTox and Medicus.  A review of those records found that *less than 10%* of the requisition forms underlying the services performed by UTox contained a medical provider's signature certifying that the services were requested.

142.    Similarly, *less than 30%* of the requisition forms underlying services performed by Medicus contained a medical provider's signature certifying that the services were requested.

143.    Examples of these claims submitted to United by UTox and Medicus, which were unrelated to The ADAR Group, but similarly falsely represented services were authorized by a medical provider, are listed in the following chart:

| Date Submitted | Claim | Amount Charged | Amount Paid | Next Health Subsidiary |
|---|---|---|---|---|
| 2/25/2013 | 4028287418 | $1,701.11 | $1,403.43 | UTox |
| 9/24/2013 | 4273584833 | $1,310.17 | $119.53 | UTox |
| 5/24/2014 | 4559345676 | $1,876.91 | $174.94 | UTox |
| 9/19/2014 | 4723857713 | $2,513.31 | $42.36 | UTox |
| 10/7/2014 | 4730247771 | $3,470.48 | $487.41 | UTox |
| 1/7/2016 | 5763041492 | $8,797.86 | $1,072.86 | Medicus |

| 1/11/2016 | 5763041490 | $1,771.95 | $99.66 | Medicus |
| 1/7/2016 | 5763041493 | $8,797.86 | $1,072.86 | Medicus |
| 1/9/2016 | 5763041498 | $1,771.95 | $99.66 | Medicus |
| 9/3/2013 | 4245478641 | $1,084.77 | $715.98 | Medicus |

144.    Upon information and belief, Next Health and its subsidiaries submitted many more claims to United that sought payment for services that were similarly unauthorized. This belief is supported (a) by United's recent review of requisition forms and medical records underlying Medicus and UTox's billed-for testing services; (b) by Next Health's performance of tens of millions of dollars of testing services, purportedly requested by physicians who had never communicated with Next Health or its subsidiaries, signed a single requisition form, or examined any patients; and (c) by the fact that kickbacks incentivize unauthorized requests for testing services.

145.    Specific details regarding whether the services performed and billed for by Next Health and its subsidiaries were actually requested by the listed medical provider are peculiarly in Next Health's possession.

b.    Standing Orders for "Custom" Profiles and Confirmation Tests

146.    Next Health knows that a medical provider must certify that each component test for different drugs or drug classes must be medically necessary. Next Health's requisition forms expressly state: "Profiles will be billed and paid when *all component tests* of the Profiles are medically necessary." (Emphasis added.)

147.    Yet, Next Health requires medical providers to request tests pursuant to "custom" profiles (i.e., standing test protocols), which, despite the name, are not "custom" at all, but rather are pre-determined groups of drugs and drug classes that bear no relation to any patient-specific clinical indications, histories, or potential future treatment options and outcomes.

148.     Next Health's "custom" profile set-up form has medical providers certify that the tests they are selecting in the form will be medically necessary *for all of their future patients* (regardless of the future patients' specific medical histories, symptoms, or clinical conditions): "I acknowledge that the tests I am ordering are medically necessary because of my legal and regulatory responsibility to take reasonable steps to prevent abuse and diversion of controlled substance medications."

149.     Next Health requires providers to sign off on "custom" profiles as a ruse; a way to give it cover for performing unnecessary testing on every specimen it receives and then present fraudulent claims to insurers for thousands of dollars.

150.     Sometimes Next Health actually sets up the "custom" profile for the medical provider, checking off each box on the sheet *after* a medical provider has signed it. This is what happened when Erik Bugen registered Dr. Kim with Next Health.

151.     Other times, Next Health tells the medical provider what component tests to include in their "custom" profile, by highlighting the drug classes that the medical provider should select as follows:



152.    Without any regard to a medical provider's independent judgment, Next Health highlights the drug classes that should be requested, which, in the above example, included 15 different panels of drugs (and more than 50 particular drugs or substances).

153.    Not only does Next Health require medical providers to request blanket testing, it imposes unnecessary quantitative confirmation testing.

154.    Next Health's "custom" profile set-up forms expressly state that confirming initially negative results *must* be personally ordered by the medical provider. But the options

provided by Next Health's "custom" profile set-up forms specifically include an option to perform confirmatory tests on all negative results:



155.   As a result, Next Health routinely performs blanket quantitative confirmatory testing, regardless of whether a substance initially tested positive or negative, and without any medical discretion as to why confirming the initial result was necessary. It does this solely to drive up the amount it can bill, and ultimately recover from, United.

156.   Similarly, the PG testing allegedly performed by Next Health's subsidiaries is performed based on "custom" profiles, which have no connection to why a patient is seeing a medical provider, his or her clinical indications, or what a medical provider determined to be medically necessary.

157.   Next Health's "custom" profiles are not based on the individualized needs of patients, but rather, are a fraudulent justification for blanket laboratory testing, which is calculated to inflate (a) the claims submitted to insurers by Next Health and its subsidiaries, (b) the payments received from insurers relying on these fraudulent claims, (c) the revenue received by Next Health and its subsidiaries, and (d) the kickbacks sent, directly or indirectly, to Next Health's referring providers or brokers.

158.   Regardless of why a patient is seeing a provider or what his or her clinical indications are, and without using any independent medical judgment to identify specific tests, Next Health subsidiaries test for dozens of substances in a single sample. They test elderly

people with no history of drug abuse for cocaine and designer-drugs like ecstasy. They test young healthy people for dozens of drugs (like anticonvulsants and synthetic analgesics) for which there is no clinical concern.

159.    The tests rarely even vary from provider to provider, much less from patient to patient, because they are only selected to maximize the amount of money that can be taken from insurers.

160.    Next Health and its subsidiaries know that these custom panels necessarily include medically unnecessary tests, but require them anyway, because their goal is to take as much money from United as possible.

161.    Next Health's imposition of "custom" profiles flouts its own rules, as well as the law. Section 105.002 of the Texas Occupations Code prohibits a health care provider from knowingly presenting (or causing to be presented) a false or fraudulent claim for the payment of a loss under an insurance policy. It further prohibits a health care provider, in connection with its professional services, from knowingly preparing, making, or subscribing to any writing, with the intent to present or use the writing, or allow it to be presented or used, in support of a false or fraudulent claim under an insurance policy. Each "custom" profile set-up form is intended to be used in support of false or fraudulent claims under an insurance policy. When Next Health (or one of its licensed subsidiaries) insists upon a physician signing-off on such a profile, each party is violating Tex. Occ. § 105.002.

162.    UTox, Medicus, US Toxicology, and ALG uniformly perform testing pursuant to these "custom" profiles, despite the fact that the profiles have no connection to why a patient is seeing a medical provider, his or her clinical indications, or what a medical provider determines to be medically necessary.

163.    Medical providers, brokers and other referral sources go along with this practice because it increases the number of claims Next Health can submit to United.  And, if Next Health receives more claim payments from United, Next Health will pay more kickbacks to its referral sources.

164.    Despite knowing that the services performed and billed for in the claim forms submitted to United were unnecessary, Next Health and its licensed subsidiaries intentionally misrepresented that the services billed for therein were medically necessary, hoping that United would rely on the false representation and make payment on the claims.

165.    On February 27, 2016, UTox submitted a claim to United for $8,797.86. This claim was based on a standing order for a custom profile of tests. The claim billed for 10 units of confirmation testing (G6058) for a total of $1,622.70. The claim also contained separate confirmations of Gabapentin (procedure code 80171) and four units of unspecified quantitative mass spectrometry (procedure code 83789) for a total of 15 separate confirmation tests.  The details of this claim are reflected in the following chart:

| Date Submitted | Procedure Code | Procedure Description | Amount Charged | Amount Paid |
|---|---|---|---|---|
| 2/27/16 | 80171 | Drug Screen Quantitative Gabapentin | $162.36 | $162.36 |
| | G6040 | Assay of Alcohol; Any Spec Exc Brth | $264.60 | $264.60 |
| | G6043 | Assay of Barbituates NES | $280.44 | $280.44 |
| | G6037 | Assay of Nortiptyline | $331.92 | $331.92 |
| | G6044 | Assay of Cocaine or Metabolite | $371.16 | $371.16 |
| | G6034 | Assay of Doxepin | $379.62 | $379.62 |
| | G6042 | Assay Amphetamine/Methamphetamine | $380.70 | $380.70 |
| | G6053 | Assay of Methadone | $399.96 | $399.96 |
| | G6032 | Assay of Desipramine | $421.56 | $421.56 |
| | G6036 | Assay of Imipramine | $426.24 | $426.24 |
| | G6052 | Assay of Meprobamate | $431.64 | $431.64 |
| | G6030 | Assay of Amitriptyline | $438.48 | $438.48 |
| | G6031 | Assay of Benzodiazepines | $453.06 | $453.06 |
| | G6055 | Assay of Nicotine | $580.14 | $580.14 |
| | 83789 | Mass Spectrometry Quant | $900.00 | $900.00 |
| | G6056 | Opiate Drug & Metabolite EA Proc | $953.28 | $953.28 |
| | G6058 | Drug Confirmation Each Procedure | $1,622.70 | $1,622.70 |

166.   On February 29, 2016, UTox submitted another claim to United for $8,797.86 for services performed on a different member. This claim included identical charges.

| Date Submitted | Procedure Code | Procedure Description | Amount Charged | Amount Paid |
|---|---|---|---|---|
| 2/29/16 | 80171 | Drug Screen Quantitative Gabapentin | $162.36 | $162.36 |
| | G6040 | Assay of Alcohol; Any Spec Exc Brth | $264.60 | $264.60 |
| | G6043 | Assay of Barbituates NES | $280.44 | $280.44 |
| | G6037 | Assay of Nortiptyline | $331.92 | $331.92 |
| | G6044 | Assay of Cocaine or Metabolite | $371.16 | $371.16 |
| | G6034 | Assay of Doxepin | $379.62 | $379.62 |
| | G6042 | Assay Amphetamine/Methamphetamine | $380.70 | $380.70 |
| | G6053 | Assay of Methadone | $399.96 | $399.96 |
| | G6032 | Assay of Desipramine | $421.56 | $421.56 |
| | G6036 | Assay of Imipramine | $426.24 | $426.24 |
| | G6052 | Assay of Meprobamate | $431.64 | $431.64 |
| | G6030 | Assay of Amitriptyline | $438.48 | $438.48 |
| | G6031 | Assay of Benzodiazepines | $453.06 | $453.06 |
| | G6055 | Assay of Nicotine | $580.14 | $580.14 |
| | 83789 | Mass Spectrometry Quant | $900.00 | $900.00 |
| | G6056 | Opiate Drug & Metabolite EA Proc | $953.28 | $953.28 |
| | G6058 | Drug Confirmation Each Procedure | $1,622.70 | $1,622.70 |

167.   UTox submitted hundreds of claims to United – charging nearly $9,000 each – that were literally identical to those reflected above. Each claim listed below was submitted to United by UTox for services performed on a different member's specimen, pursuant to a "custom" profile.

| Date Submitted | Claim | Amount Charged | Amount Paid | Next Health Subsidiary |
|---|---|---|---|---|
| 9/28/2015 | 5733667173 | $8,797.86 | $1,072.86 | UTox |
| 9/22/2015 | 5232509029 | $8,797.86 | $497.40 | UTox |
| 9/26/2015 | 5232509105 | $8,797.86 | $497.40 | UTox |
| 9/29/2015 | 5733667129 | $8,797.86 | $497.40 | UTox |
| 9/29/2015 | 5733667217 | $8,797.86 | $8,797.86 | UTox |
| 9/26/2015 | 5232509430 | $8,797.86 | $1,041.61 | UTox |
| 10/19/2015 | 5755362698 | $8,797.86 | $497.40 | UTox |
| 10/20/2015 | 5755362845 | $8,797.86 | $829.01 | UTox |
| 9/29/2016 | 52334061860 | $8,797.86 | $8,797.86 | UTox |

168.   Next Health and UTox knew this blanket toxicology testing was unnecessary when they submitted each claim to United, but they falsely represented that it was medically

necessary, intending for United to rely on the misrepresentations and make payment for the services.

169. Similarly, Medicus performed services on 34 patients at the alleged request of one medical provider, submitting approximately 296 claims to United for the testing services it performed on those patients' specimens. For each date of service with a patient, Medicus submitted two claims; one for $1,771.95 and the other for $7,617.42, which were both for testing services performed pursuant to a "custom" profile. On January 9, 2016, Medicus submitted to United the two claims listed in the chart below for services performed on the same patient's specimen. Medicus and Next Health knew these claims were for services performed pursuant to blanket requests for unnecessary testing when they submitted the claims to United, but falsely represented that the services were medically necessary.

| Claim | Procedure Code | Procedure Description | Amount Charged | Amount Paid |
|---|---|---|---|---|
| 5763040972 | 80171 | Drug Screen Quantitative Gabapentin | $162.36 | $113.65 |
| | G6030 | Assay Of Amitriptyline | $438.48 | $306.94 |
| | G6031 | Assay Of Benzodiazepines | $453.06 | $317.14 |
| | G6032 | Assay Of Desipramine | $421.56 | $295.09 |
| | G6034 | Assay Of Doxepin | $379.62 | $265.73 |
| | G6036 | Assay Of Imipramine | $426.24 | $298.37 |
| | G6037 | Assay Of Nortriptyline | $331.92 | $232.34 |
| | G6040 | Assay Of Alcohol; Any Spec Exc Brth | $264.60 | $185.22 |
| | G6042 | Assay Amphetamine/Methamphetamine | $380.70 | $266.49 |
| | G6044 | Assay Of Cocaine Or Metabolite | $371.16 | $259.81 |
| | G6052 | Assay Of Meprobamate | $431.64 | $302.15 |
| | G6053 | Assay Of Methadone | $399.96 | $279.97 |
| | G6055 | Assay Of Nicotine | $580.14 | $406.10 |
| | G6056 | Opiate Drug & Metabolites EA Proc | $953.28 | $667.30 |
| | G6058 | Drug Confirmation Each Procedure | $1,622.70 | $1,135.89 |
| **5763040972 Total:** | | | **$7,617.42** | **$5,332.19** |
| 5763040974 | 81003 | Urinalysis, Auto, W/O Scope | $48.97 | $39.18 |
| | 81005 | Urinalysis | $46.95 | $0.00 |
| | 82570 | Assay Of Urine Creatinine | $101.23 | $80.98 |
| | 83986 | Assay PH Body Fluid Nos | $62.20 | $49.76 |

| | G0431 | Drug Scr Qual; Single Class Meth EA | $1,512.60 | $1,210.08 |
|---|---|---|---|---|
| **5763040974 Total:** | | | **$1,771.95** | **$1,380.00** |

170. Hundreds of claims reflecting identical underlying services were submitted by Medicus to United. Medicus represented that these services were medically necessary, even though it knew at the time it submitted the claims that this was untrue. Examples of these claims are listed in the following chart:

| Date of Service | Date Submitted | Claim | Amount Charged | Amount Paid | Next Health Subsidiary |
|---|---|---|---|---|---|
| 10/26/2015 | 1/11/2016 | 5763040772 | $7,617.42 | $5,552.58 | Medicus |
| | 1/12/2016 | 5763040773 | $1,771.95 | $1,500.74 | Medicus |
| 11/17/2015 | 1/9/2016 | 5763040972 | $7,617.42 | $5,332.19 | Medicus |
| | 1/9/2016 | 5763040974 | $1,771.95 | $1,380.00 | Medicus |
| 10/26/2015 | 1/5/2016 | 5763040491 | $7,617.42 | $431.37 | Medicus |
| | 1/6/2016 | 5763040497 | $1,771.95 | $46.20 | Medicus |
| 10/26/2015 | 1/11/2016 | 5763041588 | $7,617.42 | $5,633.09 | Medicus |
| | 1/11/2016 | 5763041590 | $1,771.95 | $1,275.63 | Medicus |
| 10/26/2015 | 1/5/2016 | 5763040434 | $7,617.42 | $431.37 | Medicus |
| | 1/6/2016 | 5763040433 | $1,771.95 | $46.20 | Medicus |
| 10/25/2015 | 1/8/2016 | 5763041090 | $7,617.42 | $6,093.94 | Medicus |
| | 1/8/2016 | 5763041091 | $1,771.95 | $1,380.00 | Medicus |
| 10/26/2015 | 1/6/2016 | 5763040405 | $1,771.95 | $46.20 | Medicus |
| | 1/15/2016 | 5763040394 | $7,617.42 | $431.37 | Medicus |

171. By 2016, when ALG began billing United, the procedure codes for drug testing had changed. Screening tests fall under a single procedure code. Likewise, confirmatory testing falls under a single procedure code, depending on the number of component tests performed.

172. Next Health's routine performance of unnecessary tests as part of blanket testing protocols is demonstrated by examining claims that were based on requests from ALG's leading referral source, a Denton, Texas based chiropractor. In roughly one month – between July 26, 2016 and September 2, 2016 – ALG billed United nearly one million dollars ($996,618.59) for drug testing services allegedly requested by this chiropractor.

173.   On July 26, 2016 alone, ALG submitted 30 claims to United, charging $110,206.80 and receiving $103,130.81 for services allegedly requested by this chiropractor.  All of the claims were for one of two procedure codes: G0479 (presumptive drug testing performed by instrumented chemistry analyzers) or G0483 (definitive drug testing of more than 22 drug classes). In other words, this medical provider, who cannot prescribe medications, was requesting G0479, a $1,818.00 drug screen, and then, regardless of the results, G0483, a $6,456.90 confirmatory test on every single result. The chart below reflects many of these claims:

| Date Submitted | Claim | Procedure Code | Amount Charged | Amount Paid | Next Health Subsidiary |
|---|---|---|---|---|---|
| 7/26/2016 | 6060364885 | G0483 | $6,456.90 | $4,834.91 | ALG |
| 7/26/2016 | 6060364999 | G0479 | $1,818.00 | $1,818.00 | ALG |
| 7/26/2016 | 6060365056 | G0479 | $1,818.00 | $1,818.00 | ALG |
| 7/26/2016 | 6060365057 | G0483 | $6,456.90 | $6,456.90 | ALG |
| 7/26/2016 | 6060365157 | G0479 | $1,818.00 | $1,818.00 | ALG |
| 7/26/2016 | 6060365158 | G0483 | $6,456.90 | $6,456.90 | ALG |
| 7/26/2016 | 6060365173 | G0479 | $1,818.00 | $1,818.00 | ALG |
| 7/26/2016 | 6060365174 | G0483 | $6,456.90 | $6,456.90 | ALG |
| 7/26/2016 | 6060365205 | G0479 | $1,818.00 | $1,818.00 | ALG |
| 7/26/2016 | 6060365206 | G0483 | $6,456.90 | $6,456.90 | ALG |
| 7/26/2016 | 6060365218 | G0479 | $1,818.00 | $1,818.00 | ALG |
| 7/26/2016 | 6060365283 | G0479 | $1,818.00 | $1,818.00 | ALG |
| 7/26/2016 | 6060365383 | G0479 | $1,818.00 | $1,818.00 | ALG |
| 7/26/2016 | 6060365476 | G0479 | $1,818.00 | $1,818.00 | ALG |
| 7/26/2016 | 6060365477 | G0483 | $6,456.90 | $6,456.90 | ALG |
| 7/26/2016 | 6060365534 | G0479 | $1,818.00 | $1,818.00 | ALG |
| 7/26/2016 | 6060365535 | G0483 | $6,456.90 | $6,456.90 | ALG |
| 7/26/2016 | 6060365727 | G0479 | $1,818.00 | $1,818.00 | ALG |
| 7/26/2016 | 6060365728 | G0483 | $6,456.90 | $6,456.90 | ALG |
| 7/26/2016 | 6060365892 | G0479 | $1,818.00 | $1,818.00 | ALG |
| 7/26/2016 | 6060365893 | G0483 | $6,456.90 | $6,456.90 | ALG |
| 7/26/2016 | 6060366058 | G0479 | $1,818.00 | $1,818.00 | ALG |
| 7/26/2016 | 6060366059 | G0483 | $6,456.90 | $6,456.90 | ALG |
| 7/26/2016 | 6060366223 | G0479 | $1,818.00 | $1,818.00 | ALG |
| 7/26/2016 | 6060366224 | G0483 | $6,456.90 | $6,456.90 | ALG |

| 7/26/2016 | 6060366296 | G0479 | $1,818.00 | $1,818.00 | ALG |
| 7/26/2016 | 6060366297 | G0483 | $6,456.90 | $6,456.90 | ALG |

174.    The performance of unnecessary blanket quantitative confirmatory tests, which violates Next Health's own written policy, was pervasive. For example, ALG submitted approximately 1,932 claims to United for performing procedure code G0483, which is for *confirmation testing* of more than 22 drug classes at one time, billing $11,180,049.94 and receiving $4,260,736.31. These claims represent approximately 88% of the confirmatory testing billed to United by ALG.

175.    Conversely, ALG submitted 13 claims to United billed as procedure code G0480, which is for confirmatory testing of between 1 and 7 drug classes, billing $31,176.60 and receiving $8,228.01 from United. These claims represent less than 1% of the confirmatory testing billed to United by ALG.

176.    In a legitimate clinical setting, there is no medical reason to routinely perform quantitative confirmatory testing on 20 separate drug classes, particularly following a negative qualitative testing result.

177.    The lack of medical necessity underlying Next Health's testing methods is further demonstrated by the fact that it performs quantitative confirmatory testing before the medical provider ever even views the results of the screening tests. That is, Next Health runs tests to determine the *exact amounts* of multiple drugs that *may be* in a patient's system *before* the physician ever even establishes that *any amount* of drugs *are actually* present in the patient's system.

178.    The PG testing purportedly performed by Next Health subsidiaries was also done pursuant to blanket testing protocols. For example, Next Health subsidiary US Toxicology performed services on 26 patients at the request of one provider. US Toxicology submitted

approximately one claim per patient for the genetic testing services it allegedly performed. Out of those 26 requests, 24 were for *identical* genetic testing services (procedure codes 81225, 81226, 81227, 81240, 81241, 81291, 81355, 81401, 81479), charging $6,499.92 per test. The other two each were for $20,360.93, which consisted of the exact same procedure codes. US Toxicology represented that these services were medically necessary, even though it knew at the time it submitted the claims that this was untrue. The chart below reflects many of these claims.

| Date Submitted | Claim | Amount Charged | Amount Paid | Next Health Subsidiary |
|---|---|---|---|---|
| 3/30/2016 | 5854369373 | $6,499.92 | $1,688.36 | US Toxicology |
| 3/9/2016 | 5854369352 | $6,499.92 | $1,688.36 | US Toxicology |
| 3/9/2016 | 5854369374 | $6,499.92 | $1,688.36 | US Toxicology |
| 3/9/2016 | 5854369364 | $6,499.92 | $1,688.36 | US Toxicology |
| 3/9/2016 | 5854369370 | $6,499.92 | $1,688.36 | US Toxicology |
| 3/9/2016 | 5854369353 | $6,499.92 | $1,688.36 | US Toxicology |
| 3/9/2016 | 5854369354 | $6,499.92 | $1,688.36 | US Toxicology |
| 3/9/2016 | 5854369355 | $6,499.92 | $2,312.18 | US Toxicology |
| 3/1/2016 | 5854369399 | $6,499.92 | $6,499.92 | US Toxicology |
| 3/9/2016 | 5854369363 | $6,499.92 | $1,688.36 | US Toxicology |
| 3/14/2016 | 5851917234 | $20,360.93 | $9,986.07 | US Toxicology |
| 3/9/2016 | 5854369376 | $6,499.92 | $1,688.36 | US Toxicology |
| 3/9/2016 | 5854369367 | $6,499.92 | $1,688.36 | US Toxicology |
| 3/9/2016 | 5854369381 | $6,499.92 | $2,729.98 | US Toxicology |
| 4/1/2016 | 5903105808 | $20,360.93 | $5,935.33 | US Toxicology |
| 3/20/2016 | 5854369382 | $6,499.92 | $4,154.36 | US Toxicology |
| 3/9/2016 | 5854369362 | $6,499.92 | $1,688.36 | US Toxicology |
| 3/9/2016 | 5854369391 | $6,499.92 | $5,654.91 | US Toxicology |
| 3/9/2016 | 5854369368 | $6,499.92 | $1,688.36 | US Toxicology |
| 3/4/2016 | 5854369403 | $6,499.92 | $254.64 | US Toxicology |
| 3/9/2016 | 5854369371 | $6,499.92 | $1,688.36 | US Toxicology |

179.    US Toxicology sometimes submitted claims to United for blanket drug *and* PG testing. These claims charged between $14,774.82 and $18,400.89 for the combination of the testing services, including $6,456.90 for confirmatory drug testing of more than 22 drug classes.

The medical providers justify this battery of testing by using cloned statements that do not specify any particular test or any medical rationale underlying the testing.

180.    Below are a few examples of the claims submitted to United by US Toxicology for the performance of unnecessary drug and PG testing, pursuant to blanket, nonspecific testing profiles. Each of the claims associated with each member arise from the same patient encounter.

| Member | Date Submitted | Claim | Amount Charged | Amount Paid |
|---|---|---|---|---|
| #1 | 4/27/2016 | 5933444118 | $10,125.99 | $6,022.89 |
| | 5/5/2016 | 5933444119 | $1,818.00 | $1,636.20 |
| | 5/10/2016 | 5952668964 | $6,456.90 | $4,519.83 |
| Total: | | | **$18,400.89** | **$12,178.92** |
| #2 | 5/22/2016 | 5968075771 | $1,818.00 | $1,818.00 |
| | 6/2/2016 | 5977016992 | $6,456.90 | $6,456.90 |
| | 6/2/2016 | 5980715033 | $10,125.99 | $10,125.99 |
| Total: | | | **$18,400.89** | **$18,400.89** |
| #3 | 5/20/2016 | 5977017066 | $1,818.00 | $1,454.40 |
| | 5/20/2016 | 5977017067 | $6,456.90 | $5,197.16 |
| | 6/2/2016 | 5993090263 | $10,125.99 | $10,125.99 |
| Total: | | | **$18,400.89** | **$18,400.89** |

181.    Utilizing "custom" profiles to justify the performance of unnecessary drug testing is not a new concept. The Office of the Inspector General warned about the potential for fraud posed by custom profiles almost twenty years ago: "customized profile[s] may result in the ordering of tests which are not covered, reasonable, or necessary and . . . the OIG takes the position that an individual who knowingly causes a false claim to be submitted may be subject to sanctions or remedies available under civil, criminal, and administrative law." *See* Dept. of Health and Human Servs., Office of Inspector General, *Compliance Program Guidance for Clinical Laboratories*, reprinted in 63 Fed. Reg. 163 (Aug. 1998).

182.    Every claim submitted to United by Next Health and its subsidiaries for services performed pursuant to a "custom" profile intentionally misrepresented that the services were medically necessary. Next Health and its subsidiaries knew at the time they submitted these

claims that their representations that the services were medically necessary were false because they conspired with the referral sources to choose the most expensive and broadest array of testing, so that they could maximize the amount of money taken from United.

183.    Next Health and its subsidiaries falsely represented that the services in these claims were medically necessary intending that United would act on the representations and make payment on the claims. Exhibit D identifies examples of claims submitted to United by each Next Health licensed subsidiary that falsely represented that the services billed for therein were medically necessary.

184.    Upon information and belief, many more, if not all, of the claims submitted to United by Next Health and its subsidiaries were for unnecessary services performed pursuant to a "custom" profile. This belief is supported (a) by United's recent review of hundreds of requisition forms underlying UTox and Medicus's billed-for services, which demonstrate that where a testing box was checked, it was almost always for a "custom" profile; (b) by the fact that kickbacks incentivize medical providers to request the performance of unnecessary testing services; (c) by United's review of claim data that indicates an overwhelming majority of claims were for the same set of blanket services; and (d) by the fact that Next Health's requisition forms state that if no tests are selected, then Next Health and its subsidiaries will perform the "custom" profile on file.

185.    The details regarding whether the services performed and billed for by Next Health and its subsidiaries were performed pursuant to these "custom" profiles are peculiarly in Next Health, its subsidiaries, and the medical providers who sign off on custom profiles' possession.

c.    Billing for services that were performed by another provider

186.    Next Health frequently causes the submission of claims to United with the Tax Identification Number ("TIN") and National Provider Identifier ("NPI") of a licensed subsidiary that did not perform the testing services reflected on the claims.

187.    Under CLIA, Next Health subsidiaries UTox, Medicus, US Toxicology, and ALG do not and cannot perform PG testing. However, these Next Health subsidiaries routinely submit claims to United for PG testing services. Next Health refers PG testing services to outside labs, but bills United as if UTox, Medicus, US Toxicology, or ALG performed the services.

188.    The identity of the provider that actually performed the services billed for in a claim form is material information to United because, if it is not accurate, then United does not know, among other things, whether there are contractual agreements governing the charges for the services, whether United accepts claims from the provider that actually performed the services, whether United is being billed multiple times by different providers for the same services, and/or whether the provider performing the services has been identified by United for any kind of prepayment or preauthorization review.

189.    On March 14, 2016, US Toxicology submitted a claim to United that represented that United's member owed $20,360.93 for 17 genetic testing services. United paid US Toxicology $9,986.07 for these services. US Toxicology is legally unable to perform these services. The claim intentionally misled United into paying for services that were performed by another provider.

190.    In total, US Toxicology submitted more than 2,450 claims to United that falsely asserted that US Toxicology performed PG testing services, charging $10,546,739.53 and receiving $2,748,522.42 from United based on these fraudulent claims.

191.    Many of these PG tests were requested by a single practice in Dallas, Texas: Sweeney Foot and Ankle. US Toxicology submitted 555 claims to United that represented that it performed drug and PG testing at the request of two providers in this practice. US Toxicology, however, did not perform any of these services. Examples of these fraudulent claims are reflected in the following chart:

| Date Submitted | Claim | Amount Charged | Amount Paid | Next Health Subsidiary |
|---|---|---|---|---|
| 6/2/2016 | 5993090263 | $10,125.99 | $10,125.99 | US Toxicology |
| 3/26/2016 | 5903105973 | $6,499.92 | $6,499.92 | US Toxicology |
| 3/15/2016 | 5849748859 | $6,499.92 | $5,089.44 | US Toxicology |
| 4/27/2016 | 5933444118 | $10,125.99 | $6,022.89 | US Toxicology |
| 6/2/2016 | 5980715033 | $10,125.99 | $10,125.99 | US Toxicology |

192.    ALG, UTox, and Medicus also submitted a total of approximately 172 claims for PG and drug testing services allegedly performed at the request of the providers in the Sweeney Foot and Ankle practice, charging more than $796,112.69 and receiving more than $387,954.00 from United. The following chart lists claims that falsely represented that PG and/or drug testing services were performed by ALG, at the request of providers in the Sweeney Foot and Ankle practice:

| Date Submitted | Claim | Amount Charged | Amount Paid | Next Health Subsidiary |
|---|---|---|---|---|
| 7/30/2016 | 6060364956 | $1,818.00 | $1,018.08 | ALG |
| 8/10/2016 | 6070560101 | $6,456.90 | $3,615.86 | ALG |
| 8/10/2016 | 6070560102 | $10,125.99 | $5,670.55 | ALG |
| 8/19/2016 | 6070560128 | $1,818.00 | $1,272.60 | ALG |
| 8/4/2016 | 6070560129 | $6,456.90 | $4,519.83 | ALG |
| 8/4/2016 | 6072325097 | $10,125.99 | $7,088.19 | ALG |

193.    United interviewed Sweeney patients who, despite the fact that US Toxicology submitted claims for tens of thousands of dollars of testing, reported that they never provided specimens for any kind of PG or drug testing and never received the results of any such testing. Some of these fraudulent claims are listed in the following chart:

| Date Submitted | Claim | Amount Charged | Amount Paid | Next Health Subsidiary |
|---|---|---|---|---|

| 2/24/2016 | 5830317750 | $1,818.00 | $1,334.26 | US Toxicology |
| 2/24/2016 | 5830317751 | $6,456.90 | $5,055.75 | US Toxicology |
| 3/15/2016 | 5849748859 | $6,499.92 | $5,089.44 | US Toxicology |

194.   ALG submitted more than 2,000 claims to United that represented it performed PG testing services, charging $12,556,209.65 and receiving more than $4,312,489.81 from United for those services. ALG, however, did not perform these services.

195.   On August 31, 2016, ALG submitted two separate claims to United that represented that United's two members each owed $13,864.16 for 10 different PG testing services. United paid ALG $9,530.92 on one claim and $11,913.65 on the other claim. The claims intentionally misled United into paying for services that were performed by another provider. At the time the claims were submitted to United, ALG knew that this material information was untrue, but made the representations anyway, hoping to receive payments from United for services that it did not perform.

196.   UTox submitted more than 4,000 claims to United that represented it performed PG testing services, charging $22,080,491.28 and receiving more than $5,647,027.29 from United for those services. UTox, contrary to its representations in the claims submitted to United, did not perform these PG testing services. UTox falsely represented that it performed these services so that it could trick United into making millions of dollars of payments that were not owed.

197.   UTox submitted a claim to United on March 2, 2016 for PG testing services performed on a United's member's saliva specimen, charging $19,860.16 and representing that it performed the services. The next day, on March 3, 2016, UTox submitted another claim to United for PG testing services performed on a United's member's saliva specimen, again charging $19,860.93 and representing that it performed the services. The claims intentionally misled United into paying for services that were performed by another provider. At the time the

claims were submitted to United, UTox knew that this material information was untrue, but made the representations anyway, hoping to receive payments from United for services that it did not perform.

198.    This practice is not limited to PG testing. ALG performed confirmatory drug testing services before it was licensed under CLIA. To disguise that the services were performed illegally, Next Health misrepresented that UTox or Medicus performed the services in the claims submitted to United. For example, on January 5, 2016, Medicus submitted a claim to United, charging $9,389.37 for testing services allegedly performed on October 28, 2015. The claim misrepresented that Medicus performed the services.

199.    Each claim submitted to United by UTox, US Toxicology, and ALG for PG testing services falsely represented that the respective Next Health subsidiary performed the testing services billed for therein. At the time the claims were submitted, Next Health and its subsidiaries knew that this material information was false (as none of the Next Health subsidiaries had appropriate CLIA certifications or capability to perform PG testing), but made the representations anyway, intending to mislead United into paying the respective Next Health subsidiaries for services they did not perform. United reasonably relied on these material misrepresentations and was harmed each time it made a resulting payment to Next Health's licensed subsidiaries.

### 3.   *Disguising unnecessary testing by ignoring patient payment responsibilities*

200.    Next Health and its subsidiaries knew that their scheme would fail if patients were held financially responsible for the overpriced and unnecessary testing services, so they did not hold patients financially responsible for the services they performed.

201.    In other words, Next Health and its subsidiaries induce patients to accept unnecessary OON testing services that would ordinarily be against their financial interests by ignoring any patient payment responsibilities.

202.    Whether United's member is financially responsible for services, as well as the amount of the member's financial responsibility, is material to United's determination of whether a claim is payable and the amount to pay.

203.    When Next Health and its licensed subsidiaries submitted claims to United, they represented that United's members owed the amounts listed in the claims.  But when Next Health and its subsidiaries made these representations to United, they knew that they were false.  Next Health and its subsidiaries did not collect any patient payment responsibilities (and never intended to collect any patient payment responsibilities).

204.    Next Health and its subsidiaries made these false representations intentionally, hoping to trick United into taking action on the false representations by making payments to Next Health for the services.

205.    Next Health knew that it was illegal to forego the collection of patient payment responsibilities, so it sometimes sent bills to patients to disguise its policy or feign compliance. But even when a bill was sent, Next Health would not make a legitimate attempt to collect any amount purportedly owed by the member. It would not follow up with the patient and, after a month, the amount charged was simply written off. This practice violates Tex. Ins. Code § 552.003 because Next Health and its subsidiaries are intentionally and knowingly charging different prices for the same service, where the higher price is based on the fact that United will pay part of the price.

206.    Worried that patients would protest or complain to their insurer or medical provider about Next Health's unnecessary testing services, Next Health, through its subsidiaries, informed patients that they should not confuse an EOB from their insurance company as a bill, and, regardless of what an EOB stated, that a patient would never owe Next Health or its subsidiaries anything for testing services.

207.    Next Health, through its subsidiaries, told patients that, even if it sent a bill, "the billing department will never send your information to a collection agency in attempt to collect a debt. The uncollected amount will be written off by [the Next Health subsidiary] within the calendar year. There *is no action required on the part of a patient if they receive a statement.*" (Emphasis in original.) (*See* Exhibit E.)

208.    Next Health communicated this policy to its kickback-recipient coconspirators, so that they, or whoever interfaced with patients, could falsely represent to patients that the testing services were completely covered by insurance and that patients would never owe anything for the testing services.

209.    For example, when members noticed exorbitant charges on EOBs they received from United, they called Sweeney Foot and Ankle to complain and make sure that they did not actually owe the stated amounts. Sweeney's office informed the members that they owed nothing and that even if they received a bill that they could disregard it.

210.    Similarly, Erik Bugen and Kirk Zajac repeatedly told United's members that the testing being ordered by The ADAR Group was done at no charge to them and that even if a bill came for the services to disregard it.

211.    United interviewed several members regarding their experience with The ADAR Group, Sweeney Foot & Ankle, and Next Health subsidiaries. Members consistently explained

that they never received a bill for services. Next Health subsidiaries told those who did receive a bill that they should ignore it.

212.   One member provided 10-14 urine specimens to The ADAR Group and received a $50 gift card each time. When the member provided a sample, the member was asked to sign, but not date, an associated form. The member discovered that UTox and Medicus billed the member's health benefit plan for more than $217,000 and submitted claims to United for 30 different dates of service, even though the member only provided 10-14 specimens. The member never received any bills for the services and was told by an ADAR Group employee, Nathan Goodman, that there would be no bills and that the member owed nothing. Although Dr. Rao, Dr. Kim, and Dr. Parameswara are listed as the providers who requested the testing, the member never met these physicians. Each claim listed in the following chart was fraudulent because it omitted the fact that the services billed for therein were induced by kickbacks to The ADAR Group, it misrepresented that the services billed for therein were requested by the listed provider, it misrepresented that the services billed for therein were medically necessary, and it misrepresented that the member owed the Amount Charged. Next Health and UTox made these material misrepresentations and omissions knowingly and intentionally, hoping that United would rely on the fraudulent claims and make payments based on them.

| Date Submitted | Claim | Amount Charged | Amount Paid | Next Health Subsidiary |
|---|---|---|---|---|
| 8/20/2015 | 5161180557 | $1,771.95 | $900.66 | UTox |
| 8/20/2015 | 5161180558 | $1,771.95 | $1,350.66 | UTox |
| 2/20/2016 | 5164412143 | $15,060.34 | $6,358.73 | UTox |
| 2/20/2016 | 5164412144 | $5,863.89 | $5,101.55 | UTox |
| 2/20/2016 | 5172558341 | $6,499.94 | $5,192.96 | UTox |
| 2/20/2016 | 5179303523 | $1,771.96 | $962.23 | UTox |
| 2/20/2016 | 5179303524 | $1,771.96 | $577.34 | UTox |
| 2/20/2016 | 5183756475 | $8,797.89 | $8,797.86 | UTox |
| 2/20/2016 | 5192173681 | $1,771.96 | $589.94 | UTox |

| 2/20/2016 | 5192173682 | $1,771.96 | $692.61 | UTox |
| 2/20/2016 | 5192173683 | $8,797.89 | $3,539.00 | UTox |
| 2/20/2016 | 5192173684 | $8,797.89 | $3,539.00 | UTox |
| 2/20/2016 | 5196079685 | $1,771.96 | $983.23 | UTox |
| 2/20/2016 | 5196079686 | $1,771.96 | $983.23 | UTox |
| 2/20/2016 | 5202514898 | $8,797.89 | $3,539.00 | UTox |
| 2/20/2016 | 5202514899 | $8,797.89 | $3,539.00 | UTox |
| 2/20/2016 | 5202514900 | $1,771.96 | $962.23 | UTox |
| 2/20/2016 | 5202514901 | $1,771.96 | $962.23 | UTox |
| 2/18/2016 | 5207170366 | $8,797.89 | $8,797.86 | UTox |
| 2/18/2016 | 5207170367 | $8,797.89 | $8,797.86 | UTox |
| 2/19/2016 | 5212074402 | $1,771.96 | $1,771.95 | UTox |
| 2/19/2016 | 5212074403 | $1,771.96 | $1,771.95 | UTox |
| 2/19/2016 | 5216514483 | $8,797.89 | $8,797.86 | UTox |
| 2/19/2016 | 5216514484 | $8,797.89 | $8,797.86 | UTox |
| 2/19/2016 | 5230802689 | $1,771.96 | $1,771.95 | UTox |
| 2/19/2016 | 5230802690 | $1,771.96 | $1,771.95 | UTox |
| 2/19/2016 | 5230802691 | $8,797.89 | $1,523.40 | UTox |
| 2/19/2016 | 5230802692 | $8,797.89 | $2,123.40 | UTox |

213.   Another member was invited by Bugen to participate in a "urine drug study." The member gave Bugen nine or ten urine specimens. He gave the member a $50 gift card for each specimen. The member also gave one saliva specimen, for which Bugen also gave the member a $50 gift card. Each time the member provided a specimen, Bugen asked the member to sign a consent form, but not to date it. During one of these visits, Bugen bragged to the member that he made $100,000 per month as a result of his work with Next Health and its subsidiaries. The member never saw a physician or any medical provider in connection with any of these interactions. The member came to learn, however, that there was no "urine drug study" and that the member's specimens were shipped to Next Health, who then caused them to be tested by UTox, who then submitted claims to United for 18 different dates of service and more than $142,000. Each claim listed in the following chart was fraudulent because it omitted the fact that the services billed for therein were induced by kickbacks to The ADAR Group, it misrepresented

that the services billed for therein were requested by the listed provider, it misrepresented that the services billed for therein were medically necessary, and it misrepresented that the member owed the Amount Charged. Next Health and UTox made these material misrepresentations and omissions knowingly and intentionally, hoping that United would rely on the fraudulent claims and make payments based on them.

| Date Submitted | Claim | Amount Charged | Amount Paid | Next Health Subsidiary |
|---|---|---|---|---|
| 9/11/2015 | 5136003312 | $699.48 | $699.48 | UTox |
| 9/11/2015 | 5136003313 | $699.48 | $699.48 | UTox |
| 8/5/2015 | 5144171543 | $10,204.56 | $6,358.73 | UTox |
| 8/6/2015 | 5144171544 | $10,204.56 | $6,358.73 | UTox |
| 2/27/2016 | 5175823409 | $8,797.89 | $7,654.14 | UTox |
| 2/27/2016 | 5175823410 | $8,797.89 | $7,654.14 | UTox |
| 2/27/2016 | 5175823411 | $8,797.89 | $7,654.14 | UTox |
| 2/26/2016 | 5192173369 | $1,771.96 | $1,771.95 | UTox |
| 3/7/2016 | 5196079619 | $14,182.06 | $8,797.86 | UTox |

214.    The claims below were submitted by Next Health and its subsidiaries UTox and Medicus to United for services performed on one of its members. These claims falsely represented to United that its member owed $254,120.49 to UTox and $18,778.37 to Medicus. United, reasonably relying on the representations that its member owed the amounts stated in each claim, paid Next Health subsidiaries UTox $128,119.80 and Medicus $8,736.14. However, United's member did not actually owe UTox or Medicus the represented amounts. When UTox and Medicus submitted the claims to United, they knew that United's member did not owe the amounts contained in the claims, because UTox and Medicus, at Next Health's direction, do not collect any payments from patients. Indeed, United's member never received any kind of bill for the services. The following chart shows examples of the claims submitted to United, the date they were submitted, the amount charged, and the amount paid by United to UTox or Medicus in reliance on the false information contained in the claim:

| Date Submitted | Claim | Amount Charged | Amount Paid | Next Health Subsidiary |
|---|---|---|---|---|
| 7/23/2015 | 5133768780 | $239.69 | $239.69 | UTox |
| 7/24/2015 | 5133768781 | $419.69 | $419.69 | UTox |
| 8/6/2015 | 5144171459 | $10,204.56 | $5,298.31 | UTox |
| 8/10/2015 | 5144171460 | $10,204.56 | $6,358.73 | UTox |
| 8/11/2015 | 5154831414 | $1,771.95 | $962.23 | UTox |
| 8/11/2015 | 5154831415 | $1,771.95 | $962.23 | UTox |
| 8/18/2015 | 5158110606 | $10,204.56 | $6,358.73 | UTox |
| 8/18/2015 | 5158110607 | $10,204.56 | $6,358.73 | UTox |
| 8/24/2015 | 5161180488 | $6,499.92 | $5,192.96 | UTox |
| 9/3/2015 | 5167546404 | $1,771.96 | $962.23 | UTox |
| 9/8/2015 | 5172327886 | $1,771.96 | $158.23 | UTox |
| 9/8/2015 | 5172558268 | $1,771.96 | $962.23 | UTox |
| 9/9/2015 | 5174246001 | $8,797.89 | $7,654.14 | UTox |
| 9/9/2015 | 5174246002 | $8,797.89 | $7,654.17 | UTox |
| 9/18/2015 | 5175823391 | $8,797.89 | $7,654.14 | UTox |
| 9/4/2015 | 5176803197 | $8,797.89 | $7,654.14 | UTox |
| 9/9/2015 | 5192173045 | $1,771.96 | $983.23 | UTox |
| 9/9/2015 | 5192173046 | $1,771.96 | $983.23 | UTox |
| 9/9/2015 | 5192173047 | $8,797.89 | $3,539.00 | UTox |
| 9/9/2015 | 5192173048 | $8,797.89 | $3,539.00 | UTox |
| 9/14/2015 | 5196079547 | $1,771.96 | $983.23 | UTox |
| 9/14/2015 | 5196079548 | $1,771.96 | $983.23 | UTox |
| 9/13/2015 | 5197757452 | $8,797.89 | $3,539.00 | UTox |
| 9/13/2015 | 5197757453 | $8,797.89 | $3,539.00 | UTox |
| 9/14/2015 | 5197757454 | $1,771.96 | $962.23 | UTox |
| 9/15/2015 | 5200810073 | $1,771.96 | $962.23 | UTox |
| 9/18/2015 | 5202514815 | $8,797.89 | $3,539.00 | UTox |
| 9/17/2015 | 5205859100 | $8,797.89 | $3,539.00 | UTox |
| 9/17/2015 | 5205859101 | $1,771.96 | $983.23 | UTox |
| 9/17/2015 | 5207170326 | $1,771.96 | $983.23 | UTox |
| 9/19/2015 | 5208726567 | $8,797.89 | $3,539.00 | UTox |
| 9/22/2015 | 5210333293 | $8,797.89 | $3,539.00 | UTox |
| 9/23/2015 | 5212074329 | $1,771.96 | $983.23 | UTox |
| 9/25/2015 | 5216514414 | $8,797.89 | $3,539.00 | UTox |
| 9/29/2015 | 5218573639 | $1,771.96 | $983.23 | UTox |
| 9/29/2015 | 5220478534 | $8,797.89 | $3,539.00 | UTox |
| 10/13/2015 | 5232509202 | $1,771.96 | $983.23 | UTox |
| 10/13/2015 | 5232509203 | $1,771.96 | $983.23 | UTox |
| 10/13/2015 | 5235525964 | $8,797.89 | $3,539.00 | UTox |
| 10/13/2015 | 5235525965 | $8,797.89 | $3,539.00 | UTox |

| 12/8/2015 | 5733667156 | $1,771.96 | $983.23 | UTox |
|---|---|---|---|---|
| 12/8/2015 | 5733667157 | $8,797.89 | $3,539.00 | UTox |
| 12/24/2015 | 5755363317 | $1,771.96 | $983.23 | UTox |
| 12/24/2015 | 5755363318 | $8,797.89 | $3,539.00 | UTox |
| 1/8/2016 | 5763040861 | $7,617.42 | $3,212.28 | Medicus |
| 1/8/2016 | 5763040862 | $7,617.42 | $3,951.86 | Medicus |
| 1/8/2016 | 5763040863 | $1,771.95 | $786.00 | Medicus |
| 1/8/2016 | 5763040864 | $1,771.95 | $786.00 | Medicus |

215.   This practice is not unique to Medicus and UTox. All of Next Health's licensed subsidiaries falsely represented the amounts owed by United's members when they submitted claims to United. Each and every claim submitted by Next Health and its licensed subsidiaries to United contained the same species of fraudulent misrepresentation.

216.   The following chart lists claims that were submitted to United by US Toxicology. United's members were told that they were not responsible for any part of the "Amount Charged." US Toxicology and Next Health, however, submitted claims to United that represented that United's members owed the listed amounts and intended for United to rely on those false representations.

| Date Submitted | Claim | Amount Charged | Amount Paid | Next Health Subsidiary |
|---|---|---|---|---|
| 3/9/2016 | 5854369353 | $6,499.92 | $1,688.36 | US Toxicology |
| 3/9/2016 | 5854369391 | $6,499.92 | $5,654.91 | US Toxicology |
| 3/20/2016 | 5854369382 | $6,499.92 | $4,154.36 | US Toxicology |
| 3/9/2016 | 5854369354 | $6,499.92 | $1,688.36 | US Toxicology |

217.   The following chart lists claims that were submitted to United by ALG that indicated United's members owed the amounts in the "Amount Charged" column. ALG and Next Health knew when these claims were submitted to United that United's members did not owe the amounts in the "Amount Charged" column, but they made these false representations intending for United to rely on them and make payment on the claims.

| Date Submitted | Claim | Amount | Amount Paid | Next Health |
|---|---|---|---|---|

| | | Charged | | Subsidiary |
|---|---|---|---|---|
| 8/12/2016 | 6060364875 | $1,818.00 | $1,636.20 | ALG |
| 8/4/2016 | 6060364876 | $6,456.90 | $5,811.21 | ALG |
| 7/30/2016 | 6060364882 | $1,818.00 | $1,018.08 | ALG |
| 8/8/2016 | 6060364883 | $6,456.90 | $3,615.86 | ALG |

218. Every single claim submitted to United by Next Health, through its licensed subsidiaries, including the representative examples identified in this Complaint and the Exhibits attached hereto, misrepresented that United's member owed the amount listed in the claim. Next Health and its subsidiaries knew these material representations were false when they made them, because they simply did not collect payments from patients. Next Health made these false representations intentionally, hoping for United to rely on these false material facts when making payment determinations.

219. Next Health and its subsidiaries' submissions of insurance claims that contain false and misleading information were intended to defraud and deceive insurers, like United, and constitute insurance fraud, as defined in Texas Penal Code § 35.02(a).

## V. DISCOVERY RULE

220. UTox, Medicus, and US Toxicology, have been submitting fraudulent claims to United for several years, but the nature of UTox, Medicus, and US Toxicology's fraudulent conduct made discovering that United was harmed very difficult. Despite exercising due diligence, United did not discover the harm caused by its reasonable reliance on UTox, Medicus, and US Toxicology's fraudulent claims until 2016. The discovery rule applies to delay the accrual of United's causes of action for fraud, conspiracy, negligent misrepresentations, money had and received, unjust enrichment, and Civil Theft Liability until 2016, when United discovered the fraudulent conduct and its resulting injury.

## COUNT 1 – FRAUD AND FRAUDULENT NONDISCLOSURE

## (Against Next Health, UTox, Medicus, US Toxicology, ALG, Erik Bugen, and Kirk Zajac)

221.    Paragraphs 1 through 22 and 26 through 220 are incorporated as if fully stated herein.

222.    Next Health, through its licensed subsidiaries, UTox, Medicus, US Toxicology, and ALG, committed fraud by making material false representations and/or concealing and/or failing to disclose material facts in each of the claims they submitted to United.

223.    Next Health, through its subsidiaries UTox, Medicus, US Toxicology, and ALG, made material representations in each claim submitted to United that the amount listed in each claim was the amount owed by United's member; that the medical provider listed in each claim requested and authorized the services as medically necessary; that the provider listed as the servicing provider performed the services; and that United's member assigned his or her OON benefits, or authorized United to pay his or her OON benefits, to the provider that submitted the claim.

224.    In each claim submitted to United by Next Health, through its subsidiaries UTox, Medicus, US Toxicology, and ALG, the representation that United's member owed the amount listed therein was false. At the time the representations were made, Next Health and its licensed subsidiaries knew that the representations were false because they never intended to collect any amounts from United's members, much less the amounts listed in the claims.

225.    In many claims submitted to United by Next Health, through its subsidiaries UTox, Medicus, US Toxicology, and ALG, the representation that the medical provider listed therein requested the services was false. Representative samples of these claims are identified in paragraphs 143, 212, 213, 216, 217 and Exhibits, A, B, and C.  Any claim submitted to United

for services performed based on a requisition form that lacked the listed medical provider's signature misrepresented that the services were authorized. At the time such misrepresentations were made, Next Health and its licensed subsidiaries knew that the services were not authorized or made the representations that they were authorized recklessly, without any knowledge of their truth.

226.   In many claims submitted to United by Next Health, through its subsidiaries UTox, Medicus, US Toxicology, or ALG, the representation that the services performed were medically necessary was false. Representative claims containing this misrepresentation are identified in paragraphs 116, 165, 166, 167, 167, 169, 170, 173, 178, 180, 212, 213 and Exhibits A, B, C, D, and F.   Any claim submitted to United for services performed at the request of a direct or indirect kickback recipient misrepresented that the services billed for therein were performed because they were medically necessary. Any claim submitted to United for services performed pursuant to a pre-determined "custom" profile misrepresented that the services billed for therein were performed because they were medically necessary. At the time these representations were made, Next Health and its licensed subsidiaries knew that the representations were false, or at least made the representations recklessly, without any knowledge of their truth.

227.   In many claims submitted to United by Next Health, through its subsidiaries UTox, Medicus, US Toxicology, or ALG, the representation that the licensed subsidiary that submitted the claim possessed an assignment of United's member's OON benefits or an authorization to receive United's member's OON benefits was false. Claims containing this material misrepresentation are identified in paragraph 92 and Exhibit F. Any claim submitted to United that made this representation without actually possessing such an assignment or

authorization was fraudulent. At the time these representations were made, Next Health and its licensed subsidiaries knew that the representations were false or at least made the representations recklessly, without any knowledge of their truth.

228.    In many claims submitted to United by Next Health, through its subsidiaries UTox, Medicus, US Toxicology, or ALG, the representation that the licensed subsidiary that submitted the claim was the provider that performed the services billed for therein was false. Representative claims are identified in paragraphs 189 – 198. Any claim submitted to United that made this representation without actually performing the billed-for services was fraudulent. At the time these representations were made, Next Health and its subsidiaries knew that the representations were false, or at least made the representations recklessly, without any knowledge of their truth.

229.    Next Health and its licensed subsidiaries made all of these false representations intentionally and hoping for United to rely on them and make payment on claims that it would not have made had it known the truth.

230.    United was unaware of the falsity of the representations contained in the claims when Next Health submitted them through its licensed subsidiaries.

231.    United reasonably relied on the false representations and, as a direct and proximate result, suffered injury in the amount it paid on the claims. The total amount United paid to Next Health's licensed subsidiaries based on fraudulent claims is approximately $101,540,408.50. United paid UTox approximately $54,689,543.42. United paid Medicus approximately $8,606,074.68. United paid US Toxicology approximately $23,930,750.87. United paid ALG approximately $14,314,039.53.

232.    Next Health, through its licensed subsidiaries UTox, Medicus, US Toxicology, and ALG, submitted thousands of claims to United that contained partial disclosures that conveyed a false impression regarding the reason the services were performed, triggering a duty to disclose the entire truth to United. But Next Health and its licensed subsidiaries failed to disclose that the services billed for therein were induced by kickbacks. Representative examples of these fraudulent claims are identified in paragraphs 116, 212, 213, 216, 217 and Exhibits A, B, and C.

233.    The fact that the services were performed because of kickbacks, not because they were medically necessary, is material to United's determination of whether payment is owed on a claim.

234.    Next Health and its licensed subsidiaries knew that United (a) was unaware of the fact that the services were induced by kickbacks, and (b) did not have an equal opportunity to discover the truth.

235.    Next Health and its licensed subsidiaries intended to induce United to make payment on the claims by omitting the fact that the services were induced by kickbacks.

236.    United suffered injury as a result of making payments on the claims without knowledge of the undisclosed fact that the services were performed because they were induced by kickbacks.

237.    Next Health is liable as a principal for the fraud perpetrated by its licensed subsidiaries UTox, Medicus, US Toxicology, and ALG against United. Next Health is liable for the fraud as a principal, because it participated in the fraud and reaped the benefits of the fraudulent transactions carried out by its subsidiaries. Next Health orchestrated the means by which the unnecessary medical testing was performed by its various licensed subsidiaries and the

way that illegal kickbacks were funneled through its unlicensed subsidiaries, concealing and perpetuating the fraudulent scheme. Next Health retained significant sums of money as a result of this scheme.

238. Erik Bugen is liable as a principal for the fraud perpetrated by UTox, Medicus, and US Toxicology, based on claims for services allegedly requested by Dr. Rao, Dr. Kim, or Dr. Parameswara, because he participated in the fraud by (a) finding the medical providers, (b) paying for the use of their medical billing credentials, (c) advertising The ADAR Group to attract and solicit specimens to send to Next Health in furtherance of the fraudulent transactions, (d) purchasing the gift cards that attracted and induced United's members to provide specimens, and (e) benefitting from the fraud by way of the kickbacks sent to him, directly or indirectly, from Next Health. Examples of these claims are listed in Exhibits A, B, and C. United was harmed in excess of $11,185,000 as a result of Bugen's role as a principal in Next Health's fraudulent scheme.

239. Kirk Zajac is likewise liable as a principal for the fraud perpetrated by UTox, Medicus, and US Toxicology, based on claims for services allegedly requested by Dr. Rao, Dr. Kim, and Dr. Parameswara because he participated in the fraud by (a) filling out requisition forms with false information and mailing them to Next Health; (b) posting advertisements on the internet to attract United's members to come to The ADAR Group's clinics and provide specimens, (c) purchasing and distributing the gift cards used to induce United's members to return to The ADAR Group and to refer their friends, and (d) personally benefitting from the fraud by way of the kickbacks sent to him, directly or indirectly, from Next Health. Examples of these claims are listed in Exhibits A, B, and C. United was harmed in excess of $11,185,000 as a result of Zajac's role as a principal in Next Health's fraudulent scheme.

240.     United is entitled to its actual damages, consequential damages, and incidental damages caused by Defendants' conduct.

241.     United is further entitled to exemplary damages to punish Defendants for their fraudulent, malicious, and deceptive conduct that harmed United.

<u>COUNT 2 –CONSPIRACY TO COMMIT FRAUD</u>

<u>(Against Next Health, Erik Bugen, and Kirk Zajac)</u>

242.     Paragraphs 1 through 22 and 26 through 241 are incorporated as if fully stated herein.

243.     Pleading further, and in the alternative, if necessary, Next Health conspired with Bugen, and Zajac to commit fraud against commercial insurers, including United.

244.     The object of the conspiracy was to obtain funds from commercial insurers for the performance of unnecessary drug and PG testing services. The scope of the conspiracy includes all of the claims submitted to United by Next Health subsidiaries UTox, Medicus, and US Toxicology that represented that the services performed therein were requested by Dr. Rao, Dr. Kim, or Dr. Parameswara.

245.     The conspirators agreed on the object of the conspiracy and each took overt acts to further the conspiracy.

246.     Erik Bugen used funds he received from Next Health (originally paid to him in the form of kickbacks) to pay Dr. Rao, Dr. Kim, and Dr. Parameswara for the use of their medical billing credentials. He also filled out requisition forms with false information, intending for that false information to be transmitted to or passed on to United, and for United to act upon it and make payment on the claims submitted to it as a result of the fraudulent requisition forms.

247.    Kirk Zajac placed advertisements on social media websites to attract individuals with commercial health insurance to come into The ADAR Group's clinics and provide specimens for testing.  He also purchased gift cards to provide to the individuals to induce them to come back and continue providing specimens. This assistance was necessary to the success of the conspiracy's plan to fraudulently obtain funds from United for unnecessary testing. He also filled out requisition forms with false information, intending for that false information to be transmitted to or passed on to United, and for United to act upon it and make payment on the claims submitted to it as a result of the fraudulent requisition forms.

248.    Next Health selected the components of Dr. Kim's "custom" profile, utilized its subsidiaries to submit thousands of fraudulent claims to United, and made payments, funneled through its unlicensed subsidiary Sirius Laboratories to The ADAR Group and, ultimately, Bugen and Zajac. Each submission of a claim allegedly authorized by Dr. Rao, Dr. Kim, or Dr. Parameswara is a distinct unlawful overt act in furtherance of the conspiracy. Next Health also made payments in exchange for the testing specimens it received from its coconspirators.

249.    As a result of Next Health's submission of claims that fraudulently represented the services therein were authorized by Dr. Rao, Dr. Kim, or Dr. Parameswara, United was harmed in an amount totaling no less than $11,185,000.00.

### COUNT 3 – NEGLIGENT MISREPRESENTATION

### (Against Next Health, UTox, Medicus, US Toxicology, and ALG)

250.    Paragraphs 1 through 22 and 26 through 220 are incorporated as if fully stated herein.

251.    Pleading further and in the alternative, if necessary, Next Health and its licensed subsidiaries UTox, Medicus, US Toxicology, and ALG are liable to United for negligent misrepresentation.

252.    Next Health, through its subsidiaries UTox, Medicus, US Toxicology, and ALG, made numerous material misrepresentations in the claims they submitted to United.

253.    These representations were made in the course of Next Health, UTox, Medicus, US Toxicology, and ALG's businesses, in transactions in which it had a pecuniary interest, since Next Health, UTox, Medicus, US Toxicology, and ALG intended for United to make payments to them based on the submission of these claims.

254.    Next Health, through its subsidiaries UTox, Medicus, US Toxicology, and ALG, however, failed to exercise reasonable care in these transactions and, as a result, supplied false information in the claims submitted to United, but still intended for that information to be useful for United's guidance of its own business.

255.    Such false information includes that United's member owed the amount listed in the claims presented to United; that the medical provider listed in the claim requested the services; that the services performed were medically necessary; that the licensed subsidiary that submitted the claim possessed an assignment of United's member's OON benefits or an authorization to receive United's member's OON benefits; and that the licensed subsidiary that submitted the claim was the provider that performed the services billed for therein.  Next Health, UTox, Medicus, US Toxicology, and ALG failed to exercise reasonable care or competence in obtaining or communicating this material information contained in the claims being submitted to United.

256.     United suffered significant pecuniary losses by justifiably relying on the claims submitted to it by Next Health and its licensed subsidiaries, because, relying on the false information contained therein, United made payments to UTox, Medicus, US Toxicology, and ALG totaling more than $100 million.

## COUNT 4 – MONEY HAD AND RECEIVED

### (Against Next Health, UTox, Medicus, US Toxicology, and ALG)

257.     Paragraphs 1 through 22 and 26 through 220 are incorporated as if fully stated herein.

258.     Pleading further and in the alternative, if necessary, Next Health and/or its licensed subsidiaries are in possession of funds that belong in good conscious to United.

259.     United made payments to Next Health's licensed subsidiaries because those licensed subsidiaries represented that they possessed assignments to United's members' OON benefits or authorizations for United to pay them its members' OON benefits. This was widely untrue, however, as assignments or authorizations were not held by the licensed subsidiaries that performed services and submitted claims, but, rather by the unlicensed subsidiaries that were listed on the requisition forms and used to conceal or disguise the kickback payments.

260.     Further, the amounts United paid to Next Health and its licensed subsidiaries were for services that were induced by violations of Texas law, based on claims that violated Texas law, and were for services that were requested not because of any beneficial value to United's members, but specifically because United's members were insured. The amounts United paid to UTox, US Toxicology, Medicus, and ALG belong in good conscious to United. United made payments to UTox, Medicus, US Toxicology, and ALG totaling more than $100 million.

## COUNT 5 - UNJUST ENRICHMENT

### (Against Next Health, UTox, Medicus, US Toxicology, and ALG)

261.    Paragraphs 1 through 22 and 26 through 220 are incorporated as if fully stated herein.

262.    Pleading further and in the alternative, if necessary, Next Health and its licensed subsidiaries have been unjustly enriched as a result of their unlawful, fraudulent, unfair, deceptive, deceitful, and otherwise unconscionable conduct.

263.    Next Health, its licensed subsidiaries, and their coconspirators broke Texas laws, including Tex. Occ. Code §§ 102.001, 105.002, Texas Ins. Code § 552.003, and Texas Penal Code §§ 31.03 and 35.02, in their aggressive pursuit to gouge United. Defendants relied on unlawful and deceitful conduct to induce United into making payments that it would never have made had it known the truth. Allowing Defendants to retain the funds taken from United, to which they were not entitled, would encourage their unlawful and deceitful conduct and unjustly enrich Defendants.

264.    United seeks to recover the actual, consequential, and incidental damages and costs incurred as a result of Next Health's scheme.

## COUNT 6 - TEXAS THEFT LIABILITY ACT

### (Against Next Health, UTox, Medicus, US Toxicology, and ALG)

265.    Paragraphs 1 through 22 and 26 through 220 are incorporated as if fully stated herein.

266.    Next Health and its licensed subsidiaries are liable to United, under the Texas Theft Liability Act, for their theft of more than $100 million from United.

267.    United was in lawful possession and control of the property – i.e., money – that was unlawfully appropriated from it by Next Health and its licensed subsidiaries. United's possession and control of the property unlawfully appropriated from it makes it an owner of that property, pursuant to Tex. Penal Code §1.07(a)(35).

268.    Next Health, UTox, Medicus, US Toxicology, and ALG unlawfully appropriated property, in the form of approximately $101,540,408.50, from United, intending to permanently deprive United of the property, in violation of Texas Penal Code § 31.03, and are thus liable to United for the damages caused by the thefts.

269.    Next Health, UTox, Medicus, US Toxicology, and ALG acquired possession and control over this property from United without United's "effective consent," as that term is used and defined in Texas Penal Code §§ 31.03(b)(1) and 31.01(3).

270.    United's consent to relinquishing possession and control of this property to Next Health and its licensed subsidiaries was ineffective because it was induced by deception.

271.    Next Health, through its licensed subsidiaries UTox, Medicus, US Toxicology, and ALG, unlawfully appropriated this property by inducing United to consent to transfer the property through deception.

272.    Next Health's licensed subsidiaries created, by words in the claims submitted to United, numerous false impressions of facts that Next Health and its licensed subsidiaries did not believe to be true, but which were likely to, and did, affect United's judgment as to whether it should consent to transferring possession and control of the property at issue in each transaction. These false impressions created by Next Health's licensed subsidiaries include:

        a.   that the services billed for in the claims submitted to United were medically necessary;

b.  that the services billed for in the claims submitted to United were lawfully performed;

c.  that the services billed for in the claims submitted to United were performed by the entity listed in the claims as having performed the services;

d.  that the licensed subsidiary submitting the claim had a lawfully obtained and legitimate assignment or authorization to collect benefits from United for the performance of those services;

e.  and that the amounts contained in the claims were the amounts actually owed by United's members for the services rendered by the licensed subsidiary that submitted each claim.

273.    Next Health's licensed subsidiaries created, by words relayed to United's members, the false impression of fact and law that United's members insurance benefits would be accepted as payment in full for the performance of testing services and that United's members would have no payment obligations for the services, which Next Health and its licensed subsidiaries did not believe to be true, but which were likely to, and did, affect United's members' judgment in entering into the transactions by providing specimens for testing.

274.    Next Health's licensed subsidiaries promised performances – collecting patient payment responsibilities – that were likely to, and did, affect United's judgment in giving consent to relinquishing possession and control of the property put at issue in each transaction, but which Next Health and its subsidiaries did not intend to perform, knew would not be performed, and did not actually perform.  Next Health and its subsidiaries' intent and knowledge that they would not perform this promise is demonstrated by the over-arching nature of Next

Health's kickback scheme, its exorbitantly priced services, its mandatory "custom" profiles, and its routine performance of otherwise unauthorized services.

275.    United has been harmed in the amount of the property unlawfully appropriated from it by each of Next Health's licensed subsidiaries:

      a.  UTox - $54,689,543.42;

      b.  Medicus - $8,606,074.68;

      c.  US Toxicology - $23,930,750.87;

      d.  ALG - $14,314,039.53.

276.    United seeks to recover these damages, as well as statutory damages, court costs, and reasonable and necessary attorney's fees, as provided for by Tex. Civ. Prac. & Rem. Code §134.005(a) and (b).

### COUNT 7 – SHAM TO PERPETRATE FRAUD LIABILITY

### (Against Next Health, UTox, Medicus, US Toxicology, and ALG)

277.    Paragraphs 1 through 19 and 42 through 241 are incorporated as if fully stated herein.

278.    Pleading further and in the alternative, if necessary, Next Health, uses the corporate form of its subsidiaries, including UTox, Medicus, US Toxicology, and ALG, to perpetrate fraud.

279.    Next Health is liable for the harm alleged herein that was caused or furthered by its subsidiaries UTox, Medicus, US Toxicology, and ALG.

280.    Recognizing the separate corporate existence between Next Health and its subsidiaries that it used to carry out its scheme to defraud, would cause an inequitable result.

281.    Next Health has used the corporate structure of its subsidiaries to perpetrate its scheme to defraud United by concealing its relationship with kickback recipients and testing referral sources, by disguising the entity that performs testing services, and by shifting the entity that performs testing services or billing for services otherwise performed when United identifies problems with Next Health's other subsidiaries. For example, when United stopped paying UTox, Medicus and US Toxicology after discovering the ADAR Group kickback scheme, Next Health opened ALG and began using it to bill United for services performed months earlier by UTox, Medicus and US Toxicology.

282.    As a result, Next Health and its subsidiaries UTox, Medicus, US Toxicology, and ALG should be regarded as the same entity for liability purposes as Next Health has used its subsidiaries to perpetrate its scheme to defraud United.

## <u>COUNT 8 – ALTER EGO LIABILITY</u>

### <u>(Against Next Health, UTox, Medicus, US Toxicology, and ALG)</u>

283.    Paragraphs 1 through 19 and 42 through 241 are incorporated as if fully stated herein.

284.    Pleading further and in the alternative, if necessary, Next Health, is liable for the tortious conduct committed by UTox, Medicus, US Toxicology, and ALG, because it is their alter-ego.

285.    As alleged herein, Next Health exercised complete control over the operations of these four licensed subsidiaries with respect to the performance of ancillary testing services and billing United for those services. Next Health used its complete control over these subsidiaries in the perpetration of its fraudulent scheme to unlawfully obtain funds from United.

286.   Next Health, directly or indirectly, owned part or all of its subsidiaries UTox, Medicus, US Toxicology, and ALG, maintained common accounts with those subsidiaries, financed the subsidiaries, paid the salaries of the subsidiaries' employees, who were actually Next Health employees, used its subsidiaries' property as its own, did not keep the daily operations of its subsidiaries separate from its own or one another, was in control of the business given to UTox, Medicus, US Toxicology, and ALG, and generally did not observe corporate formalities.

287.   Next Health has repeatedly held itself out to United as one-in-the-same as its subsidiaries UTox, Medicus, US Toxicology, and ALG.

288.   Next Health disregarded the corporate separateness of its subsidiaries and allowing those same corporate distinctions to protect it from being liable for its subsidiaries' fraudulent misrepresentations would create substantial injustice and inequitable results.

### COUNT 9 - DECLARATORY RELIEF

### (Against Next Health, UTox, Medicus, US Toxicology, and ALG)

289.   Paragraphs 1 through 220 are incorporated as if fully stated herein.

290.   UTox, Medicus, US Toxicology, and ALG submitted and have continued to submit claims to United for services rendered to patients who are members of health and welfare benefit plans that are insured and/or administered by United.

291.   The claims submitted to United by UTox, Medicus, US Toxicology, and ALG are for services that are not covered under the relevant plans' terms.

292.   An actual controversy exists between UTox, Medicus, US Toxicology, and ALG and United regarding whether these denied claims are covered and payable under the plans insured and/or administered by United.

293.     United is a claims-review fiduciary for many of the ERISA plans impacted by Defendants' conduct and thus has standing, under 29 U.S.C. § 1132(a)(3), to bring a civil action to obtain other equitable relief, in the form of a declaration regarding the rights and obligations of those plans. This relief does not overlap or coincide with United's state-law claims, but rather only applies to outstanding Next Health claims that United has denied.

294.     For those plans that are governed by ERISA, United seeks, under ERISA Section 502(a)(3)(B), a declaration that the claims submitted by UTox, Medicus, US Toxicology, and ALG to United, which have been denied by United, were properly denied and are not covered or payable pursuant to United's plan provisions.  United also seeks recovery of its reasonable and necessary attorneys' fees and costs, pursuant to ERISA Section 502(g)(1).

295.     As to United's plans that are not governed by ERISA, pursuant to 28 U.S.C. §2201 and Tex. Civ. Prac. & Rem. Code Ann. § 37, United seeks a declaration that the claims submitted by UTox, Medicus, US Toxicology, and ALG to United, which have been denied by United, were properly denied and are not covered or payable pursuant to United's plan provisions.

## COUNT 10 –INJUNCTIVE RELIEF

### (Against Next Health, UTox, Medicus, US Toxicology, and ALG)

296.     Paragraphs 1 through 220 are incorporated as if fully stated herein.

297.     Next Health is using its licensed subsidiaries to engage in conduct that violates Texas law and other standards of conduct concerning the obligations owed by providers to submit accurate and truthful bills, make full disclosures to their patients, and otherwise provide services in a responsible and safe manner.

298.   Next Health and its subsidiaries' continued submission of fraudulent claims to United, which are induced by unlawful payments, are wrongful acts that threaten immediate and irreparable harm.

299.   United is a claims-review fiduciary for many of the ERISA Plans impacted by Defendants' conduct and thus has standing, under 29 U.S.C. § 1132(a)(3), to bring a civil action to enjoin acts and practices that violate the terms of those plans.

300.   For those plans that are governed by ERISA, United seeks, under Section 1132(a)(3)(A), a permanent injunction against UTox, Medicus, US Toxicology, ALG and Next Health, which prohibits them from submitting claims to United that violate the terms of United's ERISA plans. Specifically, United requests that the Defendants be enjoined from submitting claims to United that (1) are the product of illegal kickbacks; (2) are for the performance of unauthorized services; (3) are for the performance of medically unnecessary services; (4) are for amounts that are not actually owed by United's members; (5) falsely represent that they possess an assignment of benefits or authorization for the payment of benefits; or (6) falsely represent the identity of the provider who performed the services. United also seeks recovery of its reasonable and necessary attorneys' fees and costs, pursuant to ERISA Section 502(g)(1).

301.   As to all other plans impacted by Defendant's unlawful conduct, pursuant to Tex. Civ. Prac. & Rem. Code Ann. § 65.011, United seeks injunctive relief that Defendants cease and desist the unlawful and fraudulent practices described herein. Specifically, United requests that the Defendants be enjoined from submitting claims to United that (1) are the product of illegal kickbacks; (2) are for the performance of unauthorized services; (3) are for the performance of medically unnecessary services; (4) are for amounts that are not actually owed by United's members; (5) falsely represent that they possess an assignment of benefits or authorization for

the payment of benefits; or (6) falsely represent the identity of the provider who performed the services.

## COUNT 11 - FALSE ASSOCIATION UNDER LANHAM ACT 15 U.S.C. § 1125(a)(1)(A)

### (Against UTox and Next Health)

302.    Paragraphs 1 through 22 and 26 through 220 are incorporated as if fully stated herein.

303.    United is engaged in interstate commerce, as it provides healthcare services around the United States.

304.    Next Health, in connection with the provision of ancillary testing services, uses in commerce the name United Toxicology, which is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such company with United, or as to the sponsorship, or approval by United of the services provided by United Toxicology.

305.    Next Health steered to its subsidiary, United Toxicology, a significant portion of the testing giving rise to the claims described in this complaint, because it intended to falsely associate the services provided by United Toxicology with United.

306.    Next Health, recognizing that United sends its members EOBs after claims have been submitted for payment by providers, which contain the amounts charged by the providers for their services, sought to falsely associate its grossly over-priced and unnecessary services with United so that United's plan members and customers would believe that the billings were legitimate.

307.    By utilizing United Toxicology as the provider name for the exorbitantly priced services, Next Health intentionally created confusion about the validity of the services and their

false association with United, which has proximately caused economic and reputational harm to United.

308.   Next Health and United Toxicology's use of "United Toxicology" has caused confusion amongst United's members and customers, and has given rise to the false suggestion that United endorses or is somehow affiliated with Defendants' business and fraudulent scheme, all in violation of 15 U.S.C. § 1125(a)(1).

309.   Next Health and United Toxicology's acts of false association have been committed willfully and deliberately, and Next Health and United Toxicology have benefited from their unlawful acts of false association.

310.   Next Health and United Toxicology's willful and deliberate acts described above have caused injury and damages to United, have caused irreparable injury to United's goodwill and reputation, and, unless enjoined, will cause further irreparable injury, whereby United has no adequate remedy at law.

311.   As a result, United seeks damages for the harm done to it by Next Health and United Toxicology's false association, and for injunctive relief for Next Health to stop using United Toxicology to confuse United's customers about the validity of the fraudulent services and its association with United.

## VI. PRAYER FOR RELIEF

312.   United respectfully requests that Defendants be cited to appear and answer and that the Court enter Judgment against Defendants for the following:

    a.    An award of actual and consequential damages;

    b.    Exemplary damages;

    c.    Injunctive relief;

d.      Declaratory relief;

e.      Reasonable and necessary attorneys' fees;

f.      Costs of court;

g.      Prejudgment and post-judgment interest; and

h.      Such other and further relief at law or in equity to which United may be

justly entitled.

JURY TRIAL IS DEMANDED ON ALL ISSUES SO TRIABLE.

DATED: January 26, 2017

> **WEINBERG, WHEELER, HUDGINS,**
> **GUNN & DIAL, LLC**
>
> */s/ Stephen W. Mooney*
> STEPHEN W. MOONEY
> Texas Bar No.: 14319100
> 3344 Peachtree Road, NE, Suite 2400
> Atlanta, Georgia 30326
> Telephone: 404-876-2700
> Facsimile: 404-875-9433
> Email: smooney@wwhgd.com