## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| UNITEDHEALTHCARE SERVICES, INC.; UNITEDHEALTHCARE INSURANCE COMPANY, | § § § § | |
| Plaintiffs, | § § | CIVIL ACTION NO. |
| v. | § § | 3:17-CV-243 |
| NEXT HEALTH, LLC; UNITED TOXICOLOGY, LLC; MEDICUS LABORATORIES, LLC; U.S. TOXICOLOGY, LLC; AMERICAN LABORATORIES GROUP, LLC; ERIC BUGEN; AND KIRK ZAJAC, | § § § § § § § § | |
| Defendants. | § § | |
| NEXT HEALTH, LLC, UNITED TOXICOLOGY LLC, MEDICUS LABORATORIES, LLC, US TOXICOLOGY LLC, AMERICAN LABORATORIES GROUP LLC, | § § § § § § § | |
| Counterclaim-Plaintiffs | § § | |
| v. | § § | |
| UNITEDHEALTH GROUP INC., UNITEDHEALTHCARE SERVICES, INC., UNITEDHEALTHCARE INSURANCE COMPANY, | § § § § § | |
| Counterclaim-Defendants. | § § | |

## ENTITY DEFENDANTS'
## <u>FIRST AMENDED COUNTERCLAIMS</u>

Defendants Next Health, LLC ("Next Health"), Medicus Laboratories, LLC ("Medicus"), United Toxicology, LLC ("United Toxicology or "UTox"), U.S. Toxicology, LLC ("U.S. Toxicology") and American Laboratories Group, LLC ("ALG") (collectively the "Entity Defendants") file these First Amended Counterclaims to Plaintiffs' UnitedHealthcare Services, Inc. and UnitedHealthcare Insurance Company's ("Plaintiffs") Original Complaint (Doc. No. 1) against UnitedHealthcare Services, Inc., UnitedHealthcare Insurance Company, and United Health Group Inc. ("Counterclaim-Defendants" or "United").

## SUMMARY OF COUNTERCLAIMS

1.      This litigation is a shakedown by United Healthcare ("UHC").  Seizing on an opportunity presented by allegedly unscrupulous third-party marketers, UHC is attempting to use litigation to force a small, out-of-network laboratory services provider out of business.  Why is UHC stooping to corporate bullying as a tactic?  For one, doing so sends a message to other out-of-network providers in Texas—a thriving marketplace for medical innovation—that they must agree to in-network contracts at punitively unfavorable rates or be similarly driven out of existence.  For another, winning the lawsuit would allow them to recoup $100 million already paid for legitimately provided laboratory services and avoid paying for $36 million in legitimately provided laboratory services provided since UHC "flagged" Next Health in 2016. No other payer, including Medicare, has similarly stopped paying Next Health claims, even since UHC publicly filed this litigation.  Even if the lawsuit does not succeed, if it puts Next Health out of business, UHC pockets the $36 million that should have been paid on behalf of UHC beneficiaries but was instead withheld without any legitimate justification.  In either scenario, 500 Next Health employees lose their jobs, tens of thousands of UHC beneficiaries are denied

legitimate out-of-network benefits, and UHC keeps $36 million to boost its profits and pay millions in bonuses to the management team who authorized the shakedown in the first place.

2.      Since filing this litigation, UHC continues to do everything it can to put pressure on Next Health to close its doors.  UHC publicized its lawsuit and allegations against Next Health in an attempt to harm the reputation of Next Health and its affiliated businesses.  UHC has been attempting to interview current and former Next Health employees, business partners, and physicians to intimidate, harass, and disrupt Next Health's business operations.  UHC sent voluminous "discovery requests" designed to pressure doctors into ceasing to do business with Next Health or else risk their contracts with or reimbursements from UHC.  All of these actions are—like this litigation—a pretext, designed to permit UHC to wrongfully retain $36 million in payments owed on behalf of UHC plan beneficiaries.

3.      Instead, Next Health, by this Counterclaim, begs the Court to call UHC to account and order it to pay—or at least honestly process—$36 million in claims illegally disregarded since the Summer of 2016 and to pay—or at least honestly set rates—for $186 million in underpaid claims submitted by Next Health since 2015.  Next Health also begs for equitable relief from damage done to its enterprise value as a direct result of the corporate bullying of UHC.

4.      This is far from the first time that UHC has perpetrated a fraud on participants in the United States health care marketplace for its own financial gain.  UHC currently stands accused by the United States Department of Justice of perpetrating a decade-long, multi-billion dollar fraud by gaming the Medicare Advantage payment system.  *United States of America ex. rel. Benjamin Poehling v. UnitedHealth Group Inc., et al.*, Cause No. 2:16-cv-08697, in the U.S. District Court for the Central District of California.   In that litigation, the United States directly

accused UHC of fraud, claiming that over ten years, it conducted illegal chart reviews designed to identify additional diagnosis codes to support higher risk adjustment payments while knowingly avoiding "looking both ways" for diagnosis codes that should have been removed.  In doing so, the United States alleged that UHC, through fraud, obtained billions of dollars in risk adjustment payments to which it was not entitled.

5.      UHC's fraud against the Medicare Advantage system merely continues a long history of defrauding health care payers and providers alike.  UHC has paid hundreds of millions of dollars in penalties to a wide array of government agencies, including the U.S. Department of Justice, the U.S. Department of Health & Human Services, and attorneys general and departments of insurance in dozens of states.

6.      As an example, UHC fought a long legal battle with the State of California over its misconduct after acquiring PacifiCare in 2005. In 2008, the State of California's Department of Insurance and Department of Managed Health Care brought a lawsuit seeking $1.6 billion in fines from UHC's PacifiCare, alleging "large scale and willful decisions" to use broken systems for claim processing and responding to providers.  Specifically, the complaint alleged that after UHC acquired PacifiCare in 2005, consumer and provider complaints skyrocketed resulting in a probe by the departments.  The probe uncovered system-wide failures of PacifiCare's [UHC's] claim processing efforts, deliberate cost-saving efforts aimed at increasing profits at the expense of plan members and the health care system in the State of California.  While UHC settled the case with one of the two agencies, the other issued a ruling in 2014 fining the insurer a record $173 million dollars.  In a 200-page opinion, California Insurance Commissioner Dave Jones found that UHC had committed more than 188 violations of the California Insurance Code and Unfair Business Practices Act and 900,000 discrete unfair business practices. Deputy Insurance

Commissioner Byron Tucker called the fine "unprecedented," explaining, "In this case [UHC]'s conduct was so appalling that two separate elected insurance commissioners found these violations absolutely reprehensible… This is about a billion-dollar out-of-state company that purchased a much smaller well-functioning California insurer and systematically sucked it dry without thought for the consequences to patients or doctors."  That opinion was ultimately appealed.  And this is not the first time that UHC has been accused by the government of perpetrating a massive fraud to affect claims processing or reimbursement rates.  *See* Press Release, New York State Office of the Attorney General, New York Attorney General Announces Usual-and-Customary Database Overhaul Promised in Insurer Settlement (Oct. 27, 2009), https://ag.ny.gov/press-release/attorney-general-cuomo-announces-historic-nationwide-reform-consumer-reimbursement (last accessed on 9/22/2017) (settling an investigation into whether UHC manipulated usual-and-customary rates nationwide by deliberate mismanagement of its Ingenix database).

7.     Neither is this the first shakedown against out-of-network providers by UHC and its management team.  In a case currently pending in California, UHC is accused of "marking" an out-of-network pharmacy, intentionally underpaying it by $47 million for home infusion services while funneling business to in-network arrangements that were more profitable for UHC—just as it has done here.  *See IV Solutions Inc. v. United Healthcare Services Inc. et al*, Cause No. 2:16-cv-09598, in the United States District Court for the Central District of California.   Former UHC employees admitted to IV Solutions that these intentional underpayments are part of a company-wide strategy to undercut out-of-network providers in an effort to drive patients to in-network providers, who are more profitable for UHC.  Essentially, the scheme allowed UHC to "string along" IV Solutions until it had sufficient suitable in-

network replacements to cut IV Solutions off completely.   UHC has executed the same underpayment strategy against Next Health.

8.      In another shakedown, UHC sued a group of kidney clinics in Florida, alleging that the clinics coordinated with the American Kidney Foundation to get vulnerable patients with end-stage renal disease to buy health insurance.      *UnitedHealthcare of Florida Inc. et al. v. American Renal Associates Holdings Inc. et al.*, Cause No. 9:16-cv-81180, in the U.S. District Court for the Southern District of Florida.   Because private health plans reimbursed more than Medicare and Medicaid reimbursed for the same service, UHC alleged the effort to have people buy health insurance was a fraud perpetrated by the renal care provider.   This is not the only case where UHC has taken the position that its beneficiaries are not entitled to lifesaving treatment. *See, e.g.*, *Jones v. UnitedHealth Group, Inc., et al.*, Cause No. 0:15-cv-61144, in the United States District Court for the Southern District of Florida (alleging UHC refused to provide medically necessary, lifesaving treatment for Hepatitis C).

9.      But some out-of-network providers are fighting back.   In one case in Texas, a private out-of-network hospital won the right to sue UHC for damages under ERISA and other Texas statutes for a scheme involving deliberate, fraudulent underpayment of legitimate claims for health care services.   *See Texas General Hospital, L.P. et al v. United Health Care Insurance Company et al*, Cause No. 3:15-cv-02096 in the United States District Court for the Northern District of Texas.   In that case, this Court recognized the rights of an out-of-network provider to seek damages against UHC for wrongfully withholding payment to an out-of-network provider under both ERISA and state law causes of action (breach of contract, promissory estoppel).   In the lawsuit, Texas General Hospital accuses UHC of dramatically underpaying the usual, customary, and reasonable reimbursement rates required under the plans.   The allegations made

by Texas General Hospital demonstrate UHC's efforts to bully smaller providers and pay less than the amount fairly owed for health care services provided to their beneficiaries. Any dollars that UHC can avoid paying for legitimate claims are dollars that become profit and compensation for their management and executives.

10.     Those fighting back against UHC's illegal efforts to extract profits include public parties as well as private ones. UHC has paid millions of dollars in fines to federal and state regulators in the last 10 years and spent countless millions in litigation to bully small providers out of providing health care to members of the health plans it administers or owns. To keep its profits, management bonuses, and bounties to third-party processors high, UHC has engaged in a long-standing scheme to shake down smaller, more vulnerable providers to force them to go in-network at rates that benefit UHC and surrender otherwise legitimate claims to payments under health plans owned or administered by UHC. UHC's scheme has contributed to UHC's continued growth and incredible profitability. Since 2013, UHC's reported annual revenues have grown at an astronomical pace – from $113.8 billion in 2014 to $185 billion in 2016. Over the last three years, UHC reported $18.4 billion in net income – including $7 billion in 2017 alone.

11.     UHC's scheme to extract profits by unfairly dealing with smaller out of network providers has benefitted its management and executives. Its former Chief Executive Officer, Stephen J. Hemsley, has been paid a reported $50 million in salaries, and back in 2010, Mr. Hemsley was the highest paid CEO in the country, making a reported $102 million.[1]   The preceding CEO, William McGuire, also stepped down following a stock option backdating scandal. McGuire left with a mind-boggling severance package worth about $1.6 billion, most

---

[1] During negotiations with Next Health over an in-network contract commenced after the Adar Group's conduct became known to Next Health and UHC, representatives from UHC directly told Next Health attorneys that Mr. Hemsley and the "highest levels of United management" were aware of and had authorized UHC's actions against Next Health.

**ENTITY DEFENDANTS' ANSWER TO**
**PLAINTIFFS' ORIGINAL COMPLAINT AND FIRST AMENDED COUNTERCLAIMS – PAGE 7**

of which was in the form of stock options he accumulated over his years at UnitedHealth, as the insurer grew its revenues, income, and share price by withholding payments from services legitimately owed to beneficiaries.

12.     UHC has paid millions of dollars in bounties to third-parties to assist them in "claim recovery" by identifying legitimate claims that can be ignored or unpaid.  UHC has achieved these financial results by deliberately underpaying or refusing to pay for medically necessary health care costs for beneficiaries of the health benefit plans it offers, administers, or services.

13.     In this litigation, whether UHC wins its lawsuit and runs Next Health out of business or not, the filing of the lawsuit has achieved the desired effect.  Negative press coverage, reduced demand from physicians, and adverse actions have all flowed from UHC's scurrilous allegations and deliberate non-payment of claims for legitimate laboratory services. UHC has rubbed salt in this wound by sending threatening correspondence to some or all of the physicians who used Next Health's services, notifying them of the litigation, and demanding voluminous discovery about members who had received toxicology services from Next Health. Simply withholding funds that should rightfully be paid has had an adverse effect on Next Health's ability to continue to do business.

14.     Despite the fact that UHC has purportedly denied those claims and appears prepared to deny any future claims from Next Health allegedly due to "lack of medical necessity" or on some other fabricated basis, those denials are instead a pretext to coerce Next Health to acquiesce to UHC's demands to forgo the above-referenced millions of dollars in legitimate accounts receivable and go in-network with UHC at punitively below-breakeven rates. UHC only confirmed the artifice of this course of dealing by filing a lawsuit in a Texas federal

court seeking repayment of *every dollar ever paid* to any Next Health affiliate for laboratory testing services since 2011 on the day after negotiating an arrangement that would bring Next Health in-network at retributive rates at or below 50% of Medicare.

15.     These and other actions taken by UHC to put litigation pressure on Next Health and exact a pound of flesh without regard to the underlying merit of the submitted claims are prohibited by the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. 1001, et. seq., and other federal statutes.  Counterclaim-Defendants' conduct in denying these claims is in clear violation of the terms of Counterclaim-Defendants' plans or policies of insurance covering the UHC beneficiaries, as well as state and federal law.

16.     The timing of UHC's actions against Next Health is, not coincidentally, linked to UHC's failed attempt to impose the Beacon Laboratory Benefit Management Program in Texas. Beacon is an electronic tool initially piloted by UHC in Florida to steer orders for certain laboratory services to a subset of approved in-network labs that accept the lowest fees from UHC.  Adopting the tool—it was scheduled to be implemented in Texas on March 1, 2017— would have given UHC, not the treating physician, significant control over the determination of what laboratory services would be ordered and from what laboratory.   After significant opposition from the Texas Medical Association, the Texas Orthopedic Association, the Texas Academy of Family Physicians, the Texas Radiological Society, the Texas Society for Gastroenterology and Endoscopy, the Texas Osteopathic Medical Association, the Texas Association of Obstetricians and Gynecologists, the Texas Society of Pathologists, the Texas Neurological Society, the Texas Pain Society, the Texas Chapter of the American College of Physicians Services, the Texas Pediatric Society, the Texas Dermatological Society, the Texas Urological Society, the Texas Allergy, Asthma and Immunology Society, the Texas Society of

Child & Adolescent Psychiatry, the Texas Society of Plastic Surgeons, and the Medical Group Management Association of Texas, UHC decided in January of 2017 to put on hold its plans to expand the Beacon Program into Texas. *See* Texas Medical Association, UHC Delays Beacon Lab Benefit Program (Feb. 15, 2017), https://www.texmed.org/Template.aspx?id=44222.   Right around this same time, UHC loudly and publicly filed this lawsuit against Next Health.   The intent is obvious: after failing to impose an electronic system to force physicians to order in-network laboratory services from its select group of in-network laboratories, UHC chose to impose order on the market for laboratory services in Texas the "old fashioned" way – by making a public example of an out-of-network laboratory by filing a sensational piece of litigation against Next Health.

17.     Counterclaim-Defendants' pattern of dramatically underpaying Next Health's claims for out-of-network laboratory services mirrors similar schemes perpetrated by UHC around the country.  UHC intended to use Next Health as a whipping boy, punishing it for daring to exist.

18.     But the law permits Next Health to exist.  It allows Next Health to offer faster, more reliable laboratory services to UHC beneficiaries on an out-of-network basis.  And when those beneficiaries elect to use Next Health's services, UHC has an obligation to administer the resulting claims in good faith for those members who paid millions of dollars in premiums to have access to out-of-network benefits.  UHC has not done so.

19.     Since February 2015 alone, UHC has underpaid approximately $186,662,419 in out-of-network claims by Next Health for laboratory testing services rendered for UHC beneficiaries, who had expressly negotiated with UHC for coverage that included substantial additional premiums for access to out-of-network providers.

**ENTITY DEFENDANTS' ANSWER TO**
**PLAINTIFFS' ORIGINAL COMPLAINT AND FIRST AMENDED COUNTERCLAIMS – PAGE 10**

20.      Since at least September of 2016, UHC has actively deceived Next Health into providing approximately $36 million in additional laboratory testing services to UHC beneficiaries with out-of-network benefits despite never intending to pay for the value of those— or any other—laboratory testing services provided by Next Health.  By "flagging" Next Health, UHC asserted a lack of medical necessity for every claim submitted by any lab connected to Next Health – $36 million in payable claims.  Discovery in this case will show that the "medical necessity" denial was a sham intended to put Next Health out of business.  Under UHC's own logic, these amounts are shifted—through UHC's conduct—to "patient responsibility."   In essence, UHC is attempting through this litigation to put $36 million in its own pocket at the expense of plan beneficiaries who paid premiums for out-of-network benefits to cover exactly the types of out-of-network services provided by Next Health.

21.      In fact, no other commercial insurer including Blue Cross and Blue Shield, Aetna, Humana, Cigna nor even Medicare has stopped paying insurance claims to Next Health owned labs before or after the filing of UHC's litigation. Each of these insurance companies was provided with identical information for each test for their insureds as United Healthcare was for its insureds. All of these claims were also out-of-network claims billed at Next Health's usual and customary rates.

## I.    THE PARTIES

22.      Counterclaim-Plaintiff United Toxicology, LLC, is a limited liability corporation organized under the laws of Texas with its principal place of business in Dallas County, Texas.

23.      Counterclaim-Plaintiff Medicus Laboratories, LLC, is a limited liability corporation organized under the laws of Texas with its principal place of business in Dallas County, Texas.

24.     Counterclaim-Plaintiff U.S. Toxicology, LLC, is a limited liability corporation organized under the laws of Texas with its principal place of business in Dallas County, Texas.

25.     Counterclaim-Plaintiff American Laboratory Group, LLC, is a limited liability corporation organized under the laws of Texas with its principal place of business in Dallas County, Texas.

26.     Counterclaim-Plaintiff Next Health, LLC, is a limited liability corporation organized under the laws of Texas with its principal place of business in Dallas County, Texas. Next Health is the parent company of several subsidiaries, including Medicus, US Toxicology, ALG and United Toxicology.  Collectively, the operating lab subsidiaries will be referred to as "Next Health Labs."

27.     Counterclaim-Defendant United Healthgroup, Inc. is a corporation organized under the laws of the State of Delaware with its principal place of business located in the State of Minnesota and is the parent corporation that ultimately owns and controls the other Counterclaim-Defendants.

28.     Counterclaim-Defendant UnitedHealthcare Services, Inc. is a corporation organized under the laws of the State of Minnesota with its principal place of business located in the State of Minnesota.  UnitedHealthcare Services, Inc. administers health and welfare benefit plans.

29.     Counterclaim-Defendant UnitedHealthcare Insurance Company, Inc. is a corporation organized under the laws of the State of Connecticut with its principal place of business located in the State of Connecticut.  UnitedHealthcare Insurance Company, Inc. fully-insures and administers health and welfare benefit plans.

30.     Counterclaim-Defendants are in the business of providing or administering health benefit plans and policies of health insurance, including individual health benefit plans, such as the plans that covered the treatment received by the UHC beneficiaries.

31.     "United Healthcare" is a brand name used for products and services provided by one or more of the UHC subsidiaries or affiliates that offer, underwrite, or administer health benefits.  When used in this Complaint, "UHC" includes all United Healthgroup subsidiaries and affiliates owned or controlled by any of the named Counterclaim-Defendants whose activities are intertwined with those of the Counterclaim-Defendants.   Due to the manner in which they function, all of the Counterclaim-Defendants are functional ERISA fiduciaries and, as such, must comply with fiduciary standards.  "UHC" refers to all predecessors, successors, and subsidiaries of the named Counterclaim-Defendants to which these allegations pertain.

32.     At all relevant times, Counterclaim-Defendants were the plan administrator, fiduciary, relevant party-in-interest, and/or the obligor for the individual health benefit plans at issue in this litigation.

33.     At all relevant times, Counterclaim-Plaintiffs were the assignee, agent, and/or the authorized representative of the plan beneficiaries who received services from Counterclaim-Defendants.

## II.     JURISDICTION AND VENUE

34.     This Court has subject matter jurisdiction over this matter based on federal question jurisdiction pursuant to 28 U.S. §1331, as Next Health asserts claims against Counterclaim-Defendants, in Counts 1 – 4, under the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001 et seq.

35.     This Court also has subject matter jurisdiction pursuant to 28 U.S.C. §1132(a) as this is an action between citizens of different states and the amount in controversy exceeds the jurisdictionally-required sum of $75,000, exclusive of costs and interest.

36.     This Court has personal jurisdiction over the Counterclaim-Defendants because, at all times relevant hereto: (i) Counterclaim-Defendants operated one or more business ventures in this judicial district; (ii) there is a sufficient nexus between those operations and this action; and (iii) Counterclaim-Defendants' activity in this district was substantial and not isolated.

37.     Finally, venue is proper in the Northern District of Texas pursuant to 28 U.S.C. § 1391, because a substantial portion of the events giving rise to this action arose in this District.

## III.     STATEMENT OF RELEVANT FACTS

**Next Health and the Next Health Labs**

38.     Next Health, through its operating subsidiaries the Next Health Labs, provides clinical laboratory services to patients, including toxicology, hematology, and some genetic testing.  Each of the Next Health Labs operates in a physically separate laboratory environment.

39.     Next Health was founded in 2015 to be the parent company for the Next Health Labs, among other businesses.  However, each of the Next Health Labs has existed as an operating clinical laboratory longer than that.  For example, UHC Toxicology has operated under that name, and billed Counterclaim-Defendants under that name, since at least 2011.

**Out-of-Network Service Providers**

40.     Health care providers, including clinical laboratories, are either "in-network" or "out-of-network" with respect to insurance carriers.  "In-network" providers (sometimes called "participating providers") are those contracting with health insurers who require them to accept discounted negotiated rates as payment in full for covered services.  In the clinical laboratory

industry, insurers like Counterclaim-Defendants have dramatically limited the number of clinical laboratory companies who are permitted to come "in-network."  In exchange for contracting at in-network rates, these laboratory companies benefit from a high volume of demand for testing services, permitting them to enjoy significant economies of scale.

41.     "Out-of-network" or "non-participating" providers are those who do not contract with insurers to accept contracted, in-network rates.  Instead, these out-of-network providers set their own fees for services.  Counterclaim-Plaintiffs are out-of-network providers.

42.     Texas law does not dictate how out-of-network charges must be determined. Rather, each out-of-network provider sets its own pricing for services to be performed.  While some out-of-network providers charge more than an in-network provider for services, it is not always the case that an out-of-network provider will be paid more than an in-network provider. Although UHC, in its Complaint, alleged that Next Health's billed charges exceeded the average out-of-network providers, it made no allegations about the amounts actually paid to Next Health compared to other in-network or out-of-network providers.  In many cases UHC pays in-network providers more money than it pays a similarly situated out-of-network provider, especially when considering the legitimate claims completely denied by UHC.  In many situations, UHC imposes obligations on out-of-network providers while not holding in-network service providers to the same supposed standard.  For example, Next Health has received denials for "medical necessity" and asked for complete medical records from Next Health to support the provision of laboratory services.  It is difficult to believe that UHC ever makes these requests of other, in-network laboratories.

43.     Out-of-network providers accept assignments of benefits from individual patients and then submit claims for reimbursement to the insurer.  Individuals participating in health

benefit plans ("Beneficiaries") offered, underwritten, or administered by UHC can elect to join a plan that offers the option to choose out-of-network health care providers.  Premiums for a plan that offers these out-of-network benefits are substantially higher than plans that only permit the Beneficiary to use in-network health care providers.  Each year, UHC receives hundreds of millions of dollars of incremental premiums for plans that offer out-of-network benefits.

44.     Despite this fact, UHC and other plan administrators routinely fail to honor their obligation to pay for out-of-network services.  The story of Next Health's attempts to secure payment through UHC for out-of-network services it provided to UHC Beneficiaries—and UHC's efforts to unilaterally take steps to avoid its obligation to pay hundreds of millions of dollars for out-of-network services—represents a significant breach of UHC's fiduciary obligations to the plans it oversees, as well as to the UHC Beneficiaries.

**Next Health's Value to the Health Care Market**

45.     The Next Health Labs provide toxicology, hematology, and genetic testing services to patients around the country from their labs located in Dallas, Texas.

46.     As an out-of-network provider, Next Health does not enjoy the economies of scale of UHC's preferred in-network providers for laboratory testing services.  However, the companies that dominate the in-network market, such as Quest Diagnostics or Lab Corp, have significant weaknesses that make innovative, out-of-network providers like Next Health important to the health care market.

47.     The primary competitive advantages that the Next Health Labs offer their clients are customer-oriented and dependable provision of lab services.  Next Health Labs can offer the same, or similar, testing services as their larger, in-network competitors, but they can do so with

reliable turnaround times.  Next Health typically guarantees physicians who order their services a 72-hour turnaround time on all samples and all testing.

48.     Moreover, Next Health provides a superior level of customer service important to many health care providers and their patients.  At Next Health, a certified lab technician reviews the results of each report generated for its toxicology testing services.  When a provider has questions about interpreting a report, the supervising scientist can be made available to help a physician interpret results or explain testing procedures or results.  This level of service is anathema to the large, in-network providers, who generate lab testing reports electronically and whose telephone "hotline" hold times can sometimes exceed 4 hours or more.  Likewise, the large lab testing companies frequently experience machine downtimes that cause results delivery to vary by hours, days, or weeks from the initially-anticipated timeframes.

49.     As a result of these competitive advantages, Next Health has created a positive reputation in the marketplace for customer service and reliability.  For physicians and patients, particularly in areas like high risk surgical settings, pain management, or substance abuse, the turnaround time and client service that Next Health offers make a significant difference for the purchasers of health care services.

50.     For example, a physician responsible for administration of a pain management clinic will typically order toxicology testing services before prescribing certain pain management alternatives that could have fatal side effects when combined with other (legal or illegal) substances.  These physicians rely on Next Health to perform testing services in a timely and reliable fashion in order to ensure that they do not inadvertently prescribe medication that could result in potentially fatal side effects.

51.     Importantly, Next Health, as a laboratory, does not determine what tests are medically necessary for a particular patient.  Instead, Next Health receives an order from the physician specifying the services to be rendered.   On the requisition form or in other correspondence, the ordering physician specifies the laboratory testing services to be provided for a particular Beneficiary.

52.     Likewise, in obtaining a requisition for laboratory testing services, Next Health also obtains an "Assignment of Benefits" from individual patients, including the UHC Beneficiaries.

53.     Next Health's requisition forms include "Patient Authorization" terms granting specific rights to Next Health from its patients. In 2016 and 2017, Next Health used eight different versions of the requisition forms used for laboratory testing services performed by Next Health's labs.

54.     The first version of the form during this period, printed and delivered to Next Health on April 5, 2016, included the following "Patient Authorization" language:

> I voluntarily consent to the collection and testing of my specimen identified on this form is my is my own; it is fresh and has not been adulterated in any manner. I certify that the information provided on this form and on the specimen cup is accurate. I further authorize the laboratory to release the result of this testing to the ordering facility and or my insurance company. Furthermore, I authorize my insurance benefits directly to an affiliate lab for the services. I acknowledge that the Lab and Clinic may be an out-of-network facility with my insurance. I am also aware that in some circumstances my insurance will send the payment directly to me for the services provided. Under law, I agree to endorse the insurance check and forward it to the Lab & Clinic within 30 days of receipt. By checking "Self-Pay," I agree to be financially responsible for these tests.

55.     The version of the form printed and delivered to Next Health on May 17, 2016 included the following "Patient Authorization" language:

> I assign and transfer to the laboratory and its respective agents and representatives (collectively referred to as "Lab Parties"), to the extent permitted by law, all right, title and interest in all amounts that may be paid by

any payor, or under any state, federal, county or agency assistance program (collectively referred to as "Health Plan"), for all laboratory services rendered. I specifically direct payment by any such Health Plan to be made directly to the Lab Parties and intend that each Lab Party has an independent right of recovery to such payments as a beneficiary under all such Health Plans to the extent permitted by law. I further assi$_{gn}$ and transfer to the Lab Parties all rights, claims and causes of action against any person or entity who may be financially responsible for payment of my charges and consent to the Lab Parties pursuing recovery for the charges incurred in my care. I further assign to the Lab Parties all rights, claims or causes of action I may have to request and obtain documents from any Health Plan. I understand and agree that this assignment of all payments and benefits to my claim to the Lab Parties does not relieve me of my liability or responsibiHty for any and all charges and/or copayments incurred as a result of medical goods and laboratory services provided to me by the Lab Parties.

56.     Each of the six (6) subsequent iterations of the requisition forms printed and delivered for use by Next Health's labs in 2016 and 2017 has included the "Patient Authorization" terms shown in the immediately preceeding paragraph.

57.     Based on the terms of the requisition forms printed and delivered for use by Next Health between May 17, 2016 and February 14, 2017, claims for laboratory services submitted by Next Health labs for payment to payers, including UnitedHealthcare, after May 17, 2016 are based on requisition forms with "Patient Authorizations" containing the terms shown in paragraph 55.

58.     Some requisition forms used in 2015 and prior to May 17, 2016 have included "Patient Authorization" terms similar to or the same as those shown in paragraph 55.  They have all expressly stated that the patient is assigning a right to benefits.

59.     After receiving a requisition form, including a physician order for laboratory testing services and an assignment of benefits from a Beneficiary, Next Health's billing department will, in some cases, obtain a verification of benefits prior to the provision of the laboratory testing services.  This process usually involves a member of Next Health's billing department calling UHC to confirm that the Beneficiary's benefits include out-of-network

laboratory services of the type ordered.  Next Health will typically record the representation made by UHC.  Whether Next Health calls in advance to verify benefits appears to have little impact – pre-verified claims are paid at reduced rates or simply denied at rates comparable to claims submitted without pre-verification.

**UHC's Improper Refusal to Provide a Full and Fair Review of Next Health's Claims**

60.     Between February 1, 2015 and the present, Next Health provided laboratory services on approximately 68,954 claims for laboratory services provided to UHC Beneficiaries. It billed UHC for each of those laboratory services provided to UHC Beneficiaries after obtaining valid assignments from each.  For those 68,954 claims, Next Health's total billed charges were $286,074,448, reflecting the usual, customary, and reasonable rates for the laboratory services rendered to UHC Beneficiaries.  UHC paid some amount to Next Health on 40,333 of those claims.

61.     In each of the 68,954 claims, the UHC Beneficiary in question and/or that individual's physician received the results of the requested laboratory testing services.  In other words, the UHC Beneficiaries and UHC received the benefit of the bargain.  In practically every one of the 68,954 claims, however, UHC paid something less than Next Health's usual, customary, and reasonable rate for the testing services provided.  In many cases, UHC simply paid nothing.  Even in cases where UHC paid nothing, Next Health continued to provide critical medical information about UHC beneficiaries to the requesting beneficiaries or ordering physicians to avoid interruption of care.

62.     Next Health's billed charges were reasonable, particularly in light of the costs associated with operating its laboratories, which have significant operating expenses associated with procuring and maintaining its equipment, highly trained personnel and administrative

services such as the billing personnel necessary to deal with verification, billing, and disputes with reluctant payers such as UHC.

63.     However, to date UHC has paid only a fraction of Next Health's charges, in the amount of $71,582,137.   Even considering amounts that UHC contends are the patients' responsibility under the applicable Plans (i.e., UHC's calculation of its Beneficiaries' co-payments, co-insurance or deductible amounts) the total payments were only $92,352,717— leaving an unpaid balance of $186,662,419 across these claims.   A summary of the claims wrongfully underpaid or denied by UCH has been previously filed under seal in this case as Exhibit B to the Entity Defendants' Original Answer and Counterclaim and is incorporated herein by reference. (*See* Docket No. 72 and 73.)

64.     A spreadsheet detailing the non-payments and underpayments by Counterclaim-Defendants for these 68,954 claims has been previously filed under seal in this case as Exhibit C to the Entity Defendants' Original Answer and Counterclaim and is incorporated herein by reference.   (*Id*.)   For each claim, the Exhibit details: (i) the dates of service; (ii) usual and customary amounts incurred and billed for services provided; (iii) total insurance reimbursement to date; (iv) the UHC Beneficiaries' co-payments, co-insurance and deductibles that UHC claims to be the patients' responsibility under the applicable Plans; (vi) the service code; and, (vii) where provided by Counterclaim-Defendants, a "rejection code" purporting to specify the reasons UHC was rejecting or underpaying Next Health's legitimate claims for reimbursement.

65.     The Court in its Order dated July 20, 2018 held that pursuant to Federal Rule of Civil Procedure 12(e), that the Entity Defendants must "amend their claim spreadsheets Exhibits B and C to their Answer" and "[f]or each claim, the Entity Defendants are instructed to identify the member who assigned their benefits and the plan or policy number under which such benefits

arose."  Because of the time and financial burden of reviewing almost 70,000 claims to add patient names and plan/policy numbers to their previously filed spreadsheets, the Entity Defendants have been unable despite best efforts to amend the spreadsheets with this information.  The Entity Defendants are serving on United contemporaneously with this filing (and pursuant to the protective order in place) claim files for all claims submitted by the Entity Defendants to United from 2015-2017, with each file identified by patient name and with the plan/policy number under which each claim was submitted identified in the file.

66.     Of the 68,954 claims, UHC supplied rejection codes for thousands of line items, purporting to explain the bases for denial and the reasons for the non-payments or underpayments.  Upon information and belief, these denials were often pretextual and without basis.  For example, in at least 32,250 claims, UHC denied the claim alleging that the services provided—often, services provided to the same patients and/or ordered by the same doctors as previously paid claims—were not medically necessary.  In at least another 30,000 other claims, no basis for the rejection was given other than that the services were deemed inappropriate.  The use of rejection codes appears to have little basis in reality.

67.     Even when UHC did deem a line item within a claim payable, it did not pay the claim at anything approaching a reasonable or customary rate.  About 40,333 claims, were paid something less than fair and reasonable price for the laboratory services that were rendered.

68.     Lastly, and most egregiously, since at least September of 2016, UHC has "flagged" the Next Health Labs for prepayment review, resulting in all claims for laboratory testing services being denied.  Upon information and belief, UHC has no basis to question the medical necessity of any of these laboratory testing services.  To the contrary, this "flagging" is done as a part of a concerted strategy to put Next Health out of business.

69.     The intentionality of UHC's conduct is reinforced by examining the success rate of Next Health's attempts to appeal UHC's arbitrary and capricious practice of denying non-objectionable claims.   Between February 2015 and June 2016, Next Health's lab affiliates appealed claims with an average success rate of 68%.  Beginning in July of 2016, the rate of success on Next Health Labs' appeals dropped, eventually to zero.  Clearly, someone at UHC determined to stop paying even meritorious claims submitted by any of the Next Health Labs. This dramatic decline in success rates of its appeals confirmed to Next Health that its past and future attempts to appeal through UHC's normal channels had been and would continue to be futile.  The appeal process has also illustrated a change in tactics by UHC.  Where before some time in 2016, UHC would deny/admit claims on a heterogeneous basis, beginning at least in September 2016, UHC made a blanket denial of all claims for laboratory services by Next Health or its laboratory affiliates, purportedly for "medical necessity."   Even when appealing these claims, Next Health or its laboratory affiliates were not provided with copies of any document relating to the Plans under which the claim was purportedly being assessed, including plan summaries, plan descriptions, annual reports, terminal reports, bargaining agreements, trust agreements, or other instrument supporting the basis for the plan determination or denial.



70.     Next Health is limited in its ability to understand the reasons for these rejection codes or the other reasons given by UHC for the failure to pay amounts owed for services rendered on behalf of its Beneficiaries.  **UHC has never supplied to Next Health the terms of the actual Plans covering the UHC Beneficiaries, the plan descriptions, or the basis for rejections under any Plan.**  However, on information and belief, each of these plans includes language that ultimately imposes a duty on United to pay the usual, customary, and reasonable rates for the laboratory services rendered by the out of network providers. Despite this lack of information, Next Health has exhausted or attempted to exhaust all administrative remedies available to it.   To date, Next Health has appealed at least 7,300 claims, receiving some resolution (although rarely if ever full payment) for 509 of those claims.

71.     Despite attempting to exhaust the appeal procedures set forth in the documents that Counterclaim-Defendants made available to providers like the Next Health Labs, Counterclaim-Defendants have refused to fully reimburse Next Health Labs for the laboratory services they provided to UHC Beneficiaries, and approximately $186,662,419 remains due and owing to Next Health Labs for these services from February 1, 2015 to the present.  Moreover, since approximately July of 2016, UHC has "flagged" all Next Health claims for reimbursement related to laboratory services.  Whereas, in the past, appeals of denied claims would result in some successful resolution in 10% of cases or more each month, since July 2016, UHC has denied nearly all appeals submitted by the Next Health Labs, rendering the appeal process futile.

72.     Counterclaim-Defendants acted as the plan administrators and as fiduciaries to the Beneficiaries and Plans for each of the claims at issue in this case.   Counterclaim-Defendants exercised discretion, authority, control, and oversight in determining if plan benefits would be paid and the amounts of plan benefits that would be paid.   Counterclaim-Defendants'

administration of these claims resulted in the payment of a fraction of the usual, customary, and reasonable rates for the laboratory services rendered.

73.     UHC failed to follow claims procedures consistent with ERISA § 503, and the Department of Labor's regulatory requirements in 29 C.F.R. § 2560.503-1(f) and (g)(1), by, *inter alia*, failing to provide information required by law, including: (i) written notice of benefit determinations within ninety days of claim submission; (ii) specific reasons for denials or reductions of claims, including the specific plan provisions, rules, guidelines or protocols supporting denial; (iii) any additional material or information that is necessary to perfect a claim; (iv) detail about appeal procedures; notification of entitlement to have claims information provided for free; and (v) a description of any additional material necessary to perfect an administrative claim.

74.     This action is timely commenced well within the four years after Next Health was notified by Counterclaim-Defendants that it was rejecting or underpaying the claims for reimbursement for the services that the Next Health Labs provided to UHC Beneficiaries.

**UHC's War on Out-of-Network Providers, Including Next Health**

75.     UHC has received and paid claims for out-of-network laboratory services from the Next Health Labs since 2011.   During that time, UHC has increasingly attempted to combat out-of-network charges, given consumers and providers increasing incentives to join narrow networks for the provision of health care, penalized providers and patients who elect to remain out-of-network, and even attempted to encourage the federal government to criminalize out-of-network arrangements.

76.     UHC has publicly taken the position that narrow networks and punishment of out-of-network providers are the only way to reduce health care costs.   But as a publicly traded, for-

profit corporation, UHC's only motivation has been to increase its own profits at the expense of its Beneficiaries, Plans, and the health care industry overall.  Since 2013, UHC has reported $24 billion in net income, and its Chief Executive Officer, Stephen J. Hemsley, has reportedly been paid $50 million in salaries.  In 2010, Mr. Hemsley was the highest paid CEO in the country, reportedly making $102 million in a single year.  UHC has achieved these financial results by deliberately underpaying or refusing to pay for medically necessary health care costs for Beneficiaries of the health benefit plans it offers, administers or services.

77.     Apart from the daily claims processing issues that plagued the relationship between Next Health and UHC, the business relationship between the two entities continued until mid-2016.  That April, an individual named Erik Bugen was featured in a national news story concerning allegations about the practices of clinics operated by the Adar Group.  In addition to overseeing the Adar Group, Mr. Bugen served as salesperson under an independent contractor arrangement with a Next Health subsidiary.

78.     After investigating the circumstances of Mr. Bugen's relationship with Next Health, and the practices featured in the report, Next Health terminated its relationship with Mr. Bugen and the Adar Group.  Before receiving any request to do so, Next Health refunded all claims impacted by the practices featured in the news story, particularly any claims that could have been associated with the allegations that patients received gift cards in exchange for seeking laboratory testing services.  The allegations of the news story pertained to a small number of clinics and a tiny fraction of Next Health's laboratory business.

79.     At UHC's request, representatives from Next Health met with representatives from UHC on September 12, 2016, to explain that they had already terminated the relationship between the Adar Group and Next Health.  At that meeting, Next Health explained the results of

its investigation of the matter, its termination of the Adar Group, and its refund of payments affected by the conduct of the Adar Group representatives.

80.     Nonetheless, UHC commenced a review of all of Next Health and its laboratory services business.   Upon information and belief, UHC has been in contact with patients, physicians, and current and former employees of Next Health in an effort to magnify the allegations made by the national news story and to attempt to tarnish the reputation of Next Health and disrupt its existing physician relationships.

81.     Upon commencing its review, UHC attempted to halt all payments for laboratory services to Next Health or any laboratory services provider affiliated with Next Health.  At some point in 2016, UHC began "flagging" all payments to Next Health and several of its lab subsidiaries.  None of these payments relate to the Adar Group, as Next Health terminated its relationship with the Adar Group and its affiliated physicians immediately upon learning about the accusations in the national news coverage.  Nevertheless, UHC has consistently rejected every claim submitted by Next Health or a lab subsidiary as not "medically necessary" and made an unreasonable request that Next Health provide full patient medical records to support any claim for laboratory services.  When requesting information about the basis for the denial or the term of the health benefit plan that supposedly requires this information, UHC has informed Next Health or its lab subsidiaries only that they must provide the entire medical record to support the claim for laboratory services.  Since the laboratory does not maintain medical records for patients, these requests must ultimately go to the provider who ordered the laboratory services.  Upon information and belief, UHC knows this request to be unreasonable, and it does not make any similar demand of any other out-of-network or in-network laboratory services provider.  The denial for "medical necessity" is simply a pretext to exert financial pressure on

Next Health by refusing to process or pay legitimate claims for laboratory services provided to UHC Beneficiaries.

82.     At the same time, UHC entered into discussions with Next Health under the false pretense of being willing to resolve outstanding health care claims.  In a series of negotiations leading up to the filing of this lawsuit, UHC falsely represented to Next Health that it was willing to continue an ongoing business relationship with Next Health.  In other words, throughout this period UHC was still engaging with Next Health about the terms of a possible in-network relationship.  Next Health now believes those discussions were never conducted in good faith.

83.     Instead, UHC is attempting to use its leverage as a payer of significant volume to reap a financial windfall for itself.

84.     Upon information and belief, UHC's review of Next Health's operations and the discussions held in late 2016 were a sham as UHC prepared to file litigation in an attempt to put Next Health out of business.

85.     After discussions concerning the terms of a new in-network arrangement on January 26, 2017, UHC, without warning, completely reversed course and filed the litigation styled *United Healthcare Services, Inc., et al v. Next Health, LLC, et al*, in the United States District Court for the Northern District of Texas on January 27, 2017 (the "Next Health Litigation").   Upon serving the lawsuit, UHC informed Next Health that it was no longer interested in pursuing a business relationship because it had "just" heard about the criminal charges against owners of Next Health – charges that became public in November 2016.  (*See* Compl. at 118.)   The timing of the lawsuit, in the midst of ongoing dialogue with UHC, and the bald-faced lie about the reason for UHC's about-face demonstrate the degree to which UHC approached its discussions with Next Health in bad faith.  The discussions were obviously a

pretext to cause Next Health to continue to render legitimate laboratory services to UHC beneficiaries with no intent to ever pay for those services.

86.     Upon information and belief, UHC's flagging of legitimate claims by Next Health for laboratory testing services, its false representations of a willingness to resolve outstanding health care claims and enter into an in-network contract with Next Health, and filing of the Next Health Litigation were all part of a scheme to extract as much value out of Next Health as possible in light of the national news investigation.  Upon information and belief, UHC never intended to reach any resolution of the outstanding health care claims but intended to induce Next Health to provide laboratory testing services to UHC Beneficiaries for which UHC never intends to pay.

**UHC's Unclean Hands**

87.     The Next Health Litigation is not UHC's only use of the courts to disrupt the business practices of an out-of-network provider.  It has also filed affirmative claims against out-of-network hospitals (*see, e.g.*, *Tex. Gen. Hosp. v. United Healthcare*, Cause No. 3:15-cv-02096, in the Northern District of Texas, Dallas Division) and laboratory service providers (*see, e.g.*, *UnitedHealthcare Insurance Co. et al. v. Sky Toxicology Ltd. et al.*, Cause No. 9:16-cv-80649, in the U.S. District Court for the Southern District of Florida).  Just as in the Next Health Litigation, UHC's opening position in those lawsuits seeks damages for all services ever rendered by the out-of-network provider in question.  At the same time, just as in the Next Health Litigation, UHC simultaneously suspends processing claims for the out-of-network providers during the pendency of the suit.  For most out-of-network providers, these lawsuits combined with halting of payments as a litigation tactic are insurmountable obstacles to continued existence.

88.     In these cases, as in the Next Health Litigation, UHC argues that out-of-network providers are engaged in "fraudulent billing practices" that essentially boil down to two complaints: (i) that the out-of-network provider fails adequately to collect amounts that are—according to UHC—the patient's responsibility under their health plan – i.e., co-insurance, co-payments, and deductibles;[2] and/or (ii) that the out-of-network providers' rates are higher than UHC's in-network providers or higher than the prevailing rates that UHC believes are applicable to the services rendered.

89.     But UHC has unclean hands on either argument.  First, the charge that out-of-network providers' failure to collect co-insurance, co-payments, and deductibles causes the claim to be "fraudulent" lacks a credible basis and is inconsistent with the company's other public litigation positions.  UHC has filed lawsuits around the country seeking to enjoin out-of-network providers from "balance billing"[3] its plan members in precisely these situations.  *See, e.g.*, *UnitedHealthcare Servs., Inc. v Asprinio* (2015 NY Slip Op 25298), decided on August 31, 2015, in the Supreme Court of Westchester County.  Moreover, an out-of-network laboratory services provider, like Next Health, has no way of knowing what portion of the bill will be designated as patient responsibility until after a claim has been processed and an Explanation of Benefits (EOB) has been issued.  At this point, the laboratory services have been rendered, and the prospect of collection from a patient with limited contacts to the laboratory to begin with becomes remote.  In any event, UHC has filed lawsuits against out-of-network providers to stop just such behavior!

---

[2] Next Health's only source of information about the portion of its bill for which the patient may be responsible is the Explanation of Benefits (EOB) provided by UHC, after a claim has been submitted and processed by UHC. There are questions about the reliability of the EOB similar to the inconsistent and unreliable use of denial or rejection codes.  *See* Complaint at ¶¶ [42-46].

[3] "Balance billing" refers to the practice of a health care provider billing a patient for any outstanding balance after the insurance company has submitted a portion of the bill.

**ENTITY DEFENDANTS' ANSWER TO**
**PLAINTIFFS' ORIGINAL COMPLAINT AND FIRST AMENDED COUNTERCLAIMS – PAGE 30**

90.     Likewise, UHC's hands are unclean with respect to complaints about the charged amounts for out-of-network services.  For one thing, UHC has settled cases by the New York Attorney General and a class of plaintiffs representing out-of-network providers for $400 million in damages. *See In the Matter of UnitedHealthcare of New York, Inc. and UnitedHealthcare Insurance Company of New York*, AOD #11-051 (Dec. 16, 2011); *see also* Order, *The American Medical Association, et al. v. United Healthcare Corp., et al.*, No. 00-2800, S.D. N.Y. (Sep. 20, 2010).

91.     In both cases, UHC was accused of illegally manipulating databases maintained by a non-profit subsidiary that dictated the usual, customary and reasonable rates paid for most out-of-network services.  From Next Health's perspective, UHC's practice of manipulating out-of-network payment rates has only continued since the resolution of these two lawsuits.  Next Health continues to see varied and inconsistent payments for similar or the same services rendered to different UHC Beneficiaries.   Upon information and belief, UHC continues to arbitrarily manipulate the usual, customary and reasonable rates for out-of-network services by, *inter alia*: ignoring rates charged by providers who, like Next Health, have entered into a dispute with UHC; using rates for non-comparable services in setting UCR rates; attempting to shut down providers, like Next Health, whose rates UHC believes are too high; and taking other steps in internal systems and processes to cause the rate UHC pays to out-of-network providers to be artificially low.

## IV.    CAUSES OF ACTION

## COUNT ONE

**(Failure to Comply with Group Plan Provisions in Violation of ERISA § 502(a)(1)(B))**

92.     Next Health incorporates by reference all of the foregoing allegations as if set forth herein.

93.     Next Health has standing to pursue its claims under ERISA as an assignee of the UHC Beneficiaries' claims under the Plans.

94.     As an assignee of the Plans, Next Health is entitled to reimbursement under the ERISA Plans for the toxicology, hematology, and genetic testing services provided to the UHC Beneficiaries by Counterclaim-Plaintiffs.

95.     **UHC has never supplied to Next Health the terms of the actual Plans covering the UHC Beneficiaries, the plan descriptions, or the basis for rejections under any Plan.** However, on information and belief, each of these plans includes language that ultimately imposes a duty on United to pay the usual, customary, and reasonable rates for the laboratory services rendered by the out of network providers. Counterclaim-Defendants have breached the terms of the Plans by refusing to make out-of-network reimbursements for charges for services covered by the Plans, in violation of ERISA 502(a)(1)(B), 29 U.S.C. § 1132(a)(1)(B).  These breaches, include, among other things, refusing to pay the usual, customary, and/or reasonable charges, or the prevailing fees or recognized charges for medically necessary procedures and services performed by Counterclaim-Plaintiffs.

96.     Because of UHC's numerous procedural and substantive violations of ERISA, any appeals should be deemed exhausted or excused, and Next Health is therefore entitled to have this Court undertake review of the issues raised herein de novo.

97.     As a result of UHC's refusal to render payment on these valid claims, Next Health is entitled to recover the unpaid and underpaid benefits from Counterclaim-Defendants pursuant to 29 U.S.C. § 1132(a)(1)(B).

## COUNT TWO

### (Breach of Fiduciary Duty in Violation of ERISA)

98.    Next Health incorporates by reference all of the foregoing allegations as if set forth herein.

99.    Under 29 U.S.C. § 1132(a)(3), a civil action may be brought by a participant, beneficiary or fiduciary to (A) enjoin any act or practice which violates any provision of this subchapter or the terms of the plan, or (B) to obtain other appropriate equitable relief (i) to redress such violations or (ii) to enforce any provisions of this subchapter or the terms of the plan.

100.    As the assignee of ERISA members and beneficiaries under the Plans, Next Health is entitled to assert a claim for relief for UHC's breach of fiduciary duties and for failure to follow plan documents under 29 U.S.C. § 1104(a)(1)(B) and (D).  The specific assignments executed by UHC Beneficiaries in this action give Counterclaim-Plaintiffs standing to assert fiduciary claims on behalf of the UHC Beneficiaries.

101.    UHC is a fiduciary of the Plans and so owes fiduciary duties of care, defined as an obligation to act prudently, with the care, skill, prudence, and diligence that a prudent fiduciary would use in the conduct of an enterprise of like character.  Further, as fiduciaries, Counterclaim-Defendants were required to ensure that they were acting in accordance with the documents and instruments governing the Plans, and in accordance with ERISA § 404(a)(1)(B) and (D), 29 U.S.C. § 1104(a)(1)(B) and (D).  In failing to act prudently, and in failing to act in accordance with the documents governing the Plans, Counterclaim-Defendants have violated their duty of care.

102.     As fiduciaries, Counterclaim-Defendants also owed the UHC Beneficiaries a duty of loyalty, defined as an obligation to make decisions in the interest of its beneficiaries, and to avoid self-dealing or financial arrangements that benefit the fiduciary at the expense of members, in accordance with ERISA § 404(a)(1)(A), 29 U.S.C. § 1104(a)(1)(A) and ERISA § 406, 29 U.S.C. § 1106.   Thus, Counterclaim-Defendants could not make benefit determinations for the purpose of making money for UHC at the expense of the UHC Beneficiaries.   Likewise, Counterclaim-Defendants could not pay itself a percentage of the amounts recovered from Counterclaim-Plaintiffs without breaching its duty of loyalty to the UHC Beneficiaries.

103.     Counterclaim-Plaintiffs have standing to pursue claims under ERISA as an assignee and authorized representative of the UHC Beneficiaries' rights under their respective Plans.   In the alternative, Counterclaim-Plaintiffs bring this action seeking equitable relief on behalf of the UHC Beneficiaries with whom Counterclaim-Plaintiffs share a privity of interest.

104.     At all relevant times, UHC exercised discretion, control, authority, and oversight in determining whether Plan benefits would be paid and in what amounts.

105.     UHC has violated its fiduciary duties to Next Health by refusing since on all claims since September 1, 2016,  to reimburse for toxicology and pharmacogenetic services provided by Next Health to UHC members. These actions were for UHC's own benefit and at the expense of its members and not in accordance with: (i) the documents and instruments governing the Plans; (ii) ERISA § 404(a)(1)(A), 29 U.S.C. §1104(a)(1)(A); (iii) ERISA § 406, 29 U.S.C. §1106; or (iv) ERISA § 404(a)(1)(B) and (D), 29 U.S.C. §1104(a)(1)(B) and (D).

106.     Counterclaim-Plaintiffs are entitled to relief to remedy Counterclaim-Defendants' violation of their fiduciary duties under ERISA § 503(a)(3), 29 U.S.C. § 1132(a)(3), including declaratory and injunctive relief as well as economic damages relating to the loss of business

**ENTITY DEFENDANTS' ANSWER TO**
**PLAINTIFFS' ORIGINAL COMPLAINT AND FIRST AMENDED COUNTERCLAIMS – PAGE 34**

value caused by UHC's intentional withholding of  claims it was obligated to evaluate for payment.

## COUNT THREE

### (Denial of Full and Fair Review in Violation of ERISA § 503)

107.    Next Health incorporates by reference all of the foregoing allegations as if set forth herein.

108.    As an assignee of the UHC Beneficiaries' claims, Next Health receives protections under ERISA providing for, among others, (i) a "full and fair review" of all claims denied by Counterclaim-Defendants; and (ii) compliance by Counterclaim-Defendants with all applicable claims procedure regulations.

109.    At all relevant times, Counterclaim-Defendants were the plan administrator, fiduciary, relevant party-in-interest, and/or the obligor for the Plans.

110.    Although obligated to provide a "full and fair review" of all denied claims pursuant to ERISA § 503, 29 U.S.C. § 1133 and regulations including 29 C.F.R. § 2560.503-1 and 29 C.F.R. § 2590.715-2719, UHC has failed to do so by, *inter alia*, failing to provide information required by law, including: written notice of benefit determinations within ninety days of claim submission; failing to provide the specific reasons for denials or reductions of claims, including the specific plan provisions, rules, guidelines or protocols supporting denial; any additional material or information that is necessary to perfect claim; detail about appeal

procedures; notification of entitlement to have claims information provided for free; and a description of any additional material necessary to perfect an administrative claim.

111.    Next Health seeks declaratory and injunctive relief for Counterclaim-Defendants' failures to provide a full and fair review, to disclose information relevant to appeals, and to comply with the terms of the plans or applicable claims procedure regulations.

112.    Because Counterclaim-Defendants have not complied with the substantive and procedural requirements of ERISA, any administrative remedies should be deemed exhausted pursuant to 29 C.F.R. § 2560.503-1 and 29 C.F.R. § 2590-715-2719(b)(2)(ii)(F)(1). Further, exhaustion should be excused because it would be futile to pursue administrative remedies, as evidenced by the thousands of appeals by Counterclaim-Plaintiffs which UHC has summarily rejected.

113.    Next Health has been harmed by UHC's failures to: (i) provide a "full and fair review" of appeals submitted under ERISA § 503, 29 U.S.C. § 1133; (ii) disclose information relevant to appeals; and (iii) comply with applicable claims procedure regulations.

114.    Counterclaim-Defendants should be ordered to provide a full and fair review of all claims submitted to United since January 1, 2011, and those to be submitted in the future, to disclose information relevant to appeals, and to comply with applicable claims procedure regulations.

## COUNT FOUR

### (Failure to Provide Requested Information in Violation of ERISA § 104(b)(4))

115.    Next Health incorporates by reference all of the foregoing allegations as if set forth herein.

116.    Pursuant to ERISA § 104(b)(4), 29 U.S.C. § 1024(b)(4) a plan administrator shall, upon request "furnish a copy of the latest updated summary, plan description, and the latest annual report, any terminal report, the bargaining agreement, trust agreement, or other instrument under which the plan is established or operated."  ERISA § 502(c), 29 U.S.C. § 1132(c) provides statutory penalties of $100 per day from the date of any failure or refusal to provide requested information.

117.    Because UHC's acts, omissions, and failure to furnish requested information violated 29 U.S.C. § 1024(b)(4), Next Health, as assignee is entitled to bring a civil action pursuant to ERISA § 502(a)(1)(A) for the relief identified in ERISA § 502(c)(1).

## V.    JURY DEMAND

118.    Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Next Health hereby requests a jury trial on all issues.

## VI.    PRAYER FOR RELIEF

WHEREFORE, Counterclaim-Plaintiffs Next Health and the Next Health Labs demand judgment in their favor against Counterclaim-Defendants as follows:

A.  Declaring that Counterclaim-Defendants have breached the terms of their Plans with regard to the payment of claims for out-of-network benefits and awarding damages for unpaid out-of-network benefits, as well as injunctive and declaratory relief to prevent Counterclaim-Defendants from continuing the practices detailed herein that are not authorized by the Plans or by Law;

B.  Declaring that Counterclaim-Defendants failed to provide a "full and fair review" under Section 503 of ERISA, 29 U.S.C. § 1133, and applicable claims procedure regulations, and that "deemed exhaustion" or futility under such regulations is in effect as a result of

Counterclaim-Defendants' actions, as well as awarding injunctive, declaratory, and other equitable relief to ensure compliance with ERISA and its claims procedure regulations;

C.  Declaring that Counterclaim-Defendants violated their fiduciary duties under Section 404 of ERISA, 29 U.S.C. § 1106, and awarding injunctive, declaratory, and other equitable relief to ensure compliance with ERISA;

D.  Awarding lost profits, contractual damages, and compensatory damages in such amounts as will be proved at trial;

E.  Awarding restitution for reimbursement improperly withheld by Counterclaim-Defendants;

F.  Declaring that Counterclaim-Defendants have violated the terms of the relevant plans or policies of insurance covering the UHC Beneficiaries;

G.  Requiring Counterclaim-Defendants to make full payment on all previously denied charges relating to the UHC Beneficiaries;

H.  Requiring Counterclaim-Defendants to pay Next Health the benefit amounts as required under the Plans;

I.  Awarding reasonable attorneys' fees and costs, as provided by Section 502 of ERISA, 29 U.S.C. § 1132(g);

J.  Awarding costs of suit;

K.  Awarding pre-judgment and post-judgment interest as provided by common law, federal or state statute or equity; and

L.  Awarding all such other and further relief to which Counterclaim-Plaintiffs show they are entitled.

Respectfully submitted,


/s/    Kelley E. Cash
James S. Bell
Texas State Bar No. 24049314
james@jamesbellpc.com
Kelley E. Cash
Texas State Bar No. 24001852
**JAMES S. BELL, PC**
2808 Cole Avenue
Dallas, Texas 75204
(214) 668-9000 (Telephone)

**ATTORNEYS FOR ENTITY COUNTERCLAIM-PLAINTIFFS NEXT HEALTH, LLC, MEDICUS LABORATORIES, LLC, UNITED TOXICOLOGY, LLC, U.S. TOXICOLOGY, LLC AND AMERICAN LABORATORIES GROUP, LLC.**


<u>**CERTIFICATE OF SERVICE**</u>


     The undersigned hereby certifies that a true and correct copy of the foregoing document has been served on counsel of record via the Court's ECF system or otherwise in accordance with the Federal Rules of Civil Procedure on this 31st day of July, 2018:



/s/ *Kelley E. Cash*


**ENTITY DEFENDANTS' ANSWER TO
PLAINTIFFS' ORIGINAL COMPLAINT AND FIRST AMENDED COUNTERCLAIMS – PAGE 39**