IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| UNITED HEALTHCARE SEVICES, INC., et al., | § § § | |
| Plaintiffs, | § § | |
| v. | § § | NO. 3:17-CV-00243-E-BT |
| NEXT HEALTH, LLC, et al., | § § | |
| Defendants. | § § | |

## MEMORANDUM OPINION AND ORDER

Before the Court are the motions to dismiss plaintiffs' First Amended Complaint filed by defendants Mike Austin (Doc. 398), Nick Austin (Doc. 401), Josh Daniel (Doc. 404), Amir Mortazavi (Doc. 407), Arvin Zeinali (Doc. 411), Josh Ihde (Doc. 416), Jeremy Rossel (Doc. 419), Cary Rossel (Doc. 422), and Yan Narosov (Doc. 427) (collectively, Executive Defendants) and defendants Next Health, LLC, Medicus Laboratories, LLC, United Toxicology, LLC, U.S. Toxicology, LLC, American Laboratories Group, LLC, Executive Healthcare, LLC, APEX Pharma, LLC, Dallasite, Inc., Total Pharma, LLC, and True Labs, LLC (collectively, Entity Defendants) (Doc. 418). Having carefully considered the motions, the parties' briefing, and applicable law, the Court finds the motions should be granted in part and denied in part.

### BACKGROUND

The following is from the First Amended Complaint (FAC) filed by plaintiffs United Healthcare Services, Inc., and UnitedHealthcare Insurance Company (collectively, United) (Doc. 348).

UnitedHealthcare Services, Inc. administers health and welfare benefit plans; UnitedHealthcare Insurance Company, Inc. fully insures and administers health and welfare benefit plans.

United uses a two-tier provider system, which allows members to obtain healthcare services from network or out-of-network (OON) providers.  United enters into agreements with network providers that obligate United to reimburse them for certain health care services provided to United members, who are only financially responsible for low cost-sharing amounts.  United has no agreement with OON providers, which set their own rates and bill members directly.  OON providers often get an assignment of benefits from United members in order to submit claims directly to United.  Most United plans authorize it to pay member benefits directly to OON providers, assuming the member's cost-sharing obligations, which are typically much more expensive than the obligations for in-network services,  have been fulfilled.

In 2014, defendant Next Health, LLC (Next Health) was created by defendants Andrew Hillman, Semyon Narosov, and other Executive Defendants to act as a "parent company and administrative hub of entities" in laboratory services, pharmacy products, surgical products, and hospital/facilities businesses.  Next Health owns and controls several entities licensed to perform lab services, including defendants American Laboratories Group, LLC (ALG), Medicus, Laboratories, LLC (Medicus), US Toxicology, LLC (USTox), and United Toxicology, LLC (UTox), or fill prescriptions and used those entities to submit claims to United.  The entities, which were OON, charged several multiples of what other labs and pharmacies charged for the same services and products.

Next Health also owns and controls dozens of unlicensed lab and pharmacy entities and surgical product companies.  These entities are shell companies that have served as conduits for

illegal payments to physicians and others who referred business to Next Health.  Specifically, Executive Defendants recruited physicians to send lab specimens and prescriptions to Next Health by offering kickbacks disguised as (a) distributions on investment interests, (b) "medical director" wages, (c) payments in connection with "research studies," and (d) compensation for administrative, marketing, or consulting services.  For example, a physician would "invest" in one of the unlicensed entities and, thereafter, receive payments from the entity based on revenue from United for, at least in part, testing and/or prescriptions the physician referred to Next Health's licensed labs and pharmacies.[1]

In addition to paying kickbacks, Executive Defendants instructed employees to push physicians to use standing orders for all patients (regardless of medical histories, symptoms, or clinical needs) that covered dozens of tests or required the use of expensive, predetermined compounds and mixtures in order to maximize claims and claim payments.  The scheme allowed Next Health to induce unnecessary and/or overpriced testing and prescriptions and unjustly enrich itself by collecting United's payment of member benefits for the testing and prescriptions.

United's network provider agreements contain safeguards, including expressly prohibiting physicians from earning a profit as a result of referrals for lab services, to protect members from unscrupulous providers.  The contracts also require that physicians discuss with members, among other things, the financial impact of a referral to an OON provider and confirm, in writing, a member's informed decisions related to OON provider referrals.  Executive Defendants knew of these provisions.  As a result, they went to great lengths to disguise the payments made to

---

[1] A specific example: Next Health accountants allocated money United paid to licensed labs for services ordered by physicians who had invested in Trident Laboratory, which does not (and is not licensed to) perform lab services; Trident Laboratory then distributed nearly $4 million to a few dozen invested physicians.  Thus, the money, made to look like a distribution on investments, was laundered through Trident Laboratory to conceal that it was payments for kickbacks to the physicians.

physicians in exchange for inducing referrals.  And, the scheme was further concealed by Next Health's determination to ignore member payment responsibilities so members would not call attention to Next Health claims by objecting to the unnecessary and overpriced lab tests and compound prescriptions.

Next Health also paid heavy "commissions" to non-physician parties that could help drive lab test and compound pharmaceutical orders to Next Health entities.  Executive Defendants knew that the commission payments were being funneled to physician referral sources or were made to individuals who were usurping physicians' authority to steer referrals.  Next Health paid kickbacks disguised as commissions to (1) managing or marketing services organizations (MSOs), which were shell companies partially owned by a marketer and partially owned by referring providers, and (b) addiction treatment facilities.

Referring providers pushed for Next Health to shift to a MSO model because they believed adding additional layers between their referrals and the payments they received from Next Health would make detection less likely.  Many physicians who originally received kickbacks disguised as distributions on sham investments in Next Health subsidiaries switched to the MSO model in 2015 or 2016.  Executive Defendants worked with MSO representatives to drive up and/or maintain MSO physicians referrals and offered the marketers investments in shell companies, which served to funnel additional money to them.  Next Health quickly developed a roster of dozens of marketers, many of whom were the conduit to dozens of referral sources.

"Commissions" also were funneled directly to sober home and addiction treatment facility referral sources through Sirius Laboratories, one of Next Health's unlicensed subsidiaries.  One of those sources was the ADAR Group, which was created by defendants Erik Bugen and Kirk Zajac specifically to collect urine and saliva specimens to submit to Next Health.

Bugen began to send lab specimens, purportedly from individuals at sober homes, to Next Health in June 2015.  Next Health employees made it clear to Bugen that kickbacks would be paid in exchange for lab referrals to Next Health and its licensed entities.  And, at the urging of Executive Defendants, Bugen also "began pushing" Next Health's compound drugs and pharmacogenetics (PG) testing.  Bugen was not a medical provider and was not legally able to refer patients to any lab or write prescriptions for compound pharmacy products.  He paid physicians, who did not actually see members, using funds he received from Next Health. Next Health and Executive Defendants knew this and that the related services or products for which it submitted claims to United were not legitimate.  Next Health nevertheless encouraged and supported expansion of Bugen's business, loaning him money to purchase additional properties to operate as sober homes and, ultimately, releasing him from the loans.

Next Health and Executive Defendants knew that the information on the claim forms submitted to United was material to United's decisions about whether to pay the claims.  Yet, Next Health entities submitted claims for services and prescriptions, which they provided only because the referring physicians received payments for their referrals, without disclosing those payments and knowing the payments were in contravention of United's agreement with the physicians.  Next Health entities also submitted claims misrepresenting that members owed cost sharing amounts that the entities had no intention of collecting.

The FAC also provides numerous examples of claims in which Next Health entities misrepresented information about providers that was material to United.  For example, UTox, Medicus, USTox, and ALG were not certified or capable of performing PG testing, and Executive Defendants exclusively referred PG testing services to outside labs.  Those entities, however,

routinely submitted claims for PG testing to United falsely representing that they had performed the testing.

Next Health also billed United for lab tests ordered from Sirius, which was not a legitimate lab, using UTox's provider information.  In October 2015, United began requesting supporting medical records in connection with all UTox claims because of an abnormally high volume of lab claims and member complaints.  A number of Executive Defendants decided to stop submitting Sirius claims for United members until they figured out a plan to submit the claims in a way that would result in payment from United.  Executive Defendants instructed some Sirius clients to retroactively manufacture fictitious supporting records.  For example, defendants Hillman and Mortazavi directed a Next Health employee to provide a template "intake form" to use to retroactively create a fake medical record.

Eventually, Executive Defendants Mortazavi, Nick Austin, Mike Austin, Jeremey Rossel, Semyon Narosov, and Hillman decided to submit Sirius claims to United under Medicus's credentials and, from December 2, 2015 through about January 20, 2016, they caused Medicus to submit more than 2,900 fraudulent claims to United, which caused United to pay more than $2.5 million.

By June 2016, United had stopped paying all claims submitted to it by UTox, US Tox, and Medicus.  Executive Defendants, including Nick Austin, Hillman, Semyon Narosov, Daniel, Jeremy Rossel, Ihde, Mike Austin, and Mortazavi, decided that they needed to, again, submit claims using different billing credentials so that United would not recognize them as fraudulent. Next Health set up ALG, a new entity, and, in July 2016, Executives Defendants instructed Next Health's billing company to submit all claims to United using ALG's provider information.  Each claim Next Health caused to be submitted to United using ALG's billing credentials from July 12,

2016 through December 2016, when United stopped paying ALG, falsely represented that the services listed therein had been referred to and performed by ALG.  In all, United paid ALG in excess of $14.2 million.

Executive Defendants Nick Austin, Ihde, Jeremy Rossel, Hillman, and Semyon Narosov then worked with Next Health's billing company to set up another lab to submit fraudulent claims to United "to further distribute the claims and as a result stay under the radar."  This entity, True Labs, however, never performed any of the services it billed to United.  Based on fraudulent claims submitted from September through December 2016, United paid True Labs approximately $775,000.

The FAC describes at length each component of Next Health's scheme to defraud United and the different types of false and/or misleading claims that Next Health entities submitted.  The FAC provides the details of a number of representative examples of each of the different types of claims.  The FAC also provides information regarding each Executive Defendant's role in the different components of the scheme.

In this action, United asserts causes of action for (1) fraud and fraudulent disclosure and fraudulent transfers against all defendants, (2) violations of the Racketeer Influenced and Corrupt Organizations Act (RICO), 18 U.S.C. § 1961, *et seq*., against Executive Defendants, (3) conspiracy to commit fraud against certain individual defendants, (4) negligent misrepresentation, money had and received, unjust enrichment, and sham to perpetrate fraud liability against Entity Defendants, (5) violations of the Texas Theft Liability Act, against Next Health, UTox, Medicus, USTox, and ALG, and (6) false association against Next Health and UTox.  Executive Defendants move to dismiss all claims asserted against them.  Entity Defendants move for dismissal of the fraudulent transfers claims against them and the negligent misrepresentation, money had and received, and

unjust enrichment claims and portions of the fraud and fraudulent nondisclosure and sham to perpetuate fraud claims against Executive Healthcare, LLC (Executive Healthcare), APEX Pharma, LLC (APEX), Dallasite, Inc. (Dallasite), and Total Pharma, LLC (Total Pharma) (collectively, Pharma Defendants).

### LEGAL STANDARD

Rule 12(b)(6) authorizes a court to dismiss a plaintiff's complaint for "failure to state a claim upon which relief can be granted." FED. R. CIV. P. 12(b)(6); *see* FED. R. CIV. P. 8(a)(2) (a complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief"). In considering a Rule 12(b)(6) motion to dismiss, "[t]he court accepts all well-pleaded facts as true, viewing them in the light most favorable to the plaintiff." *In re Katrina Canal Breaches Litig.*, 495 F.3d 191, 205 (5th Cir. 2007) (citations omitted). The court's review is limited to the pleadings, including attachments to the complaint, attachments to the motion if they are referred to in the complaint and central to the plaintiff's claims, and "matters of which judicial notice may be taken under Federal Rule of Evidence 201." *Inclusive Communities Project, Inc. v. Lincoln Prop. Co.*, 920 F.3d 890, 900 (5th Cir. 2019).

To survive a motion to dismiss, a plaintiff must plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). To meet this "facial plausibility" standard, a plaintiff must "plead[ ] factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* "The plausibility standard . . . asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* Thus, a claim "is implausible on its face when 'the well-pleaded facts do not permit the court to

infer more than the mere possibility of misconduct.'" *Harold H. Huggins Realty, Inc. v. FNC, Inc.*, 634 F.3d 787, 796 (5th Cir. 2011) (quoting *Iqbal*, 556 U.S. at 679); *see also Inclusive Communities Project*, 920 F.3d at 899.  On a motion to dismiss, the court determines only whether the plaintiff has stated a claim upon which relief can be granted; it does not consider whether a plaintiff is likely to prevail.  *Mann v. Adams Realty Co.*, 556 F.2d 288, 293 (5th Cir. 1977).

A complaint alleging fraud also must satisfy the heightened pleading standard of Federal Rule of Civil Procedure 9(b).  FED. R. CIV. P. 9(b).  Generally, Rule 9(b)'s "particularity" standard requires "specificity as to the statements (or omissions) considered to be fraudulent, the speaker, when and why the statements were made, and an explanation of why they are fraudulent." *Plotkin v. IF Axess, Inc.*, 407 F.3d 690, 696 (5th Cir. 2005);  *Benchmark Elecs., Inc. v. J.M. Huber Corp.*, 343 F.3d 719, 724 (5th Cir. 2003).  Accordingly, a plaintiff must plead the "who, what, when, where, and how" of the fraud.  *Benchmark Elecs., Inc.*, 343 F.3d at 724 (citation omitted).

**ANALYSIS**

*1. EXECUTIVE DEFENDANTS*

a.  Adequacy of United's Fraud Claims

Executive Defendants assert United's fraud-based claims must be dismissed because they are insufficiently pleaded under Rule 9(b).  Specifically, they contend United (1) engages in impermissible group pleading; (2) fails to allege "knowing participation" by Executive Defendants as to any specific fraudulent claim or sub-group of claim submitted to United; (3) fails to plead the when and where of those claims; (4) fails to plead why the sub-groups of claims were fraudulent; and (5) fails to plead any proper legal basis for a duty to disclose on the part of Next Health or Executive Defendants.

To plead a common law fraud claim, a plaintiff must allege facts to show "a material misrepresentation, which was false, and which was either known to be false when made or was asserted without knowledge of its truth, which was intended to be acted upon, which was relied upon, and which caused injury." *See Formosa Plastic Corp. USA v. Presidia Eng'rs & Contractors*, 960 S.W.2d 41, 47 (Tex. 1998) (citation omitted). For a fraud by nondisclosure claim, a plaintiff must allege (1) the defendant concealed or failed to disclose a material fact that the defendant knew the plaintiff was ignorant of or did not have the opportunity to discover, (2) the defendant intended to induce the plaintiff to take some action by concealing or failing to disclose the material fact, and (3) the plaintiff suffered as a result of acting on the nondisclosure. *Dorsey v. Portfolio Equities, Inc.*, 540 F.3d 333, 341 (5th Cir. 2008). The failure to disclose information is not actionable unless there is a duty to speak. *Id.* The duty arises in four circumstances: (1) a fiduciary or other special relationship between the parties gives rise to a duty to disclose; (2) new information makes a defendant's earlier representation misleading or untrue; (3) a defendant conveys a false impression by making a partial disclosure; and (4) a defendant who voluntarily discloses information has a duty to disclose the whole truth. *Lesikar v. Rappeport,* 33 S.W.3d 282, 299 (Tex. App.—Texarkana 2000, pet. denied).

Each party to a fraudulent scheme is responsible for the acts of others in furtherance of the scheme. *In re Arthur Andersen LLP*, 121 S.W.3d 471, 481 (Tex. App.—Houston [14th Dist.] 2003, orig. proceeding). Thus, a defendant may be liable for fraud without making any fraudulent representations where he "allegedly participated in the fraudulent transactions and reaped the benefits," even by silent acquiescence. *Id.*; *see Indep. Receivables Corp. v. Precision Recovery Analytics, Inc.*, No. 1:11-CV-008-LY, 2012 WL 12874526, at *6 (W.D. Tex. May 16, 2012); *ClaimHub, Inc. v. Universal Risk Ins. Servs., Inc.*, No. H-10-2841, 2011 WL 13247456, at *3 (S.D.

Tex. July 25, 2011).  Further, "[a] corporation's [agent] is personally liable for tortious acts which he directs or participates in during his employment."  *O'Hare v. Graham*, 455 F. App'x 377, 380 (5th Cir. 2011) (quoting *Leyendecker & Assoc., Inc. v. Wechter*, 683 S.W.2d 369, 375 (Tex. 1984)); *see also Portlock v. Perry*, 852 S.W.2d 578, 582 (Tex. App.—Dallas 1993, pet. denied) ("corporate officer may be held individually liable for a corporation's tortious conduct if he knowingly participates in the conduct or has knowledge of the conduct, either actual or constructive").

The fraud alleged by United arises in a complex and wide-ranging scheme.  The FAC alleges in detail the multiple components of the scheme and the resulting submission of different types of fraudulent claims to United.  United provides a number of examples of those claims, alleging who submitted them, when they were submitted, why information in the claims was false or misleading, and facts raising an inference that the submission of the false or misleading information was intentional.   The examples include claims containing misrepresentations regarding the providers who requested, ordered, and/or authorized the services, the providers who performed the service, and that United members owed amounts the entities submitting the claims had no intention of collecting (Doc. 348, ¶¶ 93, 110, 136, 143, 182, 247, 253; Doc. 348-1, Exs. A, B, C, E, G, H, I).  The FAC also includes examples of claims submitted by Next Health entities for lab services and prescriptions without disclosure that the services and prescriptions were induced by paying kickbacks to physicians and, in cases, not medically necessary (Doc. 348, ¶¶ 102, 104, 110, 136-137, 161; Doc. 348-1, Exs. A, B, C, E).  The Court finds the allegations are sufficient to satisfy United's pleading obligations as to its fraudulent and fraudulent nondisclosure claims under Rules 8 and 9(b).  *See Griggs v. Credit Sols. Of Am., Inc.*, No. 3:10-cv-1291-D, 2010 WL 2976209, at *3 (N.D. Tex. July 28, 2010) ("When a plaintiff alleges a systemic pattern of fraud by the defendant ... Rule 9(b) [does not] require[ ] [the plaintiff] to allege specific details of

every alleged fraudulent claim ... [but] [the plaintiff] must provide *some* representative examples of their alleged fraudulent conduct." (citation omitted)); *U.S. ex rel. Tucker v. Christus Health*, No. 09-1819, 2012 WL 5351212, at *4 (S.D. Tex. Oct. 23, 2012); *U.S. ex rel. Johnson v. Shell Oil Co.*, 183 F.D.R. 204, 206 (E.D. Tex. 1998).

Additionally, United alleges facts to connect each Executive Defendant to the fraudulent claims and raise an inference of their knowing participation in the scheme. *See* Doc. 348, ¶¶ 31, 127-131, 148, 150-151, 273, 275-277, 279-282, 299, 375 (Mike Austin); *id.* ¶¶ 32, 273, 275, 279, 284, 301-302, 376 (Nick Austin); *id.* ¶¶ 37, 127-131, 221-224, 279-282, 317-319, 377 (Daniel); *id.* ¶¶ 38, 283-285, 311, 315, 378, 487 (Ihde); *id.* ¶¶ 33, 131, 150-154, 272-282, 321-322, 373, 390 (Mortazavi); *id.* ¶¶ 40, 50, 328-329, 379, 487 (Yan Narosov); *id.* ¶¶ 36, 50, 124, 154, 304-306, 371, 390, 487 (Cary Rossel); *id.* ¶¶ 35, 50, 131, 150, 154, 308-309, 372, 390, 487 (Jeremy Rossel); *id.* ¶¶ 39, 221-224, 233, 326, 380) (Zeinali).  With respect to each Executive Defendant, United also pleads that they personally benefitted by the fraudulent scheme.

United does not rely, as Executive Defendants assert, on impermissible group pleading or accuse multiple defendants of identical, unspecific misconduct.  Although the FAC contains some general allegations against all defendants, and, collectively, Executive Defendants, it also includes allegations regarding each Executive Defendant's alleged role in the scheme.  A complaint is not defective by asserting a group of defendants committed the same act where more than one defendant allegedly committed the same act together.  *See Wilson v. Deutsche Bank Trust Co.*, No. 13:18-CV-0854-D, 2019 WL 175078, at *7 (N.D. Tex. Jan. 10, 2019) (complaint impermissibly grouped defendants where the acts alleged "inherently could have been committed by only *one* defendant"); *Clapper v. Am. Realty Inv'r, Inc.,* No. 3:14-CV-2970-D, 2015 WL 3504856, at *4 (N.D. Tex. June 3, 2015).  The Court finds the FAC sufficiently alleges facts to show that each

Executive Defendants had knowledge of the fraudulent scheme, actively participated in the scheme, and gained benefit from the scheme.

Executive Defendants complain United does not show why the various claims were fraudulent, citing specifically the fact that it is not *per se* illegal for physicians to order services from providers in which they have an investment interest.  Several Executive Defendants also dispute the specific allegations regarding their involvement in the scheme.  On a motion to dismiss, however, it is not for the Court to determine whether any particular subgroup of claims were actually false or misleading or whether the allegations as to each defendant's role are true.  *See In re Katrina Canal Breaches Litig.*, 495 F.3d at 205 ("[t]he court accepts all well-pleaded facts as true, viewing them in the light most favorable to the plaintiff").

Lastly, Executive Defendants assert United fails to plead any proper legal basis for a duty to disclose its business model and physician payments to United when they are not party to United's agreement with its network physicians.  United, however, does not allege a duty to disclose arising from the United agreement.  Instead, it alleges the claim submissions conveyed a false impression regarding the reason the services were performed.  The payments to physicians resulted in increased claims, including claims for services that were not medically necessary; Executive Defendants knew this and, thus, a duty to disclose the whole truth was triggered.  *See SB Premium, LLC v. Wolfpack Wholesale, Inc.*, 3:17-cv-931-L, 2018 WL 4362726, at *11–12 (N.D. Tex. Sept. 13, 2018) (quoting *Holland v. Thompson*, 338 S.W.3d 586, 597–98 (Tex. App.— El Paso 2010 (pet. denied)).

To be sure, United's allegations do not prove fraud.  However, the Court finds they place Executive Defendants on notice of the misconduct with which they are charged and satisfy Rule 8

and 9(b) pleading requirements.  Accordingly, the motions to dismiss as to United's fraud claims should be denied.

    b.  <u>Adequacy of Derivative Theories of Liability</u>

Executive Defendants assert United's veil piercing attribution of liability theory against them must be dismissed because the FAC does not properly allege that they caused Next Health entities to perpetrate a fraud on United or the entities were used to perpetrate a fraud for their direct personal benefit.  "[A]n assertion of veil piercing or corporate disregard does not create a substantive cause of action[;] . . . such theories are purely remedial and serve to expand the scope of potential sources of relief by extending to individual shareholders or other business entities what is otherwise only a corporate liability."  *Spring St. Partners-IV, L.P. v. Lam*, 730 F.3d 427, 443 (5th Cir. 2013) (citation omitted).  A plaintiff seeking to pierce the corporate veil must "prove that the individual used the LLC form to perpetrate actual fraud for the individual's direct personal benefit."  *Id*. at 444.[2]

United alleges Next Health and Executive Defendants should be vicariously, jointly, and severally liable for the fraud perpetrated by the Next Health lab and pharmacy entities that submitted claims to United under a veil piercing theory (Doc. 348, ¶¶ 346-348).  Likewise, the corporate form of Next Health should be disregarded because the Executive Defendants used it and its subsidiaries for the purposes of perpetrating an actual fraud upon United (*Id*.).

As discussed above, United alleged specific acts on the part of Executive Defendants in support of Next Health's fraudulent scheme.  United specifically pleads that Executive Defendants

---

[2]  Executive Defendants cite to Texas Business Organizations Code section 21.223, which limits a corporate owner's liability for any contractual obligation of the corporation or any matter relating to or arising from the obligation on the basis that the owner is or was "the alter ego of the corporation or on the basis of actual or constructive fraud, a sham to perpetrate a fraud, or other similar theory" unless the obligee demonstrates the owner "caused the corporation to be used for the purpose of perpetrating and did perpetrate an actual fraud on the obligee primarily for the direct personal benefit of the" owner.  Tex. Bus. Orgs. Code Ann. § 21.223(a)(2), (b).  To the extent section 21.223 applies to United's tort claims, the result is the same.

"caused Next Health and its subsidiaries to be used for the purpose of perpetrating an actual fraud upon United, which was committed primarily for the benefit of the [Executive Defendants]" (Doc. 348, ¶ 346).   And, throughout the amended complaint, United pleads, with respect to each Executive Defendant, that they personally benefitted from the fraudulent conduct by way of distributions, salary, and bonuses from Next Health.  The Court finds the allegations in the FAC raise an inference that Executive Defendants used Next Health and its subsidiaries to perpetrate an actual fraud and, thus, satisfy the pleading requirements for United's veil piercing theory.  Indeed, the allegations are sufficient to assert claims against Executive Defendants premised on their own individual conduct (or lack thereof), and it is not necessary at this stage to pierce the corporate veil of any entity in order for Executive Defendants to face liability.  *See L&C Consultants, LLC v. ASH Petroleum*, 3:07-cv-1904-D, 2009 WL 3110200, at *8 (N.D. Tex. Sept. 29, 2009); *Sanchez v. Mulvaney*, 274 S.W.3d 708, 712 (Tex. App.—San Antonio 2008, no pet.) ("[i]n an action seeking to hold an agent individually liable for his tortious or fraudulent acts, the corporate veil is not required to be pierced").

In addition to veil piercing, United asserts Executive Defendants are liable for the Next Health entities' allegedly tortious acts in submitting false and misleading information to United under theories of substantial assistance and aiding and abetting.  Executive Defendants assert United's substantial assistance and aiding and abetting theories of liability also must be dismissed because no such claim is recognized under Texas law.  The Court agrees.  Both theories share the same elements, and require proof that a defendant, "with unlawful intent, to give substantial encouragement to a wrongdoer in a tortious act."  *W. Fork Advisors, LLC v. SunGard Consulting Services, LLC*, 437 S.W.3d 917, 921 (Tex. App.—Dallas 2014, pet. denied) (citing *Juhl v. Airington*, 936 S.W.2d 640, 644 (Tex. 1996)).  However, recognition of the theories under Texas

law "is an open question."  *Juhl*, 936 S.W.2d at 643; *see also Fiamma Statler, LP v. Challis*, No. 02-18-00374, 2020 WL 6334470, at *10 (Tex. App.—Fort Worth Oct. 29, 2020, no pet. h.).   And, "[w]hen sitting in diversity, a federal court exceeds the bounds of its legitimacy in fashioning novel causes of action not yet recognized by state courts."  *In re Depuy Orthopaedics, Inc.*, 888 F.3d 753, 782 (5th Cir. 2018).  Accordingly, the Court finds United's claims, to the extent Executive Defendants' liability is to be attributed under a theory of substantial assistance or aiding and abetting, should be dismissed.

c.  <u>Adequacy of Conspiracy to Commit Fraud Claims</u>

Executive Defendants assert United's conspiracy claims, which relate to claims submitted to United for lab services purportedly ordered by doctors associated with the ADAR Group, must be dismissed because United has not alleged facts to show (1) an agreement existed among the alleged co-conspirators or (2) that the defendants had specific intent to defraud.  Instead, the allegations show only that defendants may have agreed to market Next Health services to insured customers to raise company profits.

To establish a civil conspiracy, a plaintiff must prove: (1) a combination of two or more persons; (2) an object to be accomplished (either an unlawful purpose or a lawful purpose by unlawful means); (3) a meeting of the minds on the object or course of action; (4) one or more unlawful, overt acts; and (5) damages as the proximate result.  *Ins. Co. of N. Am. v. Morris*, 981 S.W.2d 667, 675 (Tex. 1998).  The agreement need not be formal, and each conspirator need not know all the details. *Bourland v. State*, 528 S.W.2d 350, 354 (Tex. Civ. App.—Austin, 1975, writ ref'd n.r.e.).  Concerted action may be inferred from participation in the transactions.  *Id*. at 355. To be jointly and severally liable, an alleged conspirator must have acted "in pursuance of the

common purpose of the conspiracy." *Carroll v. Timmers Chevrolet, Inc.*, 592 S.W.2d 922, 928 (Tex. 1979).

United alleges that Executive Defendants Mike Austin, Nick Austin, Jeremy Rossel, Cary Rossel, and Mortazavi conspired with Bugen and Zajac to commit fraud with respect to claims submitted to United by UTox, Medicus, and USTox for lab services purportedly ordered by four doctors, Drs. Rao, Kim, Parameswara, or Sozi. According to the FAC, the ADAR Group only ordered testing from Next Health because of the kickbacks it was promised and the tests were not supported by legitimate medical records. The object of the conspiracy was to obtain funds from commercial insurers, which the conspirators were not entitled to receive, by submitting claims for the illegitimate lab services.

United alleges overt acts in furtherance of the conspiracy, including:

(1) Next Health employees Alle Beyeseda and Jen Sears attempted to convince the physicians that there was no problem with them not seeing patients for whom they were purportedly ordering lab services and arranged for letters to ADAR Group patients intended to make them understand they would not owe any money for Next Health testing services;

(2) a September 2015 meeting and subsequent email correspondence in which Hillman, Semyon Narosov, Jeremy Rossel, Mike Austin, and Amir Mortazavi discussed with Bugen models, including for additional sober homes, to increase funds that they could obtain from commercial insurers for illegitimate lab services and encouraged Bugen to target United members, pay additional physicians to use their credentials so referrals would be "a little less noticeable" to United, and expand into other Next Health products, including illegitimate prescriptions;

(3) Hillman, Semyon Narosov, Jeremy Rossel, Cary Rossel, Mike Austin, and Mortazavi approved substantial loans to Bugen to purchase properties to house individuals with commercial insurance from whom urine specimens could be collected and sent to Next Health;

(4) Jeremy Rossel did title research and other related due diligence concerning the properties Bugen sought to purchase and provided other material support to allow Bugen to purchase the properties, modified the terms of the loans, and, in May 2016, released Bugen from any liens associated with the loans and properties;

    (5) Cary Rossel agreed to act as the trustee for the properties;

    (6) Bugen used funds he received from Next Health to pay Drs. Rao, Kim, Sozi, and Parameswara for the use of their medical billing credentials;

    (7) Bugen and Zajac falsified medical records and requisition forms to support otherwise unsupportable testing orders; and

    (8) Zajac and Bugen told the individuals from whom they were collecting lab specimens that Next Health would not hold the individuals financially responsible for any of the lab testing services.

(Doc. 348, ¶¶ 145-154, 274, 390; Doc. 348-1, Exs. A, B, C). Each submission of a claim for services allegedly ordered by Drs. Rao, Kim, Sozi, or Parameswara also was an unlawful overt act in furtherance of the conspiracy. As a result of the fraudulent claims for services allegedly ordered by Drs. Rao, Kim, Sozi, or Parameswara, United was harmed in an amount of approximately $14 million.

The facts alleged in the FAC, taken as true, indicate the conspirators' understanding, agreement, and intentional commitment to the alleged conspiracy's common purpose. Accordingly, the Court finds United's conspiracy to commit fraud claims against Executive Defendants Mike Austin, Nick Austin, Jeremy Rossel, Cary Rossel, and Mortazavi do not warrant dismissal and the motions to dismiss the claims should be denied.

    d. Adequacy of RICO Violation Claims

Executive Defendants assert United's RICO claims against them must be dismissed because United did not sufficiently plead (1) predicate acts or a pattern of racketeering activity, (2) a RICO enterprise, or (3) its standing.

It is "unlawful for any person employed by or associated with any enterprise … to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity." 18 U.S.C. § 1962(c). RICO violation claims "have three common

elements: (1) a person who engages in (2) a pattern of racketeering activity, (3) connected to the acquisition, establishment, conduct, or control of an enterprise." *Abraham v. Singh*, 480 F.3d 351, 355 (5th Cir. 2007); 18 U.S.C. § 1962.  A plaintiff has standing to bring a civil RICO claim if he is "injured in his business or property by reason of a violation of section 1962."  18 U.S.C. § 1964(c).

### i.  *Pattern of Racketeering Activity*

A RICO plaintiff must allege facts to show a "pattern of racketeering activity," which consists of two or more predicate criminal acts that are (1) related and (2) amount to or pose a threat of continued criminal activity.  *See* 18 U.S.C. §§ 1961(5), 1962(c).  United alleges predicate acts of money laundering and mail and wire fraud, which are racketeering activities.  *See* 18 U.S.C. §§ 1341, 1343, 1956, 1961(1).  Executive Defendants contend United fails to adequately plead both the predicate acts with specificity and that a pattern exists.

To establish a money laundering violation, a plaintiff must plead that a RICO defendant "(1) knowingly conducted a financial transaction; (2) which involved the proceeds of an unlawful activity; and (3) with the intent to promote or further unlawful activity."  *U.S. v. Dovalina*, 262 F.3d 472, 475 (5th Cir. 2001); 18 U.S.C. § 1956(a)(1)(A)(i).  The FAC alleges facts to show that Next Health paid physicians kickbacks for lab testing and prescription referrals.  Next Health entities submitted to United claims for services referred by those physicians that contained false and misleading representations and, after receiving payment from United, made payments to the physicians through shell entities.  The amended complaint sets out representative examples of these payments, which involved the proceeds of allegedly unlawful activities and were intended to promote the unlawful activity by encouraging further referral of lab services and prescriptions

to Next Health and concealing the source and purpose of the payments (Doc. 348, ¶¶ 103, 105, 109; Doc. 348-1, Exhibit K).

For mail fraud, a plaintiff must plead facts to show: "(1) a scheme to defraud; (2) the use of the mails to execute the scheme; and (3) the specific intent to defraud." *United States v. Traxler*, 764 F.3d 486, 488 (5th Cir. 2014); 18 U.S.C. § 1341.  The elements of a claim for wire fraud are the same as mail fraud, except the second element involves "the use of, or causing the use of, wire communications in furtherance of" the scheme.  *See United States v. Rush*, 236 F. App'x 944, 947 (5th Cir. 2007); 18 U.S.C. § 1343.

To allege mail and wire fraud predicate acts, a plaintiff must comply with Rule 9(b)'s particularity pleading requirements.  But, mail and wire fraud are "broad" crimes.  *Allstate Ins. Co. v. Plambeck*, 802 F.3d 665, 675 (5th Cir. 2015).  "Where one does an act with knowledge that the use of the mails will follow in the ordinary course of business, or where such use can reasonably be foreseen, even though not actually intended, then he 'causes' the mails to be used." *Pereira v. United States*, 347 U.S. 1, 8–9 (1954).  "Once membership in a scheme to defraud is established, a knowing participant is liable for any wire communication which subsequently takes place or which previously took place in connection with the scheme." *Plambeck*, 802 F.3d at 675 (citing *United States v. Stalnaker*, 571 F.3d 428, 436 (5th Cir. 2009)); *see also Comm. Metals Co. v. Chazanow*, No. 3:09-cv-808-B, 2009 WL 3853704, at *5–6 (N.D. Tex. Nov. 17, 2009) ("Where a plaintiff claims that mail and wire fraud were in furtherance of a larger scheme to defraud . . . Rule 9(b) only requires the plaintiff to delineate, with adequate particularity, the specific circumstances constituting the overall fraudulent scheme." (internal quotation marks and citation omitted)).

As addressed already, United sufficiently pleads facts to show the existence of a scheme to defraud and that Executive Defendants knowingly participated in the scheme and intended to

defraud United.  The use of U.S. mail and interstate carriers to deliver or receive lab specimens, requisition forms, and prescriptions and the transmission via interstate wire of the related false or misleading insurance claims are reasonably foreseeable consequences of the scheme, and the FAC identifies representative instances of those predicate acts (Doc. 348, ¶¶ 479-481; Doc. 348-1, Exs. A-E, H, I, J).

Moreover, the FAC alleges facts to connect each Executive Defendant to instances of racketeering activity (Doc. 348, ¶¶ 372-380, 466-475).  Hillman, Semyon Narosov, Mike Austin, Mortazavi, Zeinali, Daniel, and Ihde identified referral sources willing to accept disguised kickbacks and arranged for them to receive kickbacks.  Semyon Narosov, Hillman, Mike Austin, Daniel, Nick Austin (for lab services), or Zeinali (for pharmacy services) determined which Next Health subsidiary would perform a referred lab service or fill a referred prescription and which subsidiary would submit a claim to United.  After United paid the Next Health subsidiary that submitted the claim, Jeremy Rossel, Cary Rossel, or Yan Narosov directed Next Health employees to make intracompany transfers from the Next Health entity that received payment to the entity that would funnel a portion of the payment back to the referral source.  Hillman, Semyon Narosov, Mortazavi, Nick Austin, Mike Austin, Ihde, and/or Daniel, would tell Jeremy Rossel or Yan Narosov to make certain payments to referral sources or to marketers.  The Court finds United's allegations sufficient to plead mail and wire fraud predicate acts under Rules 8 and 9(b).

Executive Defendants next contend United's allegations are insufficient to establish a pattern of predicate acts and, specifically, either closed-ended or open-ended continuity.

> 'Continuity' is both a closed- and open-ended concept, referring either to a closed period of repeated conduct, or to past conduct that by its nature projects into the future with a threat of repetition. It is, in either case, centrally a temporal concept— and particularly so in the RICO context, where *what* must be continuous, RICO's predicate acts or offenses, and the *relationship* these predicates must bear one another, are distinct requirements. A party alleging a RICO violation may

> demonstrate continuity over a closed period by proving a series of related predicates extending over a substantial period of time. Predicate acts extending over a few weeks or months and threatening no future criminal conduct do not satisfy this requirement: Congress was concerned in RICO with long-term criminal conduct. Often a RICO action will be brought before continuity can be established in this way. In such cases, liability depends on whether the *threat* of continuity is demonstrated.

*H.J. Inc. v. Nw. Bell Tel. Co.*, 492 U.S. 229, 241–42 (1989) (internal citations omitted).  "Open-ended" continuity exists where there is a "specific threat of repetition extending indefinitely into the future" or "the predicate acts or offenses are part of an ongoing entity's regular way of doing business."  *Id.* at 242.

United alleges the racketeering acts "started in or around January 2015 and continued until at least January 2017," when this lawsuit was originally filed.  As examples, the FAC references hundreds of wire fraud violations, including a January 5, 2015 claim (Doc. 348, ¶ 93) and a December 9, 2016 claim (Doc. 348-1, Exhibit I).[3]

Courts will not find a RICO pattern if the allegations involve a single, narrow purpose and one or few participants directed toward a single victim.  *See, e.g., Calcasieu Marine Nat'l Bank v. Grant*, 943 F.2d 1453, 1464 (5th Cir. 1991); *Clapper v. Am. Realty Inv., Inc.*, 2016 WL 302313, at *10 (N.D. Tex. Jan. 25, 2016).  This case, however, involves several participants and, although it focuses on acts committed against United, the FAC asserts the scheme involved transmission of fraudulent insurance claims to both United and other public payors (Doc. 348, ¶¶ 290, 461, 488).

The Court finds United sufficiently pleads close-ended continuity by alleging hundreds of predicate acts as part of a complex scheme for at least two years until this case was filed.  United also pleads open-ended continuity, alleging that the "racketeering activities are central to the way

---

[3] Defendants Semyon Narosov and Hillman pleaded guilty to committing offenses that are RICO predicates through Next Health for more than three years.  *See United States v. Narosov*, 3:18-cr-475, Docs. 5, 9 (N.D. Tex. Sept. 24, 2018).

that [Executive Defendants] operate and manage the Next Health Enterprise's business affairs and the business affairs of other entities and thus constitute[d] a threat to continue in the future" (Doc. 438, ¶ 490).  Executive Defendants contend there is no threat of continuing activity because Next Health no longer conducts business and at least two defendants are in prison.  However, taking United's allegations as true, the Court finds it sufficiently pleads open-ended continuity.  *See Abraham*, 480 F.3d at 356 (district court erred in dismissing a RICO claim for failing to satisfy the continuity prong when plaintiffs "did not allege predicate acts extending over a few weeks or months and threatening no future criminal conduct," but instead "alleged that the defendants engaged in at least a two-year scheme" with multiple victims and "no reason to suppose that this systemic victimization" would have ceased if the plaintiffs had not filed the lawsuit).

Accordingly, the Court finds United has sufficiently pleaded a pattern of racketeering activity, including the predicate acts of money laundering and mail and wire fraud.  *See, e.g., Gil Ramirez Grp., L.L.C. v. Houston Indep. Sch. Dist.*, No. 4:10-CV-04872, 2017 WL 3236110, at *9–10 (S.D. Tex. July 31, 2017), *aff'd sub nom. Gil Ramirez Grp., L.L.C. v. Marshall*, 765 F. App'x 970 (5th Cir. 2019)

### ii.     RICO Enterprise

The statutory definition of a RICO enterprise is an "individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity."  18 U.S.C. § 1961(4).  An enterprise "does not have to be a formal or legal entity, but it must have some sort of hierarchical or consensual decision-making structure, and it must exist for purposes other than just to commit predicate acts."  *Walker v. Beaumont Indep. Sch. Dist.*, 938 F.3d 724, 738 (5th Cir. 2019) (citing *In re McCann*, 268 F. App'x 359, 366 (5th Cir. 2008)); *see also Boyle v. United States,* 556 U.S. 938, 946 (2009) (an informal enterprise, or

association-in-fact enterprise, must have at least three structural features: "a purpose, relationships among those associated with the enterprise, and longevity sufficient to permit these associates to pursue the enterprise's purpose."). If a complaint "alleges an enterprise created by the alleged racketeering activity itself," it has not sufficiently pleaded "the existence of an enterprise separate and apart from the pattern of racketeering activity in which it engages." *Zastrow v. Houston Auto Imports Greenway Ltd.*, 789 F.3d 553, 562 (5th Cir. 2015).

United defines the Next Health Enterprise as Next Health or, alternatively, an "association-in-fact" comprised of Next Health, LLC and Next Health lab and pharmacy subsidiaries with a common purpose "to obtain money from commercial payors by submitting fraudulent claims for lab services or prescriptions" (Doc. 348, ¶¶ 460-461). Executive Defendants assert United fails to allege an enterprise separate and apart from the alleged pattern of racketeering activity, but it alleges facts to show either enterprise is not limited to simply combining to commit the alleged predicate acts. *Compare Dell Inc. v. Mishra*, No. A-16-cv-00641-SS, 2018 WL 3717119, at *5 (W.D. Tex. Aug. 3, 2018) (when Dell pleaded RICO predicate acts of wire fraud and trafficking in counterfeit services and characterized association-in-fact enterprise's "purpose of carrying out a systematic and ongoing wire fraud through misuse of the DELL Marks and impersonating Dell," it failed to allege an enterprise that "has an existence separate and apart from the pattern of racketeering").

As pleaded, United adequately alleges Next Health, a separate legal entity, is a RICO enterprise. *See, e.g., Mugg v. Hutmacher*, No. 18-CV-732-RP, 2019 WL 3538979, at *5 (W.D. Tex. July 10, 2019), *report and recommendation adopted,* No. 1:18-CV-732-RP, 2019 WL 3536049 (W.D. Tex. Aug. 2, 2019) (citing *Landry v. Air Line Pilots Ass'n Int'l AFL-CIO*, 901 F.2d 404, 434 (5th Cir. 1990)). With respect to the association-in-fact enterprise, United alleges

24

that Next Health and its lab and pharmacy subsidiaries function together as an ongoing, continuing unit with both a hierarchical and consensual decision-making structure. Next Health, the parent company, "orchestrates intercompany charges" between the various subsidiaries, which perform different roles in furtherance of the enterprise's common purpose (Doc. 348, ¶ 461). Those associated with the enterprise have ongoing relationships, and the enterprise has an ascertainable structure, that is separate from the predicate acts that they committed. *Compare State Farm Mut. Auto. Ins. Co. v. Giventer*, 212 F. Supp.2d 639, 650 (N.D. Tex. 2002) (law offices and chiropractic clinics did not constitute an enterprise because, aside from commission of alleged predicate acts, there appeared to be nothing binding the association together). Because United alleges ongoing relationships between the Next Health entities that included and facilitated, but were not limited to, the predicate acts, the Court finds it also adequately pleads a RICO association-in-fact enterprise. *See, e.g., Gil Ramirez Grp.*, 2017 WL 3236110, at *10.

Executive Defendants next allege that United fails to plead that they conducted the affairs of the alleged RICO enterprise. For a section 1962(c) violation, a defendant must "conduct or participate, directly or indirectly, in the conduct of [the] enterprise's affairs." 18 U.S.C. § 1962(c). An enterprise may be "operated" by both upper management and "lower rung participants in the enterprise who are under the direction of upper management." *Plambeck*, 802 F.3d at 674–75 (citing *Reves v. Ernst & Young*, 507 U.S. 170, 184 (1993)).

United alleges that each Executive Defendant "participated in the management and operation of the Next Health Enterprise" and describes their involvement and authority with respect to the enterprise (Doc. 348, ¶¶ 466-475). The Court finds United sufficiently pleads that each Executive Defendant participated in the operation or management of the Next Health

Enterprise and, therefore, conducted the affairs of the enterprise.  *See, e.g., Plambeck*, 802 F.3d 665, 674–75.

> iii.    Standing

According to Executive Defendants, United fails to plead facts to show standing because it does not allege how its injuries were directly caused by any alleged racketeering activity on the part of Executive Defendants.  Specifically, they complain that United's allegations are overly general, failing to show any injury resulting from the payment of kickbacks to physicians or the fact that members were not required to pay their portion of their provider bills  Additionally, the conduct of the network physicians who referred services to Next Health entities broke the causal chain.

To establish RICO standing, a plaintiff must satisfy two elements: injury and causation. *Jackson v. Nat'l Ass'n for Advancement of Colored People*, 546 F. App'x 438, 442 (5th Cir. 2013). A RICO predicate offense must be both a "but for" cause and the proximate cause of the plaintiff's injury.  *Id*.  With respect to proximate cause, "the central question … is whether the alleged violation led directly to the plaintiff's injuries."  *Id*. (quoting *Anza v. Ideal Steel Supply Corp.,* 547 U.S. 451, 461 (2006)).

United alleges it was the target of a scheme, in which Executive Defendants knowingly participated, "aimed to unlawfully obtain money from United through the submission of intentionally false, fraudulent, and misleading insurance claims," and was  harmed by three types of racketeering activities: mail fraud, wire fraud, and money laundering (Doc. 348, ¶¶ 476, 478-483).   The FAC references specific examples of wire transmission and mailings made in furtherance of the scheme (*Id.* ¶¶ 478-481, Doc. 348-1, Exs. A, B, C, D, E, G, H, and I, J).  United also alleges money laundering predicate acts, funneling United payments through Next Health

entities to referral sources to promote further fraudulent submissions and conceal the source and purpose of the transactions.  The FAC provides examples of these transactions (Doc. 348, ¶¶ 482-483, 491, Exhibit K).

United's injury – the payment of fraudulent claims – was the objective of the Next Health Enterprise, and United was a direct and foreseeable victim of the predicate acts committed in furtherance of the scheme.  The fact that Executive Defendants dispute the fraudulent nature of the submitted claims does not preclude United from sufficiently pleading standing.  Nor does the fact that physicians provided referrals for the lab services and prescriptions break the chain of causation.  Instead, the referrals were a key part of the scheme to defraud United.  Because the alleged harm and alleged RICO violation are directly connected, the Court finds United has standing to bring its civil RICO claims.  *See Plambeck*, 802 F.3d at 676–77; *Allstate Ins. Co v. Benhamou*, 190 F.Supp.3d 631, 644–45 (S.D. Tex. 2016).

For the reasons stated above, the Court finds United alleges facts sufficient to state RICO violations claims against Executive Defendants  and, therefore, their motions to dismiss the claims should be denied.

E.      Adequacy of Fraudulent Transfer Claims

Executive Defendants assert United's claims for fraudulent transfers must be dismissed because the complaint offers only a "formulaic recitation" of the elements of a claim and broadly refers to Executive Defendants as a group without specifying the transfers for which each individual defendant is liable.

Under the Texas Uniform Fraudulent Transfer Act (TUFTA), a plaintiff may recover for a fraudulent transfer against the debtor, the transferee, or the person for whose benefit the transfer was made.  *See* Tex. Bus. & Com. Code Ann. §§ 24.008, 24.009.  "[T]he elements of an actual

fraudulent transfer under TUFTA are: (1) a creditor; (2) a debtor; (3) the debtor transferred assets shortly before or after the creditor's claim arose; (4) with actual intent to hinder, delay, or defraud any of the debtor's creditors." *Matter of Life Partners Holdings, Inc.*, 926 F.3d 103, 117 (5th Cir. 2019) (citation omitted); *see* BUS. & COM. § 24.005(a)(1). Claims under section 24.005(a)(1) require actual intent and, thus, are likely subject to Rule 9(b). *See Clapper v. Am. Realty Invs., Inc.*, 2018 WL 3868703, at *8 (N.D. Tex. Aug. 14, 2018) (explaining that, although an open question in the Fifth Circuit, several members of this court have applied the enhanced pleading requirements of Rule 9(b) when plaintiffs seek to establish the actual intent of the debtor), *recons. denied*, 2018 WL 6011182 (N.D. Tex. Nov. 16, 2018). To determine actual intent, a court may consider a non-exclusive list of factors, also known as "badges of fraud," set out in section 24.005.[4] *Id*.; *see* BUS. & COM. § 24.005(b).

Alternatively, a plaintiff may show constructive fraud. *See* BUS. & COM. §§ 24.005(a)(2), 24.006(a). Instead of actual intent to hinder, delay, or defraud any of the debtor's creditors, the plaintiff must demonstrate that a debtor made the transfer or incurred an obligation "without receiving a reasonably equivalent value in exchange for the transfer or obligation," and either (1) "was engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small," or (2) "intended to incur, or believed or reasonably should have believed that the debtor would incur, debts beyond the debtor's ability to pay as they became due." *Id*.

---

[4] These "badges of fraud include whether: (1) the transfer or obligation was to an insider; (2) the debtor retained possession or control of the property transferred after the transfer; (3) the transfer or obligation was concealed; (4) before the transfer was made or obligation was incurred, the debtor had been sued or threatened with suit; (5) the transfer was of substantially all the debtor's assets; (6) the debtor absconded; (7) the debtor removed or concealed assets; (8) the value of the consideration received by the debtor was reasonably equivalent to the value of the asset transferred or the amount of the obligation incurred; (9) the debtor was insolvent or became insolvent shortly after the transfer was made or the obligation was incurred; (10) the transfer occurred shortly before or shortly after a substantial debt was incurred; and (11) the debtor transferred the essential assets of the business to a lienor who transferred the assets to an insider of the debtor. BUS. & COM. § 24.005(b).

According to the FAC, ALG, Medicus, US Tox, UTox, True Labs, Apex Pharma, Dallasite, Inc., Executive Healthcare, and Total Pharma (collectively, debtors), at the direction of Executive Defendants, transferred tens of millions of dollars that United paid them to Next Health and Next Health affiliates, including shell labs and pharmacies (Doc. 348, ¶¶ 450-455).  The transfers (1) occurred shortly after United paid the debtors for fraudulent lab and pharmacy claims, (2) were made to affiliates and insiders, (3) were requested and directed to be made with the actual intent to hinder, delay, and defraud United and in furtherance of the frauds that were perpetrated against it, (4) were concealed, and (5) were made without receiving reasonably equivalent value in exchange for the transfers (*Id.*).  Further, the debtors, Next Health, and Executive Defendants believed, or reasonably should have believed, that the debtors would soon incur debts beyond their ability to pay them as they became due (*Id.*).

United additionally and/or alternatively alleges that, at the direction of Executive Defendants, Next Health fraudulently transferred more than $57 million in assets to Executive Defendants and a number of entities owned or controlled by certain Executive Defendants (*Id.* ¶ 456).[5]  And, "[u]pon information and belief, many more fraudulent transfers were made at the direction of the same individuals and for the benefit of the same transferees, as well as other known and unknown transferees, including but not limited to the entities identified in the [FAC] as being owned or controlled by [Executive Defendants]" (*Id.*).  These transfers also occurred shortly after United paid Next Health's subsidiaries for fraudulent lab and pharmacy claims, were made to affiliates and insiders, were requested and directed to be made with the actual intent to hinder, delay, and defraud United and in furtherance of the frauds that were perpetrated against it, were

---

[5]  These entities are Advanced Total Management, Healthcare Marketing, Optimized, Inc., Energized, Inc., Pioneer Laboratories, MNCR, AM Healthcare Holdings, Medveritas Holdings or R. Close Holdings, and ISM Holdings (Doc. 348, ¶ 456).

concealed, and were made without receiving reasonably equivalent value in exchange for the transfers (*Id*.). And, Next Health and the defendants who caused the transfers to be made believed, or reasonably should have believed, that Next Health would soon incur debts beyond its ability to pay them as they became due (*Id*.).

Executive Defendants assert United fails to identify with any specificity the transfers of which they are complaining and, thus, from whom, to whom, and at whose direction the actionable transfers were made. United responds that, by exhaustively outlining the nature, scope, and duration of the fraudulent scheme, it has adequately alleged facts to demonstrate Executive Defendants' actual fraudulent intent and constructive fraud. In doing so, it relies on cases involving Ponzi schemes in which courts have held Rules 8 and 9(b) are satisfied with respect to establishing a defendant's "'fraudulent intent by showing that the … enterprise operated as a Ponzi scheme' without proving which of the entities involved in the scheme was the transferor." *Matter of Life Partner*, 926 F.3d 103, 119 (5th Cir. 2019) (quoting *Janey v. Alguire*, 846 F. Supp.2d 662, 672 (N.D. Tex. 2011)).[6]

The threshold issue, however, is whether United has adequately pleaded the transfers for which it seeks recovery. In describing the Next Health fraudulent scheme, United generally references transfers to and from Next Health entities for the purpose of making and concealing payments to physicians and transfers to Executive Defendants and entities they own or control. However, the FAC does not identify any particular transfers that United asserts are fraudulent under TUFTA and appears to seek recovery for each transfer from one of the entities identified as a debtor to any transferee, a number of which remain unidentified, within a certain time period.

---

[6] The Court notes that the scheme alleged here is not a Ponzi scheme, in which a corporation uses money coming in as new investments to pay earlier investors and "operates and continues to operate at a loss." *See Janvey v. Alguire*, 647 F.3d 585, 597 (5th Cir. 2011) (citations omitted).

The Court found only one specific related reference in the FAC, which identifies three transfers by one debtor, UTox, in 2015 and 2016 (Doc. 348, ¶ 105).

Although United need not identify each individual transfer, the Court finds that, to state a claim for fraudulent transfer, United must take some steps to identify those transfers for which it seeks to recover so that each defendant has "fair notice" of the grounds upon which the claim against it rests. *See Twombley*, 550 U.S. at 555 (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957)). *See also, e.g., Basic Capital Mgm't, Inc. v. Dynex, Capital, Inc.*, No. 3:17-cv-1147-D, 2019 WL 329545, at *6–7 (5th Cir. Jan. 25, 2019). Because United does not adequately identify the transfers it alleges are actionable, the Court finds its TUFTA claims against Executive Defendants should be dismissed.

Executive defendants also complain that a number of other fraudulent transfer allegations in the FAC are conclusory and without factual support. And, with respect to United's constructive fraudulent transfer claim, the Court agrees. Although the FAC alleges that the debtors, Next Health, and Executive Defendants believed, or reasonably should have believed, that the debtors would soon incur debts beyond their ability to pay them as they became due, there are no factual allegations regarding the debtors' solvency or Executive Defendants' beliefs regarding that solvency to support the conclusory statement. Without more than its threadbare recital of this element of the claim, the Court finds the constructive fraudulent transfer claims against the Executive Defendants also should be dismissed on this basis. *See Iqbal*, 556 U.S. 662, 678.

## 2. ENTITY DEFENDANTS

### a. <u>Statute of Limitations</u>

Pharma Defendants move to dismiss United's claims against them for negligent misrepresentation, money had and received, and unjust enrichment because the claims are barred

by the statute of limitations.  For the same reason, they also seek dismissal of the fraud and fraudulent nondisclosure and sham to perpetuate fraud claims related to conduct prior to September 30, 2015.  According to Pharma Defendants, the claims are based on new allegations regarding the use of pharmacy subsidiaries that were not included in United's original complaint, and these new allegations against new defendants do not relate back to the original complaint.

"A complaint may be subject to dismissal if its allegations affirmatively demonstrate that the plaintiff's claims are barred by the statute of limitations and fail to raise some basis for tolling." *Frame v. City of Arlington*, 657 F.3d 215, 240 (5th Cir. 2011); *Davis v. Dallas County*, 541 F. Supp.2d 844, 856 (N.D. Tex. 2008) ("statute of limitations may support dismissal under Rule 12(b)(6) where it is evident from the plaintiff's pleadings that the action is barred and the pleadings fail to raise some basis for tolling or the like").

United's negligent misrepresentation, money had and received, and unjust enrichment claims against Pharma Defendants are subject to a two-year statute of limitations.  *HECI Exploration Corp. v. Neel*, 982 S.W.2d 881, 885 (Tex. 1998); *Merry Homes, Inc. v. Dao*, 359 S.W.3d 881, 882 (Tex. App.—Houston [14th Dist.] 2012, no pet.); TEX. CIV. PRAC. & REM. CODE ANN. § 16.003(a).  The statute of limitations for its fraud-based claims is four years.  CIV. PRAC. & REM. § 16.004(a)(4).

United pleads the discovery rule; according to the FAC, "United did not discover the harm caused by its reasonable reliance on Defendants' fraudulent claims until 2016" (Doc. 348, ¶ 349). The discovery rule "operates to defer accrual of a cause of action until the plaintiff knows, or by exercising reasonable diligence, should know of the facts giving rise to the claim." *Wagner & Brown, Ltd. v. Horwood*, 58 S.W.3d 732, 734 (Tex. 2001) (citation omitted).  Thus, crediting United's discovery allegations, the limitations period for its negligent misrepresentation, money

had and received, and unjust enrichment claims expired sometime in 2018 and the limitations period for its fraud-based claims expired sometime in 2020. United filed its proposed FAC on September 30, 2019 (Doc. 293), well after the limitations period expired for the negligent misrepresentation, money had and received, and unjust enrichment claims, but timely with respect to the fraud-based claims.[7]

The Pharma Defendants assert that, because they are new defendants, United must satisfy Rule 15(c)(1)(C) in order for the claims against them to relate back to the original complaint for purposes of the statute of limitations. Rule 15(c) "governs when an amended pleading 'relates back' to the date of a timely filed original pleading and is thus itself timely even though it was filed outside an applicable statute of limitations." *Krupski v. Costa Crociere S.p.A.*, 560 U.S. 538, 541 (2010). "When there is no mistake of identity alleged, Rule 15(c)(1)(C) is not triggered." *McDonald v. Nationwide Bldg. Servs. Inc.*, No. 3:17-CV-00981, 2019 WL 4303037, at *3 (W.D. La. Aug. 26, 2019), *report and recommendation adopted*, No. 317-CV-00981, 2019 WL 4281944 (W.D. La. Sept. 10, 2019), *aff'd sub nom. McDonald v. Brookshire Grocery Co.*, 807 F. App'x 341 (5th Cir. 2020). Here, Pharma Defendants are simply new defendants, sued in addition to the original defendants, and the element of "mistake" is lacking. Accordingly, Rule 15(c)(1)(C) does not apply to the claims against them.

United responds, however, that the fraudulent concealment doctrine applies to further toll the negligent misrepresentation, money had and received, and unjust enrichment claims against Pharma Defendants. Specifically, Next Health, which controls and shares counsel with Pharma Defendants, withheld discovery in this case, concealing the additional causes of action United

---

[7] Pharma Defendants also seek dismissal of "pre-September 30, 2015" fraud-based claims. Although the four-year statute of limitations for those claims would have expired on September 30, 2019, United's pleading of the discovery rule, taken as true, deferred the accrual of those claims until 2016, making them timely-filed, at least for purposes of this motion to dismiss.

could pursue against Pharma Defendants despite United's reasonable diligence to determine additional parties to sue.  Thus, the fraudulent concealment should toll the statute of limitations until July 2019, when Next Health first produced documents that revealed the viability of causes of action against Pharma Defendants.

Fraudulent concealment, an equitable doctrine, "tolls the statute of limitations where a defendant conceals his unlawful conduct either by (1) failing to disclose his wrongful conduct when there is a duty to disclose, or (2) by lying about his conduct."  *Vernon v. City of Dallas*, No. 3:08-cv-1068-B, 2009 WL 2486033, at *5 (N.D. Tex. Aug. 13, 2009) (citing *Timberlake v. A.H. Robins Co.,* 727 F.2d 1363, 1366 (5th Cir. 1984)).   A plaintiff must plead the fraudulent concealment doctrine.  *King v. Hood*, 806 F. App'x 339, 340 (5th Cir. 2020) (per curiam);  *Vernon*, 2009 WL 2486033, at *5.  Further, fraudulent concealment "does not apply to concealment of a wrongdoer's identity," but applies only when "the wrongdoer fraudulently conceals the plaintiff's cause of action."  *Baxter v. Gardere Wynne Sewell LLP*, 182 S.W.3d 460, 464 (Tex. App.—Dallas 2006, pet. denied) (doctrine of fraudulent concealment did not toll running of statute of limitations when appellants were aware of their cause of action, but unaware of all the potential defendants).

Here, the FAC includes no allegations to put Pharmacy Defendants on notice that United intends to assert fraudulent concealment as an affirmative defense in avoidance of the statute of limitations.  Because United has not pleaded fraudulent concealment, Pharma Defendants' motion to dismiss the negligent misrepresentation, money had and received, and unjust enrichment claims against them should be granted.

b.  Fraudulent Transfer

Entity Defendant move for dismissal of United's TUFTA claims against them, asserting the claims are untimely and the allegations are insufficient.

i.   *Timeliness*

Entity Defendants assert that United's TUFTA claims are subject to its four-year statute of repose and, therefore, United cannot rely on the discovery rule to revive stale claims.  United responds that, because it filed its motion for leave to amend and add the fraudulent transfer claims on September 30, 2019, claims based on transfers on or after September 30, 2015 are timely.   The Court agrees.

TUFTA contains the following statute of repose:

Except as provided by Subsection (b) of this section, a cause of action with respect to a fraudulent transfer or obligation under this chapter is extinguished unless action is brought: (1) under Section 24.005(a)(1) of this code, within four years after the transfer was made or the obligation was incurred or, if later, within one year after the transfer or obligation was or could reasonably have been discovered by the claimant; (2) under Section 24.005(a)(2) or 24.006(a) of this code, within four years after the transfer was made or the obligation was incurred; or (3) under Section 24.006(b) of this code, within one year after the transfer was made.

TEX. BUS. & COM. CODE ANN. § 24.010(a).  Because United filed its motion for leave to amend and add the fraudulent transfer claims on September 30, 2019, its TUFTA claims against Entity Defendants based on transfers on or after September 30, 2015, all within four years before the filing, are timely.

ii.   *Adequacy of Fraudulent Transfer Allegations*

Entity Defendants, like Executive Defendants, contend United fails to describe with any specificity the transfers that allegedly were fraudulent, including the dates, amounts, or the parties involved in each transfer.  As discussed above, because United does not adequately identify the transfers it alleges are actionable, the Court finds its TUFTA claims against Entity Defendants also should be dismissed.

CONCLUSION

For the foregoing reasons, the motions to dismiss filed by Executive Defendants (Docs. 398, 401, 404, 407, 411, 416, 419, 422, and 427) and Entity Defendants (Doc. 418) are **GRANTED in part** and **DENIED in part**.

Executive Defendants' motions to dismiss United's claims against them for (1) fraud and fraudulent nondisclosure (Count 1), (2) conspiracy to commit fraud (Count 2), and (3) violations of 18 U.S.C. § 1962(c) (Count 12) are **DENIED**.  Executive Defendants' motion to dismiss United's claims against them for fraudulent transfers (Count 11) is **GRANTED**.

Pharma Defendants' motion to dismiss United's claims against them for fraud and fraudulent nondisclosure (Count 1) and sham to perpetuate fraud (Count 7) is **DENIED**.  Pharma Defendants' motion to dismiss United's claims against them for negligent misrepresentation (Count 3), money had and received (Count 4), and unjust enrichment (Count 5) is **GRANTED**.

Entity Defendants' motion to dismiss United's claims against them for fraudulent transfers (Count 11) is **GRANTED**.

Accordingly, it is **ORDERED** that United's claims against Pharma Defendants for negligent misrepresentation (Count 3), money had and received (Count 4), and unjust enrichment (Count 5) are DISMISSED.  It is further **ORDERED** that United's claims against Executive Defendants and Entity Defendants for fraudulent transfers (Count 11) are DISMISSED.

United did not alternatively request leave to amend in its responses to the motion to dismiss, but the Court ordinarily permits a plaintiff one opportunity to replead following a first motion to dismiss.  *See Great Plains Trust, Co. v. Morgan Stanley Dean Witter and Co.*, 313 F.3d 305, 329 (5th Cir. 2002).  Accordingly, if United can, in good faith, replead the dismissed claims

36

to state claims upon which relief can be granted, it may do so on or before March 19, 2021.

Otherwise, disposition of the claims will be converted into dismissal with prejudice.

SO **ORDERED**; signed February 26, 2021.

ADA BROWN
UNITED STATES DISTRICT JUDGE

37